No. 25-3828

# In the United States Court of Appeals for the Ninth Circuit

CULTURE OF LIFE FAMILY SERVICES, INC.,
Plaintiff-Appellant,
v.

ROB BONTA, in his official capacity as
the California Attorney General
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of California
Honorable Gonzalo P. Curiel
(3:24-cv-01338-GPC)

## OPENING BRIEF OF PLAINTIFF-APPELLANT

CHARLES S. LIMANDRI
PAUL M. JONNA
JEFFREY M. TRISSELL
**LiMANDRI & JONNA LLP**
Post Office Box 9120
Rancho Santa Fe, CA 92067
(858) 759-9930

PETER BREEN
MICHAEL MCHALE
CHRISTOPHER J.F. GALIARDO
**THOMAS MORE SOCIETY**
309 W. Washington St., Ste. 1250
Chicago, IL 60606
(312) 782-1680
*pbreen@thomasmoresociety.org*

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff Culture of Life Family Services, Inc., issues no stock and has no parent corporation.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES ............................................................. 2

PERTINENT STATUTES ...................................................................... 5

STATEMENT OF THE CASE ................................................................ 6

    A. Culture of Life Family Services, Inc. ("COLFS") ............................ 6

    B. The "Abortion Pill" ................................................................... 6

    C. The "Abortion Pill Reversal" Medical Protocol ............................. 9

    D. The Abortion Pill Rescue Network .......................................... 12

    E. The Legal Fights over Abortion Pill Reversal ............................. 13

    F. Defendant Bonta's Attack on Pro-Life Viewpoints ...................... 19

    G. The Nature of Defendant Bonta's Attack .................................. 21

    H. The Present Action Seeking Pre-Enforcement Relief ................... 22

STANDARD OF REVIEW .................................................................... 26

SUMMARY OF ARGUMENT ............................................................... 27

ARGUMENT ...................................................................................... 30

    I. COLFS is Likely to Succeed on the Merits of Its Claims. ............. 30

    A. Applying the UCL and FAL to COLFS's Speech About APR
        Triggers Strict Scrutiny Under the Free Speech Clause. ......... 30

        1. Defendant Bonta's application of the UCL and FAL to pro-
            APR speech discriminates based on content and viewpoint. 31

        2. COLFS's pro-APR speech is not commercial speech. ........... 34

ii

3. Even if COLFS's pro-APR Speech Were Commercial, It Still Would Be Protected.................................................... 37

B. Defendant Bonta's Restrictions on APR Speech Also Trigger Strict Scrutiny Under the Free Exercise Clause...................... 47

1. The Challenged Restrictions Are Not Generally Applicable....
........................................................................ 49

C. Applying the UCL and FAL to COLFS's Provision of APR Triggers Strict Scrutiny Under Substantive Due Process........ 54

1. Legal Background on the Right of Procreation. .................. 54

2. Application of the Substantive Due Process Principles. ....... 55

D. Bonta's Attack on pro-APR Speech Cannot Survive Any Level of Review. .............................................................. 56

1. Bonta's Speech Restrictions Easily Fails Strict Scrutiny. ... 56

2. Bonta Also Fails Intermediate Scrutiny. ......................... 59

II. The Other Injunction Factors Favor COLFS................................ 61

CONCLUSION ............................................................... 62

STATEMENT OF RELATED CASES ....................................... 63

CERTIFICATE OF WORD COUNT ........................................ 64

CERTIFICATE OF SERVICE............................................... 65

iii

# TABLE OF AUTHORITIES

## Cases

*Adams v. County of Sacramento*, --- F.4th ---, 2024 WL 6076549 (July 9, 2025) .................................................................................. 40

*Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416 (1983) ........... 64

*All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507 (N.D. Tex. 2023) .................................................................................. 15

*All-Options, Inc. v. Att'y Gen. of Ind.*, 546 F. Supp. 3d 754 (S.D. Ind. 2021) ................................................................................ 23

*Am. Beverage Ass'n v. San Francisco*, 916 F.3d 749 (9th Cir. 2019) (en banc) ................................................................................ 55

*Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134 (D.N.D. 2019) ........ 23

*Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ................... 33

*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) ........... 42

*Bacon v. Woodward*, 104 F.4th 744 (9th Cir. 2024) ............................... 56

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ..................................... 69

*Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189 (D. Colo. 2023) ............................................................................ 16, 24, 61

*Berea Coll. v. Kentucky*, 211 U.S. 45 (1908) (Harlan, J., dissenting) ...... 62

*Bernardo v. Planned Parenthood Fed. of America*, 9 Cal. Rptr. 3d 197 (Cal. Ct. App. 2004) ........................................................... 49

*Bolger v. Youngs Drugs Prod. Corp.*, 463 U.S. 60 (1983) ................ *passim*

*Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011) ...................... 65, 66

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022) ........................................................... 39

*Cal. Med. Ass'n, Inc. v. Univ. of Cal.*, 79 Cal. App. 4th 542 (2000) .......... 57

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ...................................................................... 57, 58, 61

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980) .................................................... 46, 51, 66, 69

*Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) ........................................................................ 37, 61, 66

*Counterman v. Colorado*, 600 U.S. 66 (2023) .................................. 48, 50

*Cruzan v. Mo. Dep't of Health*, 497 U.S. 261 (1990) .......................... 63, 64

*Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir. 1988) ..................... 34

iv

*Dep't of State v. Muñoz*, 602 U.S 899 (2024) .......................................... 63

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) .... 40, 53, 63

*Doe v. Bolton*, 410 U.S. 179 (1973) ......................................................... 63

*Does 1-11 v. Univ. of Colo.*, 100 F.4th 1251 (10th Cir. 2024) ................ 38

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) .................................... 37, 63, 64

*Emp. Div. v. Smith*, 494 U.S. 872 (1990) ................................................. 56

*Farrington v. Tokushige*, 11 F.2d 710 (9th Cir. 1926) ............................. 62

*Fellowship of Christian Athletes  San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) ............................................... *passim*

*First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017) ............. 44, 45

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. ___, 2025 WL 1773625 (U.S. June 27, 2025) ................................................................... 41, 65

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ............................... 58

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101 (4th Cir. 2018) ............................................ 43, 45

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ................................... 62, 63

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003) ..................................................................................................... 50

*Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023) ... 67, 69

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) .......................... 56

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018) (Gorsuch, J., concurring) ........................................................................ 59

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........................................ 35, 41

*Meinecke v. City of Seattle*, 99 F.4th 514 (9th Cir. 2024) ....................... 34

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ................................................. 62

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ............................... 36

*Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092 (1988) ................................ 57

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ..................................... 41

*Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943) . 35, 43, 44, 45

*Nat'l Inst. of Family and Life Advocs. v. Becerra*, 585 U.S. 755, 756 (2018) ................................................................... 39, 50, 55, 68

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ........................... 39

*NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) .......... 43, 54, 67

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013) ................................................................................................. *passim*

*Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986) ....... 41

*Pacira BioSciences, Inc. v. Am. Soc. of Anesthesiologists, Inc.*, 63 F.4th 240 (3d Cir. 2023) .................................................................. 48

*Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875 (9th Cir. 1987) ................................................................................. 57

*People ex rel. Bonta v. Johnson & Johnson*, 77 Cal. App. 5th 295, 318 (2022) ......................................................................................... 29

*People of the State of Cal. ex rel. Bonta v. Heartbeat Int'l & RealOptions*, No. 23-cv-44940 (Cal. Super. Ct., Alameda Cnty., Sep. 21, 2023) ....... 28

*Planned Parenthood Ariz, Inc. v. Brnovich*, 172 F. Supp. 3d 1075 (D. Ariz. 2016) ................................................................................. 22

*Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905 (9th Cir. 2014) ...................................................................................................... 64

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .................................. 39

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................... 39, 40

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ........ 43

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ........... 69

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) ...................................... 63

*Snyder v. Phelps*, 562 U.S. 443 (2011) ....................................... 40, 54

*Soos v. Cuomo*, 470 F. Supp. 3d 268 (N.D.N.Y. 2020) ......................... 59

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................... *passim*

*Tandon v. Newsom*, 593 U.S. 61 (2021) ...................................... 56, 58

*Thomas v. Rev. Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707 (1981) .... 65

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ....................... 68

*Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ...................... 48

*United States v. Alvarez*, 567 U.S. 709 (2012) ................................. 41

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) ................... 67, 68

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025) (Thomas, J., concurring) ................................................................................. 53

*Waln v. Dysart Sch. Dist.*, 54 F.4th 1152 (9th Cir. 2022) ..................... 56

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ................................ 62

*Whalen v. Roe*, 429 U.S. 589 (1977) ............................................. 63

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ........................... 34

*X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024) ................................ 42

*Yim v. Seattle*, 63 F.4th 783 (9th Cir. 2023) ................................ 67, 68

*Zauderer v. of Disciplinary Counsel of of Ohio*, 471 U.S. 626 (1985)..41, 54, 55

**Statutes**

2022 Cal. Stat., ch. 627.................................................................27
28 U.S.C. § 1292(a)(1)...................................................................9
28 U.S.C. § 1331............................................................................9
28 U.S.C. § 1343............................................................................9
42 U.S.C. § 1983............................................................................9
Ariz. Rev. Stat. § 36-2153(A)(1)(h)............................................22
Ariz. Rev. Stat. § 36-2153(B)......................................................22
Ark. Code § 20-16-1703(b)(9)......................................................22
Cal. Bus. & Prof. Code § 17200..................................................28
Cal. Bus. & Prof. Code § 17500...........................................28, 29
Cal. Bus. & Prof. Code § 17506..................................................57
Cal. Bus. & Prof. Code 17201......................................................57
Cal. Bus. & Prof. Code 17206(a).................................................29
Cal. Gov. Code § 811.2.................................................................57
Colo. Rev. Stat. § 12-30-120(2)(a)...............................................23
Idaho Code § 18-609(f).................................................................22
Ind. Code § 16-34-2-1(a)(1)(E)....................................................23
Kan. Stat. § 65-6716(b)................................................................23
Ky. Rev. Stat. § 311.774(2)..........................................................23
La. Stat. § 40:1061.11.1................................................................23
Mont. Code § 50-20-707(5)(f).......................................................23
N.D. Cent. Code § 14-02.1-02(11)(b)(5)......................................22
Okla. Stat. tit. 63, § 1-756(B)(1).................................................23
S.D. Codified Laws § 34-23A-10.1(1)(h).....................................22
Tenn. Code § 39-15-218(e)...........................................................23
U.S. Const. amend. XIV, § 1.......................................................62
Utah Code § 76-7-305(2)(a)(i)(D)................................................22
W. Va. Code § 16-2I-2(a)(4).........................................................23

**Other Authorities**

1 Annals of Congress 455 (June 8, 1789) (James Madison)....................62

Amanda Marcotte, *The Newest Crisis Pregnancy Center Offer: "Abortion Reversals,"* Slate (Dec. 8, 2014) ............................................. 24

Cath. Med. Ass'n, *The Lincare Quarterly*, https://www.cathmed.org/the-linacre-quarterly/ ..................................................................... 20

Clarke D. Forsythe & Donna Harrison, *State Regulation of Chemical Abortion After Dobbs*, 16 Liberty U. L. Rev. 377 (2022) ....................... 22

Daniel Grossman, et al., *Continuing Pregnancy After Mifepristone and "Reversal" of First-Trimester Medical Abortion: A Systematic Review*, 92 Contraception 206 (2015) ................................................ 24

Declaration of Mary Davenport, M.D., *Planned Parenthood Ariz., Inc. v. Brnovich*, No. 2:15-cv-01022 (July 30, 2015), ECF No. 60-2 ................ 22

Ethics & Public Policy Center, "Largest-Ever Study of Abortion Pill Reveals Shocking Number of Adverse Events," April 28, 2025........... 47

Étienne-Émile Baulieu, *RU 486: An Antiprogestin Steroid with Contragestive Activity in Women, in* The Antiprogestin Steroid RU486 and Human Fertility Control (Baulieu & Segal eds., 1985) .......... 16, 17

FDA, Mifeprex Drug Approval Package, *Pharmacology Review(s)* 16-17 (Sept. 28, 2000) ............................................................... 17

FDA, *Mifepristone U.S. Post-Marketing Adverse Events Summary Through 12/31/2024* (Jan. 17, 2025) .................................... 28

FDA, Warning Letter to Mitchell D. Creinin, MD (June 12, 2002) ....... 32

Florida Planned Parenthood, Get Care, "Abortion Care," Medication Abortion ............................................................................ 47

George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21 (2018) ........................................................................... 20

*Hearing on SB230190: Deceptive Trade Practice Pregnancy-related Service,* Colorado House Judiciary Committee (Mar. 28, 2023)........... 26

Issues in Law & Med., *About*, https://issuesinlawandmedicine.com/about/ ....................................... 20

Kristen Hwang, *How California Created the Nation's Easiest Abortion Access—and Then Went Further*, Cal Matters (Apr. 21, 2022)........... 27

Mara Gordon, *Controversial 'Abortion Reversal' Regimen Is Put to the Test*, NPR (Mar. 22, 2019) ................................................. 25

Mary L. Davenport, et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32 Issues L. & Med. 3 (2017) .... 24

*Mifeprex Label*, Initial U.S. Approval: 2000............................................60

Mitchell D. Creinin, et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstet. Gynecol. 158 (2020) ..........................................25, 26

Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395 (2023)....................20, 51

Planned Parenthood First Ave. Fam. Planning Michelle Wagner Ctr., *Abortion in San Diego, CA: Medication Abortion/Abortion Pill*, https://tinyurl.com/4ftt3dt ....................................................................59

Pope John Paul II, Motu Proprio *Dolentium Hominum* (Feb. 11, 1985) . 14

R.A. Fisher, *Statistical Methods for Research Workers* (7th ed. 1938) ..25

Simon Caldwell, *GMC Drops Restrictions Against Catholic Doctor Who Helped Women to 'Reverse Abortions'*, Cath. Herald (Mar. 7, 2022) ...23

The Federalist No. 84 (Clinton Rossiter ed. 1961) (Hamilton) ...............62

Univ. Cal. Davis, *Blocking Mifepristone Action with Progesterone*, Clinical Trial No. NCT03774745 (Dec. 11, 2018) ..................................25

Zheng Shu-Rong, *RU 486 (Mifepristone): Clinical Trials in China*, 68 Acta Obstetricia et Gynecologica Scandinavica S.149 (1989).............24

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 with respect to Plaintiff Culture of Life Family Services's ("COLFS's") 42 U.S.C. § 1983 claims for violation of the First and Fourteenth Amendments. On June 13, 2025, the district court (1) denied COLFS's motion for a preliminary injunction and (2) granted in part and denied in part Defendant Attorney General Bonta's motion to dismiss. 1-ER-2-31; 1-ER-32-67. On June 17, 2025, COLFS timely filed its notice of appeal from those orders. 6-ER-1119-1120. This Court thus has jurisdiction over the appeal of the denial of COLFS's motion for preliminary injunction under 28 U.S.C. § 1292(a)(1), and it has pendent appellate jurisdiction over the appeal of the partial grant and partial denial of the motion to dismiss.

## STATEMENT OF THE ISSUES

In the aftermath of *Dobbs*, California Attorney General Rob Bonta launched an aggressive campaign to silence pro-life voices offering alternatives to abortion. His primary target: pregnancy help clinics like COLFS that inform women about "abortion pill reversal" ("APR")—a legal progesterone treatment that can help women who regret taking mifepristone and want to save their pregnancies.

Despite receiving zero consumer complaints about APR and presenting no evidence of patient harm, Bonta wielded California's commercial fraud statutes as a weapon to censor speech he ideologically opposes. Meanwhile, he turns a blind eye to demonstrably false claims by abortion providers. This selective enforcement transforms ostensibly neutral business deception laws into a content-based censorship regime that punishes religiously motivated speech while protecting secular allies.

The district court discussed the science on APR in detail, credited both sides' experts, and weighed their respective studies and views. It found no lack of good faith or any intent to deceive by COLFS. The court opined that "the science here is unclear" regarding APR's mechanism and effectiveness.

Faced with a genuine ongoing scientific debate, an issue of significant public concern, and a well-intentioned noncommercial speaker, the district court was bound to apply heightened scrutiny under the First Amendment and halt the government's attempts at censorship. Instead,

the district court decided the public debate, declared COLFS's speech to be false, misleading, and commercial, and approved Bonta's efforts to silence the pro-life viewpoint on APR.

The issues on appeal are as follows:

Issue 1: Whether COLFS, a Catholic nonprofit health clinic serving women regardless of ability to pay, is likely to succeed on its Free Speech claim that Bonta's one-sided APR censorship discriminates based on content and viewpoint and thus triggers strict scrutiny, including:

(a) whether COLFS's pro-APR statements are commercial speech; and

(b) even if they are, whether the "breathing space" required by the First Amendment for speech on a matter of public concern in an ongoing, peer-reviewed scientific debate about APR forbids Bonta from enforcing strict-liability commercial fraud statutes against COLFS's pro-APR speech.

Issue 2: Whether COLFS is likely to succeed on its Free Exercise of Religion claim that Bonta's censorship is not a generally applicable burden on COLFS's religiously motivated speech about APR.

Issue 3: Whether COLFS is likely to succeed on its Substantive Due Process claim that Bonta is violating patients' fundamental right to choose legal medical care in furtherance of the protected choice to "beget a child."

3

Issue 4: Whether Bonta's censorship can survive any level of consti-tutional scrutiny.

Issue 5: Whether a preliminary injunction should issue to prevent irreparable harm and further the public interest, particularly in the absence of any consumer complaints about APR.

## PERTINENT STATUTES

Pertinent statutes are attached as an addendum to this brief.

## STATEMENT OF THE CASE

### A. Culture of Life Family Services, Inc. ("COLFS")

COLFS is a Catholic nonprofit and state-licensed community health clinic, 6-ER-944 (Verified Complaint), inspired by the Catholic Church's "integral . . . mission" of "service to the sick and suffering." Pope John Paul II, Motu Proprio *Dolentium Hominum*, ¶1 (Feb. 11, 1985). COLFS's primary mission "is to ensure that Christ-centered medical care and pregnancy clinic services are available to all women regardless of ability to pay," including "access to Abortion Pill Reversal for women who have regret after starting a medication-induced abortion." 6-ER-944 (quoting website). Guided by "faith and . . . traditional Christian ethics," COLFS "is committed to providing compassionate care that aligns with these principles, ensuring that [its] patients receive respectful and dignified treatment throughout their healthcare journey." 6-ER-944 (quoting website); *see* 5-ER-792 (declaration of CEO William Goyette); 2-ER-318 (declaration of Medical Director George Delgado).

### B. The "Abortion Pill"

When a woman becomes pregnant, her ovary forms a structure known as the corpus luteum, which secretes progesterone. Progesterone is essential for sustaining pregnancy; it prepares and maintains the

uterine lining and stimulates the production of nutrients required by the developing embryo. 6-ER-944-945.[1]

In the 1980s, the French pharmaceutical company Roussel Uclaf S.A. developed RU-486, an antiprogestin that outcompetes progesterone at binding sites on a pregnant woman's progesterone receptors and thereby "halts nutrition, and ultimately starves the unborn human until death." *All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507, 520 (N.D. Tex. 2023) ("*All. for Hippocratic Med. I*"), *rev'd on standing grounds*, 602 U.S. 367 (2024). 6-ER-945.

In the mid-1990's, the Clinton Administration worked with Roussel Uclaf S.A. to bring RU-486 to the U.S. market. As part of the effort, Roussel Uclaf S.A. donated the drug to the Population Council, a nonprofit that then submitted a new drug application to the FDA under the generic name mifepristone and the brand name Mifeprex as part of a two-drug regimen to induce abortion. 6-ER-945.

As the FDA explained:

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination

---

[1] The Complaint was verified by both Mr. Goyette and Dr. Delgado, with the medical information authenticated by Dr. Delgado. *See* 6-ER-983-984.

> of an intrauterine pregnancy. During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity of prostaglandins.

5-ER-906 (quoting *Label for Mifeprex (mifepristone) Tablets*, FDA (rev. Mar. 2016)).

Mifepristone alone "is not fully effective in aborting an embryo," though scientists debate its standalone effectiveness. 6-ER-945 (quoting *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1197 (D. Colo. 2023)). So patients follow mifepristone with a second drug—misoprostol—within one to two days to "dilate[] the cervix and induce[] muscle contractions," to complete the abortion. 6-ER-945 (quoting *Bella Health*, 699 F. Supp. 3d at 1197). In combination, the two-drug regimen terminates roughly 97% of early-term pregnancies. 6-ER-945.

Mifepristone was developed as an abortifacient because of its ability to compete with progesterone at the receptor level. Early in vitro animal studies showed that increased progesterone concentrations could displace mifepristone from the progesterone receptor, leading the drug's inventor to conclude that it acts "reversibly." 6-ER-945 (quoting Étienne-Émile Baulieu, *RU 486: An Antiprogestin Steroid with Contragestive Activity in Women, in* The Antiprogestin Steroid RU486 and Human Fertility Control 1 (Baulieu & Segal eds., 1985)). Dr. Baulieu reported that, for up to 49 days gestation, mifepristone alone had a 70% completed abortion rate, 20% incomplete abortion rate (residual tissue), and 10% fetal survival rate. For up to 70 days gestation, mifepristone alone had a

50% completed abortion rate, 35% incomplete abortion rate, and 15% fetal survival rate. (Baulieu, *supra*, p.24.)[2]

In 2000, the FDA approved mifepristone tablets under the brand name Mifeprex for chemical abortions up to seven weeks' gestation. 6-ER-946. Based on its own pharmacological review that included animal studies, the FDA similarly concluded that "the abortifacient activity of RU-486 is antagonized by progesterone *allowing for normal pregnancy and delivery*." 6-ER-946 (quoting FDA, Mifeprex Drug Approval Package, *Pharmacology Review(s)* 16-17 (Sept. 28, 2000)); 2-ER-305-306) (emphasis added). That is, the FDA independently confirmed that progesterone can reverse the effects of mifepristone and restore the hormonal conditions necessary for fetal survival.

Notably, since the FDA has never approved misoprostol for abortion, its use for that purpose remains "off-label." 6-ER-946. Today, mifepristone is the only product owned, manufactured, or distributed by a company called Danco Laboratories. 6-ER-953.

## C. The "Abortion Pill Reversal" Medical Protocol

Many women regret having taken mifepristone, with some reporting they were coerced into taking it. 6-ER-946-947. To help one of these women who sought his care, and relying on animal studies that suggested progesterone could reverse the effects of mifepristone, 6-ER-945; *see also*

---

[2] *See* Scott Veale, *Étienne-Émile Baulieu, Who Developed the Abortion Pill, Dies at 98*, New York Times (May 31, 2025).

6-ER-948-949; 5-ER-910-912, Dr. Matthew Harrison in 2006 made the first known attempt to use bioidentical progesterone to reverse the effects of mifepristone in a human. His patient delivered a healthy baby girl. 6-ER-947. Two years later, COLFS's medical director Dr. George Delgado helped another women in a similar situation save her own baby by referring her to a local physician for progesterone supplementation. 2-ER-319-320.

These early successes prompted a case series published in 2012 in which Dr. Delgado and Dr. Mary Davenport found that four of six women who received progesterone supplementation after ingesting mifepristone delivered healthy babies. 2-ER-320; 3-ER-380-383. Dr. Delgado inferred from the high fetal survival rate—67% compared to 10-15% in early mifepristone studies—that progesterone appeared to reverse the effects of mifepristone in humans, as it does in animals. So, he proposed a treatment protocol using supplemental progesterone called "Abortion Pill Reversal" or "APR." 6-ER-947; 3-ER-382.

APR is grounded in the understanding that mifepristone binds to uterine progesterone receptors twice as aggressively as progesterone does, but not irreversibly. 6-ER-947. Therefore, by adding more progesterone substrate, mifepristone's effect as a competitive inhibitor can be counteracted. 6-ER-947. Nearly a decade ago, Dr. Harvey Kliman, the director of the reproductive and placental research unit at the Yale School of Medicine, told the *New York Times* that APR's theory "makes

10

biological sense." He added that if one of his daughters accidentally took mifepristone during pregnancy, he "would tell her to take 200 milligrams of progesterone three times a day for several days, just long enough for the mifepristone to leave her system," concluding, "'I bet you it would work.'" 6-ER-950.

Since then, higher grades of evidence have joined thousands of APR successes in clinical practice worldwide. 6-ER-947; 6-ER-968. Several case series published in peer-reviewed journals have found higher fetal survival rates with APR as compared to no intervention after a woman ingests mifepristone. 6-ER-949 (discussing 2017 case series with 3 patients; 2/3 success rate; and 2023 case series with 6 patients, 5/6 success rate). The largest case series, published in 2018, found fetal survival rates of 64% and 68%, respectively, when 547 women who received APR within 72 hours of mifepristone were stratified by treatment method.[3] Women who received progesterone intramuscularly had a fetal survival rate of 64% (80/125), and those who received a high initial dose of oral progesterone followed by daily oral progesterone in the first trimester had a fetal survival rate of 68% (21/31). No adverse health events for the mothers were reported, and the birth defect rate was lower than that in the general population. The authors concluded that the intramuscular and oral protocols represented viable APR treatment methods. 6-ER-949-950; 3-ER-385-395; George Delgado, et al., *A Case Series Detailing the*

---

[3] 207 women from the initial 754 were excluded for control purposes.

*Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 27 & tbl.1 (2018).[4]

Most recently, a July 2023 scoping review of the existing scientific literature concluded there is "no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy," and "mifepristone antagonization with progesterone is a safe and effective treatment." 6-ER-950 (quoting Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395, 402 (2023).)[5] APR is publicly endorsed by the American Association of Pro-Life Obstetricians & Gynecologists (over 7,000 members), the Catholic Medical Association (2,500 members), and Canadian Physicians for Life (2,500 members). 6-ER-950.

### D. The Abortion Pill Rescue Network

In 2012, following peer-review and publication of his initial six-patient case series, Dr. Delgado created a website and hotline to provide women with information about APR and to connect them, if they desired, to a local physician. He called it the APR Network. 6-ER-947; 6-ER-951; 2-ER-320. This network was not a standalone incorporated entity, but

---

[4] "*Issues in Law & Medicine* is a peer reviewed medical and legal professional journal published semiannually . . . by the National Legal Center for the Medically Dependent & Disabled." Issues in Law & Med., *About*, https://issuesinlawandmedicine.com/about/.

[5] *The Linacre Quarterly* is the peer-reviewed official journal of the Catholic Medical Association. Cath. Med. Ass'n, *The Lincare Quarterly*, https://www.cathmed.org/the-linacre-quarterly/.

rather a program undertaken by COLFS. 2-ER-320.

In April 2018, following peer-review and publication of his much larger case series, Dr. Delgado recognized the APR Network would soon outgrow his small clinic. To support its expansion and raise public awareness of APR, COLFS transferred it to a nationwide pro-life nonprofit, Heartbeat International, for $1. 6-ER-951; 2-ER-321-322. Heartbeat then incorporated it as wholly owned subsidiary "Abortion Pill Rescue Network, LLC," 2-ER-321-322; 2-ER-331, and began offering state-certified continuing education courses on the APR protocol for nurses.[6]

Since 2012, the Abortion Pill Rescue Network has confirmed that more than a thousand of its APR patients have delivered their babies. Applying fetal survival rates the larger Delgado case series found, Heartbeat estimates that 4,000 APR patients who have not reported their results also had continuing pregnancies. And APR has presumably saved more lives via physicians unaffiliated with the Rescue Network. 6-ER-952.

### E. The Legal Fights over Abortion Pill Reversal

Following APR's initial development, several states began to require that information about reversal be included in the informed consent process for elective abortion. *See* Clarke D. Forsythe & Donna Harrison, *State*

---

[6] Heartbeat is a registered as a continuing education provider with the California Board of Registered Nursing for its APR courses; it is industry practice to register in California since most states accept California's continuing education credits for nurses. 6-ER-951.

13

*Regulation of Chemical Abortion After Dobbs*, 16 Liberty U. L. Rev. 377, 406-08 (2022). Arizona, Arkansas, and South Dakota enacted measures in 2015 and 2016 on the strength of the existing six-patient case series. *See* Ariz. Rev. Stat. § 36-2153(A)(1)(h) (eff. July 3, 2015); Ark. Code § 20-16-1703(b)(9) (eff. July 22, 2015); S.D. Codified Laws § 34-23A-10.1(1)(h) (eff. July 1, 2016).

Arkansas's and South Dakota's informed consent statutes went unchallenged, but Planned Parenthood sued over Arizona's requirement. Arizona primarily defended its requirement by offering expert testimony on mifepristone's mechanism of action and APR's biochemical basis. *See* Declaration of Mary Davenport, M.D., *Planned Parenthood Ariz., Inc. v. Brnovich*, No. 2:15-cv-01022 (July 30, 2015), ECF No. 60-2. Once Planned Parenthood survived a motion to dismiss, however, Arizona modified the statute to require only that abortion clinic staff "inform the woman that the use of mifepristone alone to end a pregnancy is not always effective and that she should immediately consult a physician if she would like more information." Ariz. Rev. Stat. § 36-2153(B) (eff. May 17, 2016); *see Planned Parenthood Ariz, Inc. v. Brnovich*, 172 F. Supp. 3d 1075 (D. Ariz. 2016).

After Dr. Delgado's much larger 2018 case series, several additional states enacted similar informed-consent statutes. *See, e.g.*, Utah Code § 76-7-305(2)(a)(i)(D) (eff. May 8, 2018); Idaho Code § 18-609(f) (eff. July 1, 2018); N.D. Cent. Code § 14-02.1-02(11)(b)(5) (eff. Mar. 22, 2019); Ky.

14

Rev. Stat. § 311.774(2) (eff. June 27, 2019); Neb. Rev. Stat. § 28-327(1)(e) (eff. Sep. 1, 2019); Okla. Stat. tit. 63, § 1-756(B)(1) (eff. Nov. 1, 2019); Tenn. Code § 39-15-218(e) (eff. July 13, 2020); Ind. Code § 16-34-2-1(a)(1)(E) (eff. July 1, 2021); W. Va. Code § 16-2I-2(a)(4) (eff. July 9, 2021); La. Stat. § 40:1061.11.1 (eff. Aug. 1, 2021); Mont. Code § 50-20-707(5)(f) (eff. Oct. 1, 2021); Kan. Stat. § 65-6716(b) (eff. July 1, 2023). When abortion providers challenged some of those statutes, federal district courts enjoined several of them (though never permanently) as impermissibly compelling speech. *See, e.g.*, *Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134 (D.N.D. 2019); *All-Options, Inc. v. Att'y Gen. of Ind.*, 546 F. Supp. 3d 754 (S.D. Ind. 2021).

Meanwhile, abortion activists mounted a broad international pressure campaign to restrict APR. Licensing boards and legislatures quickly caved. In 2016, the California Board of Registered Nursing audited Heartbeat's outlines and instructor résumés for all continuing education courses concerning APR. 6-ER-951. In 2021, the United Kingdom's General Medical Council barred two physicians from providing APR for years before dropping an investigation spurred by an abortion provider's complaint. *See* Simon Caldwell, *GMC Drops Restrictions Against Catholic Doctor Who Helped Women to 'Reverse Abortions'*, Cath. Herald (Mar. 7, 2022). In 2023, Colorado enacted a statute branding APR as unprofessional conduct unless the state medical, pharmacy, and nursing boards *all* certified it as a generally accepted standard of practice. Colo. Rev. Stat. § 12-30-120(2)(a) (eff. Apr. 14, 2023)*, enjoined by Bella Health &*

15

*Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212 (D. Colo. 2023).

Critics first attacked APR's effectiveness, citing a review of thirteen studies that found 8-46% fetal survival after mifepristone absent any later intervention. Daniel Grossman, et al., *Continuing Pregnancy After Mifepristone and "Reversal" of First-Trimester Medical Abortion: A Systematic Review*, 92 Contraception 206, 209 tbl.1 (2015). In other words, the very *highest* rate of fetal survival in any of the thirteen studies came close to the very *lowest* rate of fetal survival found in the stratified results of any route of progesterone administration in any APR study. But reanalysis of Grossman's data, excluding studies he had improperly included in violation of his own screening criteria, yielded an actual average fetal survival rate of 23.3%, well below APR study survival rates. 2-ER-320-321; Mary L. Davenport, et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32 Issues L. & Med. 3, 12 (2017); *see* Zheng Shu-Rong, *RU 486 (Mifepristone): Clinical Trials in China*, 68 Acta Obstetricia et Gynecologica Scandinavica S.149 (1989). Regardless, Grossman himself freely conceded that progesterone "probably won't hurt a woman if she's under medical supervision." Amanda Marcotte, *The Newest Crisis Pregnancy Center Offer: "Abortion Reversals,"* Slate (Dec. 8, 2014).

After reanalysis of Grossman's study suggested with near certainty that APR increases fetal survival rates, opponents then claimed that APR was unsafe. Those claims relied on an abandoned randomized control

16

trial run by Dr. Mitchell Creinin, a paid consultant for mifepristone's manufacturer and designed to undermine studies supporting APR effectiveness. 6-ER-953-954; Mara Gordon, *Controversial 'Abortion Reversal' Regimen Is Put to the Test*, NPR (Mar. 22, 2019).[7]

The methodological flaws of that trial were clear from its outset. The study was far too small to yield to measure the effect it sought to study. *See* Univ. Cal. Davis, *Blocking Mifepristone Action with Progesterone*, Clinical Trial No. NCT03774745 (Dec. 11, 2018); R.A. Fisher, *Statistical Methods for Research Workers* 100-02 (7th ed. 1938) (hypergeometric formula to compute p-values for small samples with known fixed-margins, yielding p=0.262 for Creinin study).[8] Confounding variables within that small group also abounded: number of prior abortions, age, body mass index, and others. And then two of the twelve women exited the study early. *See* Mitchell D. Creinin, et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstet. Gynecol. 158, 160, 162 & tbl. 1 (2020).

Even if one could set aside those fatal design defects, several of Creinin's findings actually *strengthened* the conclusion that APR is safe and effective. First, patients in the control and treatment groups did not

---

[7] https://www.npr.org/sections/health-shots/2019/03/22/688783130/controversial-abortion-reversal-regimen-is-put-to-the-test

[8] https://www.clinicaltrials.gov/study/NCT03774745

experience noticeably different rates of typical side effects. *Id.* at 162. Second, the rate of the *severe* side effect of heavy bleeding in the progesterone group was *half* the rate of the control group. Third, the fetal survival rate at the end of the study period in the progesterone group was *twice* the rate in the mifepristone-only control group. *Id.* at 160-61.[9]

Creinin abruptly ended his Danco-funded study after observing those inconvenient early pro-APR results, and claimed instead that his study showed APR is dangerous. *Id.* at 162. Bonta similarly claims (without evidence) that "APR can cause severe, life-threatening bleeding." 6-ER-1025. The available data instead shows that only *minor* adverse health events occur in about 1 in 200 APR patients.[10]

---

[9]One woman from the treatment group allegedly experienced what she considered severe bleeding but required no medical intervention. *Id.* a 160. Two women from the placebo group (i.e., who did not receive supplemental progesterone) experienced severe bleeding and needed medical intervention, *id.* at 160-61, including participant No. 10 (required surgical abortion) and No. 11 (required blood transfusion). *See* Appendix 1 to the Study, available at http://links.lww.com/AOG/B658.

[10] *See Hearing on SB230190: Deceptive Trade Practice Pregnancy-related Service,* Colorado House Judiciary Committee (Mar. 28, 2023) (Heartbeat reports that in "the last year there have been nine reports of adverse reactions and those were six cases of dizziness, one case of nausea, one case of heartburn, and one case of [] pain at an injection site"; "Now, that's nine cases out of an estimated 1,800 patients, which is adverse reaction rate of 0.005%"), https://sg001-harmony.sliq.net/00327/Harmony/en/PowerBrowser/
PowerBrowserV2/20241230/29/14431, at 8:07:44.

## F. Defendant Bonta's Attack on Pro-Life Viewpoints

After excoriating the Supreme Court about *Dobbs* in 2022, Bonta promised to use his power as attorney general to aggressively advance abortion rights. 6-ER-960; 6-ER-940. He created a new "Reproductive Justice Unit" within the Department of Justice and a statewide "Reproductive Rights Taskforce" to coordinate the unit's work with sympathetic local counsel across California. Despite California being one of the easiest places in America to get an abortion, he joined Governor Newsom to announce new abortion protections. 6-ER-961-962; *see* Kristen Hwang, *How California Created the Nation's Easiest Abortion Access—and Then Went Further*, Cal Matters (Apr. 21, 2022). And he sponsored a bill (since enacted) barring California agencies from cooperating with investigations by other States into illegal abortions. *See* 2022 Cal. Stat., ch. 627.

His abortion rights agenda also has targeted pro-life pregnancy help organizations like COLFS for harassment and lawfare because they offer abortion alternatives. What began weeks after *Dobbs* with an official AG "Consumer Alert" that these organizations do not provide abortions soon progressed into a website and hotline to collect complaints about them. 6-ER-940; 6-ER-1029-1052; 6-ER-960-961. When no one complained, he launched investigative demands at dozens of pro-life organizations, which after a year could find no actual wrongdoing. 6-ER-962-963.

19

After all this, Bonta's Reproductive Justice Unit filed a single lawsuit against pro-life organizations, in September 2023. 6-ER-963; 6-ER-93; 6-ER-986-1027; *People of the State of Cal. ex rel. Bonta v. Heartbeat Int'l & RealOptions*, No. 23-cv-44940 (Cal. Super. Ct., Alameda Cnty., Sep. 21, 2023).[11] That suit alleges that offering women information about APR violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, by. 6-ER-1025; 2-ER-177-178; 2-ER-196; 6-ER-1023-1025.

While vigorously prosecuting pro-life organizations for their speech, Bonta has not even hinted at addressing objectively false factual claims by abortion providers overstating the safety of chemical abortion. The FDA estimates that more than 4,200 women who completed the chemical abortion regimen have suffered adverse medical events, including at least 36 deaths. 6-ER-965; FDA, *Mifepristone U.S. Post-Marketing Adverse Events Summary Through 12/31/2024*, at 1-2 tbls.1-2 (Jan. 17, 2025).[12] Yet for years abortion providers in California have induced women into chemical abortions by falsely claiming without caveat that mifepristone "is a *safe and effective* way to end an early pregnancy." 6-ER-964. Adding misimpression to that falsehood, Planned Parenthood

---

[11] To be clear, although Bonta's team has not filed any other suit, it has urged the Ohio Attorney General to also sue Heartbeat, which is headquartered there, for informing women about APR. 6-ER-1023-1025. The Ohio Attorney General has so far declined the invitation.

[12] https://www.fda.gov/files/drugs/published/mifepristone_ttt_2022-2468_us_ae_summary_table_update_through_december_2024_final.pdf.

further promises its customers that any complications from mifepristone will be minor and of short duration: "cramping and bleeding that can last several hours or more. You can be at home, or wherever is comfortable for you. Plan on taking it easy for the day." 6-ER-965.

Even if Bonta's team had confined its efforts solely to false statements about APR, it would have found abortion providers guilty there. For example, Planned Parenthood asserts online that APR has never even "been tested for safety, effectiveness, or the likelihood of side effects"—a claim belied by dozens of peer-reviewed studies including the one on which Bonta relies in this case. 6-ER-964.

## G. The Nature of Defendant Bonta's Attack

Bonta does not seek restitution or damages in his suit, and he points to no women actually harmed by RealOptions's noncommercial APR services or actually misled by Heartbeat's noncommercial APR speech. He instead demands civil penalties of up to a ruinous $5,000 per incident. *See* 6-ER-1025-1026; Cal. Bus. & Prof. Code §§ 17206(a), 17500; *People ex rel. Bonta v. Johnson & Johnson*, 77 Cal. App. 5th 295, 318 (2022) ($2,500 fines under the UCL and FAL nonexclusive).

Bonta's civil enforcement action identifies several categories of allegedly fraudulent or misleading statements. *See* 6-ER-1025-1026; 5-ER-923. These include three categories of positive statements that: (1) APR is "effective" at "revers[ing]" a medical abortion, leading to thousands of lives saved; (2) the APR protocol has been shown to be 64-68% successful with

21

no evidence of an increased risk of birth defects; and (3) APR may still be effective in non-standard situations (such as more than 72-hours after taking mifepristone, or after taking misoprostol or methotrexate). He also faults the organizations for errors of omission—for *not* stating that APR may lead to life-threatening bleeding (which they believe to be false). 6-ER-1025-1026; 5-ER-923.

Bonta argues that the above categories of statements are fraudulent, when made during individual interactions with patients and "untrue and misleading" when posted on websites. 6-ER-1023-1024.

### H. The Present Action Seeking Pre-Enforcement Relief

COLFS has provided APR since 2008 and in recent years to roughly 10-30 women annually. 2-ER-319; 2-ER-324. To date, from its location in San Diego, it has personally coordinated approximately 100 confirmed pregnancies. 6-ER-952. In the process, as one mother recounts it, Dr. Delgado:

> explained the process of reversing the abortion pill using progesterone. I was skeptical, so I called Planned Parenthood for clarity. They were adamant: "The baby is probably already dead. If not, it will be severely disabled. Don't listen to anyone who tells you otherwise."
>
>  . . .
>
> Today, I'm grateful to Dr. Delgado and [COLFS]. They gave me a second chance I didn't think was possible. . . . Now, I'm the proud mother of an incredible son named Christian. My then boyfriend and I married in 2014, and we've built a beautiful life together, complete with two more children.

2-ER-336-337; *see also* 5-ER-838-839; 5-ER-853-855.

COLFS brought this pre-enforcement action on July 30, 2024, fearing Bonta would target it with a civil enforcement action like that against Heartbeat International and RealOptions, yet refusing to be bullied into not helping women. 6-ER-1076-1118. On November 12, 2024, the district court dismissed the original complaint with leave to amend and denied as moot COLFS's preliminary injunction motion. The court held COLFS had inadequately alleged that its speech about APR was sufficiently similar to that of RealOptions and Heartbeat International to justify pre-enforcement standing. 6-ER-1061-1075.

Three days later, COLFS filed its First Amended Complaint (verified by Dr. Delgado) and renewed its motion for a preliminary injunction. *See* 6-ER-937-1053; 5-ER-933. COLFS explained that, among other things, it has generic webpages which mention that "[t]he abortion pill can be reversed," along with "a detailed FAQ page describing much of the science underlying [APR]"—including the 2018 case series finding that APR protocols have a 64-68% success rate with no increased risk of birth defects. 6-ER-970; 5-ER-863-871. As before, COLFS argued that Bonta's enforcement action against the same or similar statements by RealOptions and Heartbeat International unconstitutionally threatens its and its patients' rights under the Free Speech, Free Exercise, and Substantive Due Process Clauses. 6-ER-970-971. Bonta again moved to dismiss,

23

invoking abstention doctrines and asserting COLFS's had failed to state a claim. 5-ER-790.

COLFS supported its injunction motion with its Verified First Amended Complaint and expert declarations from Dr. Michael Valley, who has used APR in his practice, 5-ER-902-921; 2-ER-275-283, and Dr. Elena Kraus, a specialist in high-risk pregnancy who has a Ph.D. in Healthcare Ethics and M.S. in Clinical Investigation—i.e., medical study design. 5-ER-872-893; 2-ER-250-274; 2-ER-76-80. In response, Bonta relied only on Creinin—the author of the failed mifepristone reversal trial and paid consultant for mifepristone's manufacturer—who was also previously censured by the FDA for research malpractice. 3-ER-339-369; 2-ER-69-74; *see* FDA, Warning Letter to Mitchell D. Creinin, MD (June 12, 2002).[13]

On June 13, 2025, the district court partially granted and partially denied Bonta's motion to dismiss, holding that COLFS's Free Speech claim could proceed. The court held that the UCL and FAL are content-neutral as applied to COLFS's statements about APR, but also that COLFS plausibly alleged those same statements were protected, noncommercial speech. 1-ER-53-59. The court dismissed COLFS's Free Exercise and Substantive Due Process claims, along with its Free Speech claim on behalf of its patients' right to receive information. 1-ER-60-67.

---

[13] https://www.circare.org/fdawls3/creinin_20020612.pdf.

On the same day, the district court denied COLFS's motion for a preliminary injunction. 1-ER-2-31. The court incorporated by reference its order dismissing of COLFS's Free Exercise, Substantive Process, and right-to-receive information claims in holding that COLFS was not likely to succeed on those claims. 1-ER-9-10. It also held that COLFS was not likely to succeed on its Free Speech Claim. 1-ER-10-21. 1-ER-10 (citing 1-ER-55). The court incorporated by reference its prior conclusion that the UCL and FAL are content-neutral as applied here. 1-ER-10 (citing 1-ER-55. But (departing from its dismissal order) it determined that COLFS's has an "economic motive" for its APR speech because (1) it promotes APR success stories in its charitable fundraising efforts and (2) despite providing APR for free to anyone in need, COLFS will accept insurance for those with insurance. 1-ER-10-13. The court then engaged in a detailed overview of competing scientific opinions about APR and concluded that Bonta's view of that science is more persuasive—and thus that Bonta can censor COLFS's pro-APR speech under the UCL and FAL. 1-ER-14-30.

On June 17, 2025, COLFS timely appealed both the denial of its motion for preliminary injunction and the dismissal order, since the two orders are "inextricably intertwined" and review of both is "necessary to ensure meaningful review of the order properly before [this Court] on interlocutory appeal." *Arc of California v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014) (citation omitted). 6-ER-1119-1120.

25

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without injunctive relief, (3) the balance of harms tips in its favor, and (4) a preliminary injunction is in the public interest. *Fellowship of Christian Athletes ("FCA") v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683-84 (9th Cir. 2023) ("*FCA*") (en banc) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

The Court "review[s] the district court's denial of a preliminary injunction for an abuse of discretion." *FCA*, 82 F.4th at 680. But in First Amendment cases, the Court "make[s] an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024); *see Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988).

## SUMMARY OF ARGUMENT

COLFS is likely to succeed on its Free Speech claim because Defendant Bonta's targeted enforcement against pro-APR information unconstitutionally restricts speech based on content and viewpoint. By censoring speech *advocating* APR, while allowing false speech *denouncing* it, Bonta is "favor[ing] one side in the abortion debate and thus" engaging in transparent "viewpoint discrimination—an egregious form of content discrimination." *McCullen v. Coakley*, 573 U.S. 464, 482 (2014) (internal quotation marks omitted). Bonta's one-sided attack thus must survive strict scrutiny, which he has not even attempted to satisfy.

The district court wrongly concluded that COLFS's statements promoting APR speech are commercial speech. COLFS is a Catholic non-profit whose mission is to serve women in need regardless of ability to pay. And COLFS provides APR at no cost to women in financial need. The fact it will accept insurance payment for APR services and that it fundraises to help provide free services hardly vitiates its underlying religious purpose. *See Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943). COLFS's pro-APR speech thus does far more than simply "propose a commercial transaction." *Bolger v. Youngs Drugs Prod. Corp.*, 463 U.S. 60, 66 (1983) (citation omitted). Nor does COLFS's speech about APR's safety and efficacy, particularly on its FAQ page with *general* information about APR, refer to a "specific product." *Id.* COLFS's pro-APR speech is therefore not commercial.

27

Even if it were, the First Amendment forbids government from censoring speech reflecting one side of an ongoing, peer-reviewed scientific debate, particularly where (as here) Bonta has not presented *any* evidence of consumer complaints regarding APR. Indeed, the First Amendment protects speakers from liability for speech on matters of "public concern" without knowledge or recklessness regarding the alleged falsity. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Accordingly, courts recognize that speech which accurately characterizes peer-reviewed scientific studies cannot be outlawed as "false" speech. *See, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013).

Here, COLFS's pro-APR speech accurately reflects peer-reviewed studies on a controversial matter of public concern. The First Amendment thus prohibits Bonta from outlawing such speech under the strict liability provisions of the UCL and FAL based merely on his differing viewpoint. This protection applies even in the "commercial marketplace, . . . where ideas and information flourish" and "where information can save lives." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566, 579 (2011). As a result, Bonta's efforts to censor scientifically accurate speech about APR cannot survive any level of scrutiny.

COLFS is also likely to succeed on its Free Exercise claim. Bonta's attempt to censor pro-APR speech burdens COLFS's exercise of its sincere religious beliefs, which are the reason it speaks about APR in the first place. And Bonta is doing so while exempting secular activities that

undermine his asserted interest in protecting consumers from APR "in a similar or greater degree." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993). For example, public hospitals and politicians remain free to promote APR under express exemptions in the UCL and FAL; and Bonta selectively allows Planned Parenthood to engage in misleading speech about both APR and the abortion pill. Accordingly, Bonta's enforcement action is not generally applicable and easily fails strict scrutiny.

COLFS is also likely to succeed on its substantive due process claim because Bonta is burdening patients' right to receive wanted reproductive care for the protected purpose of "beget[ting] a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972).

Because Bonta is violating COLFS's constitutional rights, COLFS will suffer irreparable harm in the absence of a preliminary injunction. And the public interest and balance of harms favor protecting constitutional rights—particularly where, as here, there is no evidence APR is harmful, and an injunction will allow women access to more information about their most intimate healthcare options.

## ARGUMENT

### I.  COLFS is Likely to Succeed on the Merits of Its Claims.

"When evaluating likelihood of success on the merits,  . . . [i]f the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable." *Does 1-11 v. Univ. of Colo.*, 100 F.4th 1251, 1267 (10th Cir. 2024). Thus, the court may "consider all of a moving party's potential paths to success on the merits." *Id.*; *cf. FCA*, 82 F.4th at 686 (addressing "all three" arguments).

Here, as explained below, COLFS is likely to succeed on all three of its legal theories: Free Speech, Free Exercise, and Substantive Due Process.

### A. Applying the UCL and FAL to COLFS's Speech About APR Triggers Strict Scrutiny Under the Free Speech Clause.

Contrary to the district court's holding, subjecting COLFS's promotion of APR to the UCL and FAL regulates speech based on content and viewpoint and thus triggers strict scrutiny. The district court likewise erred when it concluded COLFS's speech about APR is commercial speech, as COLFS does more than merely "propose a commercial transaction." *Bolger*, 463 U.S. a 66 (citation omitted).

Even if COLFS's speech were commercial (it isn't), content-based regulation of commercial speech still triggers heightened scrutiny, *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011), especially if the speech

30

concerns "medicine and public health, where information can save lives," *Nat'l Inst. of Family and Life Advocs. ("NIFLA") v. Becerra*, 585 U.S. 755, 756 (2018) (citing *Sorrell*, 564 U.S. at 566). Because content-based restrictions on "doctor-patient discourse" might "suppress unpopular ideas or information," *id.* at 771, Bonta cannot leverage them to "elevate[] one side of a legitimately unresolved scientific debate," *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022), without satisfying heightened scrutiny, *Sorrell*, 564 U.S. at 572. Here he plainly does not.

### 1. Defendant Bonta's application of the UCL and FAL to pro-APR speech discriminates based on content and viewpoint.

Government restrictions on speech based on "the topic discussed or the idea or message expressed" are content-based and thus "presumptively unconstitutional," requiring strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Likewise, viewpoint-based restrictions are "uniquely harmful to a free and democratic society" and so also are presumptively invalid, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024), given the risk that "Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (internal quote marks omitted).

Relatedly, speech that touches on "matters of public concern is at the heart of the First Amendment[]" and so receives "special protection," since "debate on public issues should be uninhibited, robust, and wide-

open." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (citation modified). A matter of public concern is one "relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Id.* at 453 (citation modified); *accord Adams v. County of Sacramento*, --- F.4th ---, 2024 WL 6076549, at *5 (July 9, 2025). Because of its "special protection," such speech may not "be restricted simply because . . . society finds the idea itself offensive or disagreeable." *Snyder*, 562 U.S. at 458 (internal quote marks omitted).

Here, Bonta targets COLFS's speech about a matter of public concern because of its content and viewpoint. Few would dare to gainsay that abortion is a matter of debate in modern America, and the Supreme Court leaves no doubt that it views it as such. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022). Thus, speech about disputed abortion issues always merits "special protection." *Snyder*, 562 U.S. at 452. Yet Bonta labels COLFS's speech as "false," "fraudulent," or "deceptive" based on its topic and content of its message. *See Reed*, 576 U.S. at 163. Even worse, he does so in a way that silences only the side of an ongoing scientific debate he disfavors. 6-ER-939-941; 6-ER-960-963; 3-ER-339-369; 2-ER-0069-0073.

The district court nonetheless held the restrictions are *not* content-based, 1-ER-0010, because they only "prohibit false and misleading statements" and "do not focus on messages in favor or against abortion," 1-ER-0055. The Supreme Court repeatedly has held otherwise: restricting

speech because it is false or fraudulent is inherently content-based. *See United States v. Alvarez*, 567 U.S. 709, 716-17 (2012); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. ___, 2025 WL 1773625, at *15 (U.S. June 27, 2025). Furthermore, restricting *pro*-APR speech under the UCL and FAL while exempting *anti*-APR speech plainly is an "attempt to give one side of a debatable public question an advantage in expressing its views to the people" and thus restricts speech based on viewpoint. *McCullen*, 573 U.S. at 483 (internal quotation marks omitted).

Bonta additionally runs afoul of the First Amendment's longstanding protection against *compelled* speech by attempting to sanction pregnancy centers for *not* saying that APR supposedly can lead to life-threatening bleeding. 6-ER-1024-25, 5-ER-0933. The Supreme Court guards speakers against such compelled speech even if it offers "the public a greater variety of views," which is not true here. *Moody v. NetChoice, LLC*, 603 U.S. 707, 729 (2024) (citing *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 12 (1986)). And compelling speech here would be barred under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), even in an imaginary world where COLFS's speech was commercial. *See infra.*

Accordingly, Bonta's application of the UCL and FAL to COLFS's pro-APR speech must survive strict scrutiny. It cannot. *See infra.*[14]

---

[14] COLFS's patients have a right to hear COLFS's message about APR, *see Griswold v. Connecticut*, 381 U.S. 479, 482 (1965), and COLFS has

33

## 2. COLFS's pro-APR speech is not commercial speech.

The district court's conclusion that COLFS's speech about APR is commercial was erroneous. Commercial speech is speech that "does no more than propose a commercial transaction." *Bolger*, 463 U.S. at 66 (internal marks omitted). Distinguishing commercial from noncommercial speech on the margins relies in large part on "common-sense." *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (citing *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021)). Where the question is "close," courts should consider whether "[1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Id.* (brackets in original) (citing *Bolger*, 463 U.S. at 66-67).

The third consideration sets a high bar, requiring that "the economic motive was the *primary* purpose for speaking." *Ariix, LLC*, 985 F.3d at 1117 & n.7 (emphasis added) ("the question is context-specific and requires determining whether the speaker's purpose primarily turns on the economic benefit that the speaker receives from the speech."). Put

---

standing to assert their interests. *See Eisenstadt*, 405 U.S. at 443-46. Here, the district court dismissed the Free Speech claim, as brought on behalf of patients, due to a misapprehension that Bonta was only challenging website statements, not discussions between doctors and patients. 1-ER-0064-65. This is inaccurate. *See, e.g.,* 6-ER-1025 ("each consent form provided to pregnant individuals"). The Court should reverse that dismissal and find this claim is an additional ground to grant the preliminary injunction. *See Arc of Cal. v. Douglas*, 757 F.3d 975, 992-93 (9th Cir. 2014).

differently, speech is not deemed commercial just because it concerns a service that generates revenue. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024). And speech that otherwise is commercial loses that character if it is "inextricably intertwined with otherwise fully protected speech." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *NetChoice*, 113 F.4th at 1120.

Here, COLFS's speech about APR lacks *any* economic motivation, let alone a primary one. COLFS provides APR solely out of religious devotion to helping women in need. 6-ER-0939; 6-ER-0943-44; 6-ER-0952-53. Guided by religious faith and traditional Christian ethics, COLFS lives out its mission of ensuring Christ-centered medical care to all women in part by offering access to APR to all "regardless of ability to pay." 6-ER-944 (quoting website); *see* 5-ER-0794; 5-ER-0847-0861; *see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 109 (4th Cir. 2018) (observing pro-life pregnancy center was "a non-profit organization whose clearest motivation is not economic but moral, philosophical, and religious").

That religious mission is at least as decisive to the commercial-speech analysis here (likely more so) as it was in *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943). There, the Supreme Court noted that Jehovah's Witnesses sold religious books and pamphlets for the primary purpose of evangelization, which made it immaterial whether the preachers derived some revenue from the sales. That sales revenue, the

Court clarified, "does not transform evangelism into a commercial enterprise." *Id.* at 111. It was a "distortion of the facts of record to describe" the preachers' activities "as the occupation of selling books and pamphlets." *Id.*

So too, here. The district court's conclusion that COLFS's statements are mere "advertisements" meant to "solicit[] women to become potential clients," 1-ER-0012, required it to ignore not only COLFS's expressly *religious* mission to provide APR "regardless of ability to pay," 6-ER-0944, but also that COLFS's informational statements about APR on its "FAQs" direct visitors not just to its own services but to a national helpline and numerous third-party websites hosting scientific studies over which it has no control and from which it obtains no revenue. 5-ER-0864. That last fact alone normally would compel the conclusion that COLFS's speech is noncommercial. *See Bolger*, 463 U.S. at 66 n.13 (general references to a product can be commercial only if speaker exercises sufficient market control or is a trade association that promotes that product).

The district court also erred in finding COLFS's pro-APR statements commercial simply because it uses those statements and stories about its APR patients in separate fundraising efforts. 1-ER-0012-13. The district court grounded its analysis primarily in *First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017), where this Court found that a pro-life community health clinic's speech was commercial because (1) the "majority" of its fundraising focused on its client base and (2) members of its senior

management team could "receive bonuses based on criteria which may include . . . the number of new clients." *Id*. at 1273. But there is no evidence here that either a *majority* of COLFS's fundraising derives from its APR statements and stories or that APR management or staff bonuses are tethered to APR client acquisition. As the Fourth Circuit has recognized on similar facts, "the relationship here between clinic patronage and fundraising is too attenuated to amount to 'economic motivation.'" *Greater Balt. Ctr.*, 879 F.3d at 109.

No other conclusion is consistent with the Supreme Court's emphasis in *Murdock* that "an itinerant evangelist . . . does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him." *Murdock*, 319 U.S. at 111. "Freedom of speech," the Supreme Court reminded those who would infringe it, is "available to all, not merely to those who can pay their own way." *Id*. That a nonprofit like COLFS must say *something* when it fundraises to keep fulfilling its religious mission does not transform that mission into a commercial endeavor. COLFS's speech about APR is not commercial.

### 3. Even if COLFS's pro-APR Speech Were Commercial, It Still Would Be Protected.

Although COLFS's pro-APR speech is noncommercial, that speech would be protected under the First Amendment even if commercial. Government action that targets commercial speech is suspect if it is based on content and speaker. And government is especially constrained if, as here, it seeks to elevate (or suppress) one side of a legitimate ongoing scientific

debate based on content or to compel speech about a disputed issue.

### a. *Content-based targeting of commercial speech requires heightened scrutiny.*

"People will perceive their own best interests if only they are well enough informed." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980) (citation omitted). Because even commercial speech "furthers the societal interest in the fullest possible dissemination of information," *id.* at 61, the First Amendment accords it "substantial protection." *Bolger*, 463 U.S. at 68. Such protection entails "heightened scrutiny" when government seeks to suppress certain content or views, given the risk that it seeks to "to keep people in the dark" for what it believes "is their own good." *See Sorrell*, 564 U.S. at 567, 577. Bonta's efforts to restrict APR speech under the UCL and FAL triggers (and cannot survive) such scrutiny. *See infra.*[15]

### b. *Government may not suppress one side of a legitimate, ongoing scientific debate.*

Although government has narrow power to restrict misleading commercial information under *Central Hudson*, 447 U.S. at 563-64, that limited power does not extend to opinions about matters of legitimate, ongoing scientific debate. Indeed, if Bonta's position were correct, a pro-

---

[15]Bonta openly seeks to restrict pro-APR speech based on his mere disagreement with peer-reviewed scientific findings in an ongoing scientific debate. Such viewpoint discrimination based on mere "disagree[ment]" with COLFS's scientific opinion per se fails heightened scrutiny, as discussed below. *See infra*, Sec. I, b., ii.

life attorney general could even more readily bring a false-claims action against Planned Parenthood for its assertions that the abortion pill (which Planned Parenthood sells) is "safe and effective." *See, e.g.*, Florida Planned Parenthood, Get Care, "Abortion Care," Medication Abortion ("the abortion pill . . . is a safe and effective way to end an early pregnancy");[16] *cf.* Ethics & Public Policy Center, "Largest-Ever Study of Abortion Pill Reveals Shocking Number of Adverse Events," April 28, 2025.[17] Here, the district court credited both sides' experts, including holding that COLFS's experts were "reliable," and extensively discussed and weighed recent scientific studies bearing on APR. While COLFS urges the studies firmly support APR—and that Bonta has advanced no studies showing harm from APR or disproving COLFS's APR claims—the district court's exercise demonstrates that, at worst, there is a legitimate, ongoing scientific debate about APR.

      i.   *Scientific opinion on matters of public concern enjoys full First Amendment protection.*

A "statement of opinion relating to matters of public concern" that is not "*provably false*" receives "full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (emphasis added). The reason for that protection is simple. Free speech needs "breathing space" to

---

[16] https://www.plannedparenthood.org/planned-parenthood-florida/medical-services/abortion (last visited July 14, 2025).
[17] https://eppc.org/news/largest-ever-study-of-abortion-pill-reveals-shocking-number-of-adverse-events/.

survive, so the Supreme Court requires that someone speaking on a matter of public concern *know* of the false implications of what he says or exhibit a reckless disregard for its truth before he can be held liable for it. *Id.* at 19-20 (emphasis added) (citation modified); *see also Counterman v. Colorado*, 600 U.S. 66, 75 (2023). This is especially true in the medical and public health context, "where information can save lives." *Sorrell*, 564 U.S. at 566.

This protection extends to good-faith statements reflecting one side of an ongoing, peer-reviewed scientific debate in recognition of the fact that science is inherently "tentative and subject to revision." *ONY*, 720 F.3d at 496; *see, e.g., Pacira BioSciences, Inc. v. Am. Soc. of Anesthesiologists, Inc.*, 63 F.4th 240, 244 (3d Cir. 2023). So long as a speaker "draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement," his statements "are not grounds for a claim of false advertising." *ONY*, 720 F.3d at 498; *see also Pacira BioSciences*, 63 F.4th at 247 (methodological critiques of scientific studies "cannot create an actionable falsehood because they do not bear on whether the statements are verifiable") (quoting *ONY*, 720 F.3d at 497); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation."). Recognizing this, the California Court of Appeal has held that statements of scientifically

40

controverted matters about abortion are not actionable under the UCL or FAL. *See Bernardo v. Planned Parenthood Fed. of America*, 9 Cal. Rptr. 3d 197, 219-20, 228-29 (Cal. Ct. App. 2004) (applying First Amendment "[b]ecause the claimed link between abortion and breast cancer is a public health issue about which scientific researchers and public health advocates in good faith have disagreed" and rejecting application of UCL and FAL, even assuming the challenged speech was commercial).

> ii. *The district court foreclosed the "breathing space" afforded to such speech.*

Here, the district court did precisely what it may not do. Judges are "ill-equipped to undertake to referee [scientific] controversies." *ONY*, 720 F.3d at 497. But the district court nonetheless purported to resolve an ongoing scientific debate—and allow the government to censor one side of that debate. *See* 1-ER-0015-30.

The district court did so despite acknowledging that Bonta's view of the science is far from settled, including that:

- the "science here is unclear" as to "how exactly supplemental progesterone reacts with mifepristone," essential for verifying APR's "reversal" effect, 1-ER-0020;

- "there is no agreed-upon rate" of continuing pregnancy after a woman ingests mifepristone with no later intervention to reverse its effects, essential for determining APR's effectiveness, 1-ER-0021;

41

- it is "unclear and difficult to make any definitive conclusions from [] studies" regarding the impact of APR on birth defects, 1-ER-0026; and

- it is "unclear what percentage" of women will receive progesterone by each possible route of administration, essential for assessing COLFS's statement of a fetal survival rate of 64%-68%, 1-ER-0028.

Yet the district court nonetheless concluded that it is misleading to call APR "safe" and "effective," based on its view of the results of Creinin's abandoned 2019 study—even as it conceded (1) that scientists have competing "interpretation[s]" of that study, *id.* at 24, and (2) that Creinin provides no data "on any life-threatening risks" from APR. *Id.* at 24.

The district court violated the Supreme Court's dual admonitions that it is vital to "preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," *NIFLA*, 585 U.S. at 757 (citation modified), and "a *mens rea* requirement provides breathing room for more valuable speech." *Counterman*, 600 U.S. at 75 (citation modified); *see also Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003) ("exacting proof requirements" such as "intent to mislead" ensure "sufficient breathing room for protected speech" when the government attempts to restrict "[f]alse statement[s]"). Applying strict liability under the UCL and FAL to opinions about debated scientific data, on a matter of public concern like abortion, suffocates disfavored views on the "highly

42

paternalistic" assumption that people cannot "perceive their own best interests if [] they are well enough informed." *Central Hudson*, 447 U.S. at 562; *see Sorrell*, 564 U.S. at 577.

While the district court criticized the APR studies COLFS relies on, it did not find (and Bonta does not contend) that those studies are based on fraudulent data or that COLFS inaccurately describes the data or methodologies underlying those studies. *See* 1-ER-0002-0031. Nor could it, as COLFS's descriptions are accurate. *See, e.g.*, George Delgado et al., *A Case Series Detailing the Successful **Reversal** of the Effects of Mifepristone Using Progesterone*, 33(1) Issues L. & Med. 21 (2018) (emphasis added), 6-ER-0949-50; 3-ER-0385-0394; Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395, 402 (2023) (finding "mifepristone antagonization with progesterone is a **safe and effective treatment**"). (emphasis added) 6-ER-0950.

Further, all three statements the district court found "inherently misleading," *see* 1-ER-0028-29, likewise accurately recite the findings of scientific studies or remain subject to scientific dispute. First, COLFS's statement on its FAQ page that "[i]nitial studies of APR have shown that [it] has a 64-68% success rate," 5-ER-0866, accurately characterizes what the 2018 Delgado study found when APR is taken intramuscularly or through higher doses or oral capsules, 3-ER-0391. The district court deemed this statement inherently misleading nonetheless because it is

43

allegedly "unclear" whether COLFS uses those methods, 1-ER-0030-31—even though Dr. Delgado, who "endorse[s] the better-performing protocols," 3-ER-0393, is COFLS's own medical director. The district court's finding here thus plainly contradicted the actual record.

Second, the district court deemed it inherently misleading for COLFS's to state that it "*may* not be too late" to "call the helpline" if 72 hours have passed since receiving mifepristone. 5-ER-0865 (emphasis added); 1-ER-0028-29. The district court based the conclusion on an alleged lack of expert declarations "even purport[ing]" to say as much. *Id*. But even on the same page of its decision, the district court recognized that Dr. Kraus's declaration notes that mifepristone's "period of activity" (which APR can reverse) is only "*mostly* within *about* 72 hours." 1-ER-0029 (emphasis added). And the district court cited no evidence that APR *cannot* safely work after 72 hours. Yet despite its lack of expertise in this "sufficiently novel area of research," the district court erroneously "referee[d]" the controversy. *ONY*, 720 F.3d at 497.

Finally, the district court's conclusion that saying APR can work after receiving misoprostol or methotrexate also inherently misleads, 1-ER-0028, again contradicts the record and is erroneous. For starters, COLFS has never said this. It appears the court confused this case with Bonta's suit against Heartbeat International—which has developed model protocols and informed consent forms for APR use in those situations. 6-ER-1017-18; 4-ER-0589-90; 4-ER-0602-03; 4-ER-0606-07. In any

44

event, even those claims by an organization not party to *this* case merely opine that progesterone "*may* also be beneficial" in those use cases while clarifying that no studies have yet shown as much. 4-ER-0603; 4-ER-0507. Those reasonably cautious statements hardly are "inherently misleading" in this "novel area of research," *ONY*, 720 F.3d at 497, particularly "where information can save lives," *Sorrell*, 564 U.S. at 566.

The district court also wrongly credited the anti-APR views of the American College of Obstetricians and Gynecologists, 1-ER-0024, while ignoring the pro-APR views of other professional organizations of obstetricians and gynecologists. 6-ER-0950. Even if there hypothetically were an "overwhelming medical consensus" by "numerous major medical organizations" that APR is unsafe and ineffective, that fact would do nothing to delegitimatize speakers' right to promote a competing viewpoint—especially when the government *cannot present a single scientific study* supporting that supposed "consensus." *See United States v. Skrmetti*, 145 S. Ct. 1816, 1840 (2025) (Thomas, J., concurring) (citing *Dobbs*, 597 U.S. at 301). That is even truer here, where no such overwhelming medical consensus exists.

At bottom, COLFS's pro-APR speech merely reflects legitimate, peer-reviewed findings about APR in the midst of a "rancorous national controversy" about abortion. *Dobbs*, 597 U.S. at 292. The First Amendment thus protects it from content-based targeting based merely on Bonta's competing view of science. Indeed, censoring speech based on

45

mere "disagree[ment]" *per se* fails heightened scrutiny. *See Snyder*, 562 U.S. at 458 (internal quotation marks omitted). COLFS is likely to succeed on the merits for this reason alone.[18]

### c. *Defendant Bonta's attempt to compel certain APR speech violates* Zauderer.

Despite finding COLFS has pre-enforcement standing, the district court failed to adjudicate its request to preliminarily enjoin Bonta's attempt to compel the statement that APR may allegedly lead to life-threatening bleeding. *See* 6-ER-1024-25, 5-ER-0933; *cf.* 1-ER-0002-0031. Such compulsion easily violates the First Amendment and should be preliminarily enjoined.

The Supreme Court has applied a modified form of rational-basis review to laws that "compel the disclosure of 'purely factual and uncontroversial' commercial speech." *NetChoice*, 113 F.4th at 1119 (quoting *Zauderer*, 471 U.S. at 651). This is known as "the *Zauderer* test" requiring the *government* to show the compelled notice is "(1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Am. Beverage Ass'n v. San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc).

Bonta's attempt to compel the statement that APR may lead to life-

---

[18] Such per se unconstitutional viewpoint discrimination is all the more true with respect to *non*-commercial speech, discussed above. Regardless, the challenged restrictions still fail the ordinary tests for strict and intermediate scrutiny. *See infra*.

threatening bleeding readily fails all three prongs. No study contains any data showing that APR leads to life-threatening bleeding or that APR is otherwise unsafe. At most, this is a matter of ongoing scientific debate and thus not "purely factual." *See* 1-ER-0025-26 (acknowledging competing "interpretation[s]" of related Creinin study); *see ONY*, 720 F.3d at 496-97. Additionally, this Court has already held that a mandatory notice which "elevates one side of a legitimately unresolved scientific debate" about the safety of a commercial product "is controversial" and thus not permissible under *Zauderer*. *Cal. Chamber of Comm.*, 29 F.4th at 478; *see also NIFLA*, 585 U.S. at 769 (compelled notice about "abortion" is "anything but an 'uncontroversial' topic"). Finally, Bonta's mandatory notice is "unduly burdensome" because it impermissibly attempts to remedy "purely hypothetical" harms (again, Bonta presents no evidence of consumer complaints about APR) and would "drown[] out the facility's own message" reflecting the contrary findings of peer-reviewed scientific studies. *NIFLA*, 585 U.S. at 776, 778.

The district court's failure to hold as much should be reversed.

## B. Defendant Bonta's Restrictions on APR Speech Also Trigger Strict Scrutiny Under the Free Exercise Clause.

The Free Exercise Clause protects religious *exercise*, defined as one's ability to live out faith "in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597

U.S. 507, 524 (2022) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)).

Because laws restricting religious exercise must be generally applicable, government may not burden sincere religious practice by treating any "comparable secular activity more favorably." *FCA*, 82 F.4th at 686 (citation omitted); *see Tandon v. Newsom*, 593 U.S. 61, 62 (2021). "Any" means "any"—if even one secular activity is favored over even one comparable religious activity, the restriction is not generally applicable and is subject to strict scrutiny. *See id.*; *FCA*, 82 F.4th at 689-90.

If an exempted secular activity undermines the government's asserted interest in a similar or greater degree than the burdened religious exercise, the secular activity is "comparable." *See Tandon*, 593 U.S. at 62-63 (hair salons and retail stores, among other things, comparable to religious gatherings with respect to government's interest in reducing the risk of spreading COVID-19); *see also Bacon v. Woodward*, 104 F.4th 744, 752 (9th Cir. 2024) (COVID-19 vaccine exemption for secular but not religious reasons undermined similar interest).

General applicability also "requires, among other things, that the laws be enforced evenhandedly," *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022), such that "selective enforcement favoring comparable secular activities" makes a regulation non-generally applicable. *FCA*, 82 F.4th at 689.

48

### 1. The Challenged Restrictions Are Not Generally Applicable.

Because COLFS provides (and promotes) APR as part of its sincere religious mission, 6-ER-0939; 6-ER-0944; 6-ER-0975, prohibiting it from speaking about APR burdens its exercise of religion. *See Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 880 (9th Cir. 1987) (liability for "tort damages" is a "direct burden on religion"); *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1117 (1988). That burden is *not* generally applicable for at least four independent reasons.

### a. *The UCL and FAL Exempt Government Hospitals and Politicians.*

The purpose of the UCL and FAL is to curb commercial fraud, which the statutes jointly advance by preserving fair business competition and preventing "injuries to consumers." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Yet the UCL and FAL expressly exempt public entities—including public hospitals and clinics that may care for women who have ingested mifepristone and want to reverse its effects—and politicians, even though both types of speakers can just as readily deceptively promote (or oppose) APR, even in commercial transactions or fundraising pitches. *See* Cal. Bus. & Prof. Code §§ 17201, 17506; Cal. Gov. Code § 811.2; *Cal. Med. Ass'n, Inc. v. Univ. of Cal.*, 79 Cal. App. 4th 542, 551 & n.14 (2000) ("public entities" not "persons" under UCL). In other words, the exemptions "permit secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City*

49

*of Philadelphia*, 593 U.S. 522, 534 (2021).

The district court deemed these exemptions non-comparable because they allegedly do not "present the same risks" of "deceptive advertisements or business practices [as] private corporations." 1-ER-0061. But the court's conclusion rested solely on the *reasons* for these exemptions—i.e., that "the state is a sovereign entity representing the people," and political speech is protected by the First Amendment and subject to elections—even though comparability is "not" based on the "reasons" for a particular exemption. *Tandon*, 593 U.S. at 62. Indeed, the district court ignored that Bonta deems the pro-APR statements at issue here as per se false and misleading. Thus, *allowing public entities and politicians to engage in the same speech* necessarily poses "similar" risks of "injuries to consumers" under the UCL and FAL, *Cal-Tech Cmmc'ns*, 20 Cal.4th at 180, thereby triggering strict scrutiny.[19]

### b. *Bonta Selectively Exempts Deceptive Speech by Abortion Providers.*

Despite Bonta's purported interest in protecting California consumers from deceptive or misleading statements about APR, 6-ER-0975, he

---

[19] The district court's reliance on the state's sovereign immunity is similarly flawed. 1-ER-0062. Again, the question is not *why* a particular entity is exempt, but whether it may engage in activity that poses similar risks to the state's asserted interest. Here, public entities (including public health care providers, which are often multi-million-dollar businesses) remain free to engage in the same APR speech that Defendant Bonta seeks to censor when expressed by nonprofit pro-life pregnancy centers.

has not sued (or threatened to sue) speakers for deceptive speech *opposing* APR—despite the abundant evidence of such speech. As noted, Planned Parenthood publicly asserts that APR has never "been tested for safety, effectiveness, or the likelihood of side effects." 6-ER-0964-67. That statement is demonstrably false—indeed, Bonta's own expert witnesses discuss *decades* of such studies. *See* 3-ER-0339-69. Statements like these injure consumers by depriving women of "information [that could] save lives." *Sorrell*, 564 U.S. at 566. Yet rather than investigate, Bonta has worked with Planned Parenthood to target groups like COLFS.

Nor has Bonta shown any interest in using the UCL or FAL to protect California consumers from Planned Parenthood's equally deceptive online statements about the abortion pills it sells. Despite mifepristone's known risks of side effects, up to and including death, San Diego's downtown Planned Parenthood for instance markets mifepristone, without caveat or consequence, as "a safe and effective way of ending an early pregnancy." Planned Parenthood First Ave. Fam. Planning Michelle Wagner Ctr., *Abortion in San Diego, CA: Medication Abortion/Abortion Pill*, https://tinyurl.com/4ftt3tdt.

Accordingly, Bonta has rendered the UCL and FAL non-generally applicable *as applied. See FCA*, 82 F.4th at 689 (defendant engaged "in a pattern of selective enforcement favoring comparable secular activities")*; Soos v. Cuomo*, 470 F. Supp. 3d 268, 282-83 (N.D.N.Y. 2020) (similar); *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 647-54 (2018)

51

(Gorsuch, J., concurring).

The district court deemed Planned Parenthood's abortion-pill speech non-comparable because it allegedly poses "different harms" given that the abortion pill is FDA-approved and involves "known risks." 1-ER-0063. But proclaiming the abortion pill to be "safe and effective" without notice, for example, that it contains a "black box warning" that it can cause "fatal infections and bleeding" poses similar (and in reality far greater) risks of "injuries to consumers" in the abortion context. *See Mifeprex Label*, Initial U.S. Approval: 2000.[20] Indeed, it strains credulity to think promoting APR as "safe and effective," where APR has never been shown to cause serious injury or death, is somehow *more* misleading or potentially harmful than proclaiming that mifepristone is "safe and effective" without qualification, where mifepristone *has* been shown to cause serious injury or death. In short, the selective exemption for Planned Parenthood's deceptive speech about APR and the abortion pill is comparable and also triggers strict scrutiny.

### c. *Bonta Selectively Exempts Other Off-Label Uses of Progesterone.*

Bonta also reads an exemption into the UCL and FAL for off-label use of progesterone supplementation so long as it is not aimed at reversing the effects of mifepristone. Such supplementation has been common for decades, performed on millions of pregnant for reasons such as IVF

---

[20] https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s025Lbl.pdf.

treatment and miscarriage prevention. Because the FDA deems progesterone supplementation safe, physicians are free under federal law to use their professional judgment to prescribe it off-label, and California does not regulate that off-label use in any procedure other than APR. This disparate treatment renders California's attempted restriction of APR not generally applicable. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212-13 (D. Colo. 2023) (holding that non-APR off-label uses of progesterone is comparable exemption).

The district court rejected this comparator on the grounds that general principles of federalism allow such selective regulation. But that reasoning ignores that the Free Exercise Clause "protects religious observers against unequal treatment." *Lukumi*, 508 U.S. at 542 (citation modified). Here, Bonta permits a speaker to promote progesterone use for IVF, for example, while restricting a speaker from promoting the same treatment for use in APR. Strict scrutiny must apply to such selective discrimination.

### d. *The government allows APR*.

Finally, California's continued allowance of APR itself undermines Bonta's purported interest in restricting speech *about* APR. The UCL and FAL aim to prevent "injuries to consumers." *Cal-Tech Cmmc'ns*, 20 Cal.4th at 180. Bonta contends, remarkably, that pro-APR speech risks creating consumer injuries by promoting a procedure California permits. But allowing APR itself inherently poses "similar" (if not greater)

53

purported risks as allowing speech *about* APR. Thus, California's continued allowance of APR itself, while attempting to censor speech *about* APR under the UCL and FAL, also triggers strict scrutiny.

### C. Applying the UCL and FAL to COLFS's Provision of APR Triggers Strict Scrutiny Under Substantive Due Process.

#### 1. Legal Background on the Right of Procreation.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The guarantee of liberty extends to fundamental rights that preexist the Constitution, which at the time of ratification were "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" and that the people did not expressly surrender to the government. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *see Griswold v. Connecticut*, 381 U.S. 479, 486 (1965); 1 Annals of Congress 455 (June 8, 1789) (James Madison) (introducing the Bill of Rights); The Federalist No. 84, at 512-13 (Clinton Rossiter ed. 1961) (Hamilton) (the people retain all rights not expressly surrendered).

This Court in some respects recognized the scope of substantive due process even before the Supreme Court did. *E.g.*, *Farrington v. Tokushige*, 11 F.2d 710, 713 (9th Cir. 1926) (quoting *Berea Coll. v. Kentucky*, 211 U.S. 45, 67 (1908) (Harlan, J., dissenting)). Included in that scope is a right "to marry, establish a home and bring up children." *Meyer v. Nebraska*, 262

54

U.S. 390, 399 (1923). "Marriage and procreation are fundamental to the very existence and survival of the race" and thus "one of the basic civil rights of man." *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

A law that sweeps too broadly and thereby invades these preexisting freedoms must be struck down as unconstitutional. *Griswold*, 381 U.S. at 485-86. That includes freedom to bear or beget a child (*see Eisenstadt*, 405 U.S. at 453[21]) or to undergo "unwanted medical treatment." *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (citation omitted). And it necessarily encompasses the adjacent right to make important medical decisions with a physician's advice, *see Whalen v. Roe*, 429 U.S. 589, 603 (1977), especially without government interference in a "woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it." *Doe v. Bolton*, 410 U.S. 179, 197 (1973).

To be sure, burdening this right triggers strict scrutiny. *See, e.g.*, *Dep't of State v. Muñoz*, 602 U.S 899, 911 (2024).

## 2. Application of Substantive Due Process Principles.

APR is a permissible medical treatment available to a woman to help carry her wanted child to term. 6-ER-0946-50. In seeking APR, she

---

[21] Though popularly misreported, the Supreme Court did not recently cast into doubt its holding in *Eisenstadt* that the substantive due process right to privacy exists. *Dobbs*, 597 U.S. at 256-57; *see also id.* at 295 ("It is hard to see how we could be clearer" that *Dobbs* does not "cast doubt" on *Eisenstadt*).

exercises her constitutional right to refuse additional medical treatment (misoprostol) and then to decide to try to increase her odds of bearing a child. *See Cruzan*, 497 U.S. at 278; *Eisenstadt*, 405 U.S. at 453. And even a regulation that purports to be motivated by public health fails to survive the requisite strict scrutiny if the evidence shows that the procedure "may be performed [] safely." *Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 437 (1983); *see Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 913 (9th Cir. 2014).

### D. Bonta's Attack on pro-APR Speech Cannot Survive Any Level of Review.

Although application of the UCL and FAL to COLFS's speech about APR is subject to (and fails) strict scrutiny, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Sorrell*, 564 U.S. at 571.[22]

#### 1. Bonta's Speech Restrictions Easily Fails Strict Scrutiny.

Under strict scrutiny, the challenged restrictions must be the *least restrictive means* of achieving a *compelling* government interest. *Thomas*

---

[22] The district court believed COLFS had not argued that the restrictions fail to advance Bonta's asserted interests and are not narrowly tailored. 1-ER-0030. However, it was Bonta who waived any argument that he satisfied either intermediate or strict scrutiny below, instead arguing solely that COLFS's speech is commercial, false, and misleading, and entirely unprotected. 3-ER-0471-77. The court mistakenly believed it was *COLFS's burden* to satisfy heightened scrutiny instead of the government. Regardless, COLFS explained that underinclusive restrictions are not narrowly tailored, *e.g.*, 6-ER-1054-

*v. Rev. Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). This is the "most demanding test known to constitutional law," and the Supreme Court has "only once" held "that a law triggered but satisfied strict scrutiny" in "the First Amendment context." *Paxton*, 606 U.S.___, 2025 WL 1773625, at *11(internal quotation marks omitted).

Critically, strict scrutiny requires "an 'actual problem' in need of solving"; the restriction "must be actually necessary to the solution"; and "ambiguous proof will not suffice." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799-800 (2011). "[A]s a practical matter," strict scrutiny "is fatal in fact absent truly extraordinary circumstances." *Paxton*, 2025 WL 1773625, at *12.

Bonta fails this test at every turn. As noted, he has "no evidence of any complaints from APR patients related to APR treatment," 2-ER-0177-78; 2-ER-0196; 2-ER-0215; Dr. Creinin knows of no U.S. medical board disciplining a doctor for APR, 2-ER-0280; and the *only* evidence of alleged harm from APR that Bonta has is the 2019 Creinin study, where only one patient in the APR treatment group was transported to the hospital and then needed *no intervention*. 2-ER-0228. Put succinctly, there is no real-world problem in need of solving, 5-ER-0911-16; 5-ER-0890-92; 2-ER-

_____

55, and that Bonta's censorship of pro-APR speech is underinclusive, *e.g.*, 6-ER-1057-58; 6-ER-1059-60. COLFS also argued that government counter-speech would be a permissible lesser restrictive means. 6-ER-1056. *Accord* 6-ER-0093.

0279-82; 2-ER-0269-72. Censoring COLFS's speech about APR therefore is not necessary.

Further, as noted, the district court denied COLFS's motion for preliminary injunction based on its observations that, among other things, "the science [] is unclear" as to "how exactly supplemental progesterone reacts with mifepristone"; "there is no agreed-upon rate of continuing pregnancy for mifepristone alone"; and it's "unclear and difficult to make any definitive conclusions from these studies." 1-ER-0020, -0022, -0027. In other words, at best the district court relied "ambiguous proof" that per se fails strict scrutiny. *See Brown*, 564 U.S. at 800.

Additionally, a restriction does not advance a compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (citation omitted). Here, the UCL and FAL exemptions allow public entities and politicians to freely promote that APR is "safe and effective," etc., notwithstanding Bonta's interest to the contrary. The same is true of medical professionals who actually provide APR. If pro-APR *speech* is dangerous to consumers, it should follow *a fortiori* that the actual *provision* of APR is much less safe. Yet the latter remains unprohibited. Thus, Bonta's attempt to censor pro-APR speech lacks a compelling interest.

Accordingly, application of the UCL and FAL to COLFS's pro-APR speech violates the First Amendment.

58

## 2. Bonta Also Fails Intermediate Scrutiny.

Even assuming strict scrutiny does not apply, Bonta still fails intermediate scrutiny for content-based restrictions on commercial speech under *Central Hudson*, which requires: (1) a substantial government interest; (2) that is directly advanced by the regulation; and (3) not more restrictive than necessary to serve the interest. *See NetChoice*, 113 F.4th at 1119. Because this test offers "substantial protection . . . to commercial speech," *Bolger*, 463 U.S. at 68, it still demands "evidence establishing that the harms [the state] recites are real, and that its speech restriction will '*significantly*' alleviate those harms." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) (citation modified). Further, because "[t]here must be a fit between the [] ends and the means chosen to accomplish those ends," *Sorrell*, 564 U.S. at 572 (internal quotation marks omitted), a restriction "cannot meaningfully advance the government's stated interests if it contains exceptions that undermine and counteract those goals," *Yim v. Seattle*, 63 F.4th 783, 794 (9th Cir. 2023) (citation modified).

Applied here, the government trips right out of the gate. As noted, APR remains legal in California (and elsewhere). Bonta thus has no cognizable interest simply in "dampening demand" for it. *Junior Sports Mags.*, 80 F.4th at 1117. In other words, restricting COLFS's speech about a perfectly legal service fails to directly advance a substantial government interest. *See, e.g., United States v. Caronia*, 703 F.3d 149, 162-

69 (2d Cir. 2012) (restriction on promoting off-label use of targeted drug failed to directly advance substantial interest where the "off-label drug usage [itself] is not unlawful"). The same is true of the exemptions for public entities and politicians, who remain free to speak the same pro-APR speech COLFS wishes to continue expressing here and thus "undermine" Bonta's "goals" to restrict such speech. *Yim*, 63 F.4th at 794.

The government also has more narrowly tailored means to advance any substantial interest with respect to APR. *See Yim*, 63 F.4th at 796 (while restriction need not be "the least restrictive," it must still be "narrowly tailored to achieve the desired objective") (citation modified). Even in the commercial context, "precision . . . must be the touchstone when it comes to regulations of speech, which so closely touch our most precious freedoms." *NIFLA*, 585 U.S. at 775 (citation modified) (finding mandatory notice requirement on pro-life pregnancy centers failed even intermediate scrutiny). Here, the government "could inform the women itself with a public information campaign" promoting its own view of APR. *Id.* "But California has identified no evidence" that it has actually "tried an advertising campaign." *Id.* Relatedly, "[t]he government could develop [] warning or disclaimer systems," or "prohibit the [] use [of APR] altogether." *Caronia*, 703 F.3d at 168. But censoring speech itself "must be a last—not first—resort." *Id.* (citing *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)).

In short, the alleged "governmental interest could be served as well by a more limited restriction" on COLFS's speech. *Central Hudson*, 447 U.S. at 564. It accordingly fails intermediate scrutiny and must be preliminarily enjoined.[23]

## II. The Other Injunction Factors Favor COLFS.

To obtain a preliminary injunction, a plaintiff likely to succeed on the merits of its claim also must establish it would suffer irreparable injury absent the injunction, the balance of hardships favors the plaintiff, and the public interest favors an injunction. *FCA*, 82 F.4th at 683-84. If a government is the defendant, the last two factors merge. *Id*. at 695.

All three requirements are easily met here because COLFS has met its burden to establish "a colorable First Amendment claim." *FCA*, 82 F.4th at 694-95. Whenever a party has established it is likely to succeed on the merits of a constitutional claim, the remaining preliminary injunction factors almost always favor enjoining the offending law. *See Junior Sports Mags.*, 80 F.4th at 1120. After all, a moment's deprivation of a constitutional right constitutes irreparable injury, *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020), and is never in the public interest, *see Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

---

[23] Additionally, as already discussed, Bonta's attempt to *compel* speech that APR can allegedly lead to life-threatening bleeding fails the applicable test under *Zauderer*.

61

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of a preliminary injunction, as well as dismissal of claims.

Respectfully submitted,

Dated: July 16, 2025      By: *s/Peter Breen*
                                         Peter Breen
                                         Michael McHale
                                         Christopher J.F. Galiardo
                                         THOMAS MORE SOCIETY
                                         309 W. Washington St., Ste. 1250
                                         Chicago, IL 60606
                                         (312) 782-1680

                                         Charles S. LiMandri
                                         Paul M. Jonna
                                         Jeffrey M. Trissell
                                         LiMANDRI & JONNA LLP
                                         Post Office Box 9120
                                         Rancho Santa Fe, CA 92067
                                         Telephone: (858) 759-9930

                                         *Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

*National Institute of Family and Life Advocates, et al., v. Rob Bonta*, Appeal No. 25-2287.

Both cases arise from the unconstitutional actions of the Attorney General seeking to restrict the speech of pro-life pregnancy help organizations in relation to "Abortion Pill Reversal." The plaintiffs in both cases are pro-life pregnancy help organizations who assert First Amendment claims, among others, and cite similar illegal actions taken by the Attorney General in support of those claims.

**CERTIFICATE OF WORD COUNT**

The text of this Opening Brief of Plaintiff-Appellant is in compliance with Federal Rules of Appellate Procedure 32 and 9th Circuit Rule 32-3(2), consisting of 13,462 words excluding items listed in Rule 32(f) as counted by the word processing program (Microsoft Word) used to generate the brief.

/s/*Peter Breen*
Peter Breen

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2025, I electronically filed the Opening Brief of Plaintiff-Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/*Peter Breen*
Peter Breen

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                          .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                                    **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                    *Rev. 12/01/22*

APPEAL NO. 25-3828

In the United States Court of Appeals for the Ninth Circuit

CULTURE OF LIFE FAMILY SERVICES, INC.,
Plaintiff-Appellant,
v.

ROB BONTA, in his official capacity as
the California Attorney General
Defendant-Appellee.

On appeal from the United States District Court
for the Southern District of California
Honorable Gonzalo P. Curiel
(3:24-cv-01338-GPC)

## ADDENDUM TO OPENING BRIEF OF APPELLANTS

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
LiMandri & Jonna LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel.: (858) 759-9930
pjonna@limandri.com

Peter Breen
Michael McHale
Christopher J.F. Galiardo
Thomas More Society
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel.: (312) 782-1680
pbreen@thomasmoresociety.org
  docketing@thomasmoresociety.org

# ADDENDUM TABLE OF CONTENTS

U.S. Constitution Amendment I .............................................................. A-1

U.S. Constitution Amendment XIV ....................................................... A-1

28 U.S.C. § 1331 ...................................................................................... A-2

28 U.S.C. § 1292(a)(1) ............................................................................ A-1

42 U.S.C. § 1983 ...................................................................................... A-2

Cal. Bus. & Prof. Code § 17200 ............................................................. A-3

Cal. Bus. & Prof. Code § 17201 ............................................................. A-3

Cal. Bus. & Prof. Code § 17206 ............................................................. A-3

Cal. Bus. & Prof. Code § 17500 ............................................................. A-4

Cal. Gov't Code § 811.2 .......................................................................... A-5

## U.S. Constitution Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## U.S. Constitution Amendment XIV

Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

## 28 U.S.C. § 1292(a)(1)
## Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

> (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify

injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

## 28 U.S.C. § 1331
## Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 42 U.S.C. § 1983
## Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

A-2

**Cal. Bus. & Prof. Code § 17200**
**Unfair competition; prohibited activities**

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

**Cal. Bus. & Prof. Code § 17201**
**Person**

As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons.

**Cal. Bus. & Prof. Code § 17206**
**Civil Penalty for Violation of Chapter**

(a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, by any district attorney, by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, by any city attorney of a city having a population in excess of 750,000, or by a county counsel of any county within which a city has a population in excess of 750,000, by any city attorney of any city and county, or, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor, in any court of competent jurisdiction.

(b) The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by

A-3

any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(c)

(1) If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the General Fund.

## Cal. Bus. & Prof. Code § 17500
## False or misleading statements; penalty

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any

A-4

violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine.

**Cal. Gov't Code § 811.2**
**Public entity**

"Public entity" includes the state, the Regents of the University of California, the Trustees of the California State University and the California State University, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State.