CASE NO. 25-3828

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

CULTURE OF LIFE FAMILY SERVICES, INC.
a California nonprofit corporation,

*Plaintiff-Appellant,*

v.

ATTORNEY GENERAL ROB BONTA,
in his official capacity as the California Attorney General,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:24-cv-01338-GPC-KSC

---

## EXCERPTS OF RECORD
## Volume 1 of 6, Pages 1- 67

---

Peter Breen
Michael McHale
Christopher J.F. Galiardo
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel.: (312) 782-1680
pbreen@thomasmoresociety.org
docketing@thomasmoresociety.org

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel.: (858) 759-9930
pjonna@limandri.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CULTURE OF LIFE FAMILY SERVICES, INC., a California nonprofit corporation, <br><br> Plaintiff, <br><br> v. <br><br> ATTORNEY GENERAL ROB BONTA, in his official capacity as the California Attorney General, <br><br> Defendant. | Case No. 3:24-cv-01338-GPC-KSC <br><br> **(1) ORDER DENYING THE MOTION FOR PRELIMINARY INJUNCTION** <br><br> **(2) ORDER DENYING MOTION FOR LEAVE TO ALLOW NON-ELECTRONIC FILING** <br><br> **(3) ORDER GRANTING EX PARTE MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION** <br><br> **[ECF Nos. 21, 26, 36]** |

Plaintiff Culture of Life Family Services, Inc. ("COLFS") brings a pre-enforcement action against California Attorney General Rob Bonta ("AG Bonta" or "Defendant") seeking declaratory and injunctive relief. In its Amended Complaint, COLFS alleges that several statements it makes about abortion pill reversal treatment are constitutionally protected, and that AG Bonta's alleged "attack against APR [abortion pill

1

1  reversal]" puts COLFS at risk of incurring enforcement actions by the State.  ECF No. 20

2  ¶ 12.

3          Before the Court is COLFS's motion for preliminary injunction.  ECF No. 21.

4  Based on the reasons below, the Court DENIES Plaintiff's motion for preliminary

5  injunction.

6                          **FACTUAL BACKGROUND**[1]

7  **I.    Abortion Pill Reversal treatment**

8          COLFS is a Catholic community health clinic in San Diego County that provides

9  free abortion pill reversal ("APR") treatment.[2]  ECF No. 20 ("Am. Compl.") ¶ 4, 19, 21.

10  APR is a medical procedure designed for pregnant women who have started the chemical

11  abortion process by ingesting mifepristone, the first pill out of two[3], and who later decide

12  to keep the unborn child.  *Id.* ¶ 2.  APR consists of taking the hormone progesterone in

13  order to counteract mifepristone's blocking of the body's natural supply of progesterone.

14  *See id.* ¶¶ 2, 3, 33-34.

15          COLFS alleges that "[s]upplemental progesterone itself is indubitably safe." *Id.* ¶

16  30.  The "first known attempt to reverse the effects of mifepristone using bioidentical

17  progesterone" was in 2006, and the woman "went on to deliver a healthy baby."  *Id.* ¶ 31.

18  A few years later, COLFS's medical director, Dr. George Delgado "devised the APR

19

20  _____

21  [1] The factual background of this case was detailed in the Court's Order dated November

22  12, 2024, ECF No. 17, and is, for the most part, incorporated herein.

23  [2] The Court recognizes the term, "abortion pill reversal treatment," itself is contested,

24  since AG Bonta alleges that "reverse" or "reversal" are in fact fraudulent statements for

    describing the supplemental progesterone treatment that is at issue here.  Putting that

25  aside, the Court will refer to this medical treatment as "abortion pill reversal treatment"

26  or "APR treatment" throughout this Order, because that is the treatment's common name.

27  [3] The first pill contains mifepristone, the second misoprostol.  Am. Compl. ¶ 25.

28

2

1  protocol for reversing the effects of mifepristone and began to advise doctors on APR."

2  *Id.* ¶ 32.

3  **II.     Heartbeat International and the Enforcement Action**

4         In light of what were viewed as successful APR interventions, COLFS's medical

5  director, Dr. George Delgado, set up a website and hotline in May 2012 to educate

6  pregnant women seeking to counteract the effects of mifepristone and to connect them

7  with licensed medical professionals. *Id.* ¶ 43.  This became known as the "APR

8  Network." *Id.*  In 2018, to "ensure expansion of the APR Network and increased public

9  awareness of the APR protocol," COLFS transferred the Network for the nominal sum of

10 $1 to Heartbeat International, a nationwide trade group that represents pro-life pregnancy

11 resource organizations. *Id.* ¶ 44.

12        On September 21, 2023, Rob Bonta, the California Attorney General and the

13 Defendant in this case, filed a complaint in California state court seeking a permanent

14 injunction, civil penalties, and other equitable relief against Heartbeat International et al.

15 for false and misleading advertising of APR treatment.  ECF No. 4-2, Request for

16 Judicial Notice ("RJN"), Ex. A.  AG Bonta's complaint against Heartbeat International et

17 al. ("Enforcement Action" or "State Action") alleges that there is no credible scientific

18 evidence supporting the theory that progesterone counteracts mifepristone without

19 harmful effects or that APR is safe. Ex. A ¶¶ 32, 33, 37, 40-45.

20        The Enforcement Action alleged two causes of action under California's Unfair

21 Competition Law ("UCL"), Business and Professions Code section 17200 *et seq.*, and

22 False Advertising Law ("FAL"), Business and Professions Code section 17500 *et seq.*

23 Ex. A ¶¶ 96-101.  The Action alleged that Heartbeat International et al. promulgated eight

24 statements in their APR advertisements and communications that are false and

25 misleading because they are unsupported by credible scientific evidence: (1) the use of

26 the terms "reverse" and "reversal"; (2) that APR "has been shown to increase the chances

27

28

3

24-cv-01338-GPC-KSC

of allowing the pregnancy to continue"; (3) that APR has a success rate of 64-68%; (4) that the rate of birth defects following APR is "less or equal to the rate in the general population"; (5) that "thousands of lives have been saved" through APR; (6) that APR may be effective beyond a 72-hour window following mifepristone administration; (7) that APR may be effective following administration of misoprostol and methotrexate; and (8) that APR can cause only non-life-threatening side effects, even though it can cause severe bleeding. Ex. A. ¶¶ 97, 100.

Heartbeat International and the other defendant RealOptions, Inc. filed demurrers asking the state court to dismiss the action, based on constitutional grounds, and Heartbeat International filed a motion to quash. Exs. C, D, E. In June 2024, the state court denied the motion to quash and overruled the demurrers. Exs. F, G. The defendants filed their joint answer, including as part of their affirmative defenses that the Action is unconstitutional under the First Amendment's Free Exercise and Free Speech Clauses and under the Fourteenth Amendment's Substantive Due Process Clause. Ex. B at 31-33.[4]

### III.   COLFS and the current complaint

COLFS sold to Heartbeat International, for a nominal sum, the APR Network that Dr. Delgado created, which included a website, a hotline, and a network of providers willing to provide APR treatment. Am. Compl. ¶¶ 43-44.

COLFS alleges the Enforcement Action is an "attempt to restrict APR," *see id*. ¶¶ 122, 140, 151. COLFS alleges that the Enforcement Action has created its need for pre-enforcement relief from AG Bonta because COLFS alleges it makes the same or similar statements as those targeted in the Enforcement Action against Heartbeat International. *See id.* ¶¶ 97, 100, 102-05.

---

[4] Page numbers in this Order will refer to the CM/ECF pagination.

24-cv-01338-GPC-KSC

1       In bringing this claim against AG Bonta, COLFS alleges that "Bonta's attack on
2 APR is chock full of constitutional implications" that infringe on COLFS's and their
3 patients' rights. *Id.* ¶ 56. These "constitutional implications" involve violations of the
4 free exercise of religion, the right to free speech, and the right to make reproductive
5 decisions. *Id.*

6       Specifically, COLFS alleges that the Enforcement Action constitutes a content-
7 based restriction on speech about APR and thus violates the Free Speech Clause. *Id.* ¶
8 112. COLFS also alleges that the Enforcement Action violates the Free Speech Clause's
9 protection of patients' "right to receive information." COLFS alleges that doctors have
10 "third-party standing to assert the interests of their patients so long as the physician has
11 also suffered injury himself." *Id.* ¶ 145 (citing *McCormack v. Herzog*, 788 F.3d 1017,
12 1027 (9th Cir. 2015)).

13       Furthermore, COLFS alleges that the Enforcement Action violates the Free
14 Exercise Clause because it is not a generally applicable policy, since the Action does not
15 apply to off-label uses of progesterone. *Id*. ¶ 137.[5]

16       Finally, COLFS alleges that the Enforcement Action violates the Substantive Due
17 Process Clause of the 14th Amendment, because Bonta's assertion that APR must be
18 restricted violates COLFS's patients' right to "procreation, reproductive privacy, and to
19 reject unwanted medical treatment." *Id*. ¶ 159.

20 **PROCEDURAL HISTORY**

21       On July 30, 2024, COLFS filed its original complaint. ECF No. 1. On August 21,
22 2024, AG Bonta filed a motion to dismiss, or alternatively stay, COLFS's complaint.

23 ─────────────────

24
25 [5] COLFS feels "religiously obligated to offer Abortion Pill Reversal" by nature of its
religious mission, so the provision of APR treatment, according to COLFS, is an exercise
26 of religious freedom and expression that is protected under the First Amendment. *See id*.
27 ¶ 122.

28 24-cv-01338-GPC-KSC

1  ECF No. 4.  On November 5, 2024, COLFS filed a motion for preliminary injunction.

2  ECF No. 13.

3      On November 12, 2024, this Court granted AG Bonta's motion to dismiss, based

4  on the finding that COLFS had not sufficiently alleged pre-enforcement standing, and

5  granted COLFS leave to amend.  ECF No. 17.  The following day, the Court denied

6  COLFS's preliminary injunction request as moot.  ECF No. 18.  On November 15, 2024,

7  COLFS filed its amended complaint and re-filed its preliminary injunction motion.  ECF

8  Nos. 19, 21. On December 10, 2024, AG Bonta filed a motion to dismiss COLFS's

9  amended complaint simultaneously with his opposition to COLFS's preliminary

10  injunction request.  ECF Nos. 25, 27.  On January 3, 2025, COLFS responded to the

11  motion to dismiss, ECF No. 29, and filed a reply in support of its motion for preliminary

12  injunction, ECF No. 30.  On January 17, 2025, AG Bonta filed a reply in support of his

13  motion to dismiss.  ECF No. 31.

14      On June 13, 2025, this Court granted AG Bonta's motion to dismiss the first

15  amended complaint on counts two through four, but denied it as to count one.  ECF No.

16  43.

17      The Court now considers COLFS's Motion for Preliminary Injunction ("Motion"

18  or "Mot.").

### REQUEST FOR JUDICIAL NOTICE

20      Under Federal Rule of Evidence 201, a district court may take notice of facts not

21  subject to reasonable dispute that are capable of accurate and ready determination by

22  resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).

23      Defendant seeks judicial notice of several exhibits, including court filings made in

24  the State Action and court filings (expert declarations) made in other federal district court

25  cases raising related legal issues.  ECF No. 27, AG Bonta's Request for Judicial Notice

26  ("RJN").  Plaintiff objects as to the expert declartions but, in the event that the Court

27

28

takes judicial notice of these declarations, Plaintiff seeks judicial notice of Exhibits I through N, expert declarations in favor of APR that have been submitted in cases across the country. ECF No. 30, COLFS's RJN.

The Court takes judicial notice of Exhibits A, B, and C from Defendant's RJN because these are court filings in the State Action, which are both "matters of public record," *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted), and also highly relevant because Plaintiff has based its need for pre-enforcement relief on the existence of the pending State Action, Am. Compl. at 32. And neither party disputes its authenticity. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010). The Court does not, however, take judicial notice of the truth of any disputed facts contained in these exhibits. *See Lee*, 250 F.3d at 689.

As to the expert declarations found in Defendant's Exhibits D through M and Plaintiff's Exhibits I through N, the Court will take judicial notice of the existence of the documents and that they were publicly filed, but not the truth of matters stated therein. "Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 587 U.S. 1014 (2019). That is true of court documents. *See GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1019 (C.D. Cal. 2017), *aff'd sub nom. GemCap Lending I, LLC v. Quarles & Brady, LLP*, 787 F. App'x 369 (9th Cir. 2019) (finding that a court may "take judicial notice of the existence of another court's opinion or of the filing of pleadings in related proceedings; the Court may not, however, accept as true the facts found or alleged in such documents.").

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted).

24-cv-01338-GPC-KSC

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). As such, the "grant of a preliminary injunction is a matter committed to the discretion of the trial judge[.]" *Evans v. Shoshone–Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (citation omitted). "In exercising their sound discretion," district courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982).

District courts exercise this discretion according to a four-factor test rooted in well-established principles of equity. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Under the Ninth Circuit's "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). That being so, all four elements must be satisfied. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022). The moving party carries the burden to meet the four *Winter* prongs. *All. for the Wild Rockies,* 632 F.3d at 1135.

## DISCUSSION

The Court turns to COLFS's motion for preliminary injunction. Because the Court concluded in a prior order that Plaintiff failed to state a plausible claim for relief as to counts two through four, *see* ECF No. 43, the Court concludes that Plaintiff is unlikely to succeed on the merits as to those claims and accordingly DENIES the motion for

8

24-cv-01338-GPC-KSC

1    preliminary injunction as to those causes of action.  *See Disney Enterp., Inc. v. VidAngel,*

2    *Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (if a movant fails to meet the "likelihood of

3    success on the merits" prong, the court need not consider the other factors).

4         The Court now considers Plaintiff's surviving First Amendment claim: whether

5    applying the UCL and FAL to COLFS's statements about APR treatment would violate

6    the Free Speech Clause.  In its order granting the Defendant's motion to dismiss, the

7    Court previously found that taking the well-pleaded allegations as true, this claim

8    contained sufficient facts to plausibly support a cognizable legal theory.  With respect to

9    the requested preliminary injunction, "in the First Amendment context, the moving party

10   bears the initial burden of making a colorable claim that its First Amendment rights have

11   been infringed, or are threatened with infringement, at which point the burden shifts to

12   the government to justify the restriction" on speech. *Thalheimer v. City of San Diego*, 645

13   F.3d 1109, 1116 (9th Cir. 2011), *overruled on other grounds by Bd. of Trs. of Glazing*

14   *Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc).  The

15   Court finds that COLFS has failed to make a colorable claim and even if it has, the

16   government has justified its restriction on speech.

17     **A. Likelihood of success on the merits**

18       1. <u>The commercial nature of the speech</u>

19         The Court has already found that the challenged laws are not content-based and do

20   not warrant application of a strict scrutiny standard.  *See* ECF No. 43 (Order Denying in

21   Part and Granting in Part Motion to Dismiss) at 24.  But as content-neutral regulations,

22   they are generally subject to heightened scrutiny: the government may impose reasonable

23   restrictions on the time, place, or manner of protected speech, provided the restrictions

24   "are justified without reference to the content of the regulated speech, that they are

25   narrowly tailored to serve a significant governmental interest, and that they leave open

26

27

28

9

24-cv-01338-GPC-KSC

1  ample alternative channels for communication of the information." *Clark v. Community*
2  *for Creative Non–Violence,* 468 U.S. 288, 293 (1984).

3      The threshold question is, however, whether the speech at issue is protected.  To
4  answer this, the Court takes up whether the subject speech is commercial or non-
5  commercial. Because "the degree of protection afforded by the First Amendment depends
6  on whether the activity sought to be regulated constitutes commercial or non-commercial
7  speech," the Court "must first determine the proper classification" of the speech at
8  issue.  *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 65 (1983).  In general, laws
9  regulating commercial speech are subject to a lesser standard of scrutiny.  *See id.* at 64-
10  65.  Inherently false and misleading statements in commercial speech are given little
11  constitutional protection.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of
12  N.Y.*, 447 U.S. 557, 563 (1980).

13      The Supreme Court has held that speech may be "characterized as commercial
14  when (1) the speech is admittedly advertising, (2) the speech references a specific
15  product, and (3) the speaker has an economic motive for engaging in the speech." *Am.
16  Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir.2004) (citing *Bolger*, 463
17  U.S. at 66–67). While "[t]he combination of all of these characteristics ... provides strong
18  support for the ... conclusion that [the communication is] properly characterized as
19  commercial speech," *Bolger*, 463 U.S. at 67, it is not necessary that each of the
20  characteristics "be present in order for speech to be commercial," *id.* n. 14.

21      COLFS argues that its APR speech is noncommercial because as a religious
22  nonprofit, it seeks to "ensure that Christ-centered medical care and pregnancy clinic
23  services are available to all women regardless of ability to pay."  Am. Compl. ¶ 21.
24  However, as the Court noted in its order granting the motion to dismiss, this is not
25  dispositive.  Instead, the Bolger factors are applied in a "fact-driven" analysis, *First

10

24-cv-01338-GPC-KSC

*Resort*, 860 F.3d at 1272, and courts take a "common-sense" approach, *Ariix, LLC v. NutriSearch Corp.,* 985 F.3d 1107, 1115 (9th Cir. 2021).

Relying on the Amended Complaint, as well as transcripts of videos that are played at annual fundraising galas, AG Bonta offers evidence that COLFS uses the APR statements in advertisements that are directed towards, and solicit, women to become potential clients. *See, e.g.*, Am. Compl. ¶¶ 4, 15, 19, 21, 97, 102, 104; Goyette Decl. ¶¶ 5-8; *id.* Ex. B at 4 ("COLFS Medical Clinic can perform the APR process, but you must contact us immediately."), Ex. C ("Do you regret your decision and wish to reverse the effects of the abortion pill? We are here to help you!"), and Ex. H ("At COLFS Medical Clinic we can help you learn everything you need to know about the APR procedure…"). These advertisements are clearly about the particular service/product of APR treatment and are aimed at soliciting women who are pregnant and have taken the first drug in the abortion pill regimen. COLFS's statements are "placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas." *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176, 181 (N.D. 1986).

AG Bonta asserts that COLFS has an economic motivation because it uses the APR statements in its yearly fundraising gala and uses patient stories about APR to solicit donations. Opposition to PI at 14-15. In other words, the APR advertising statements solicit patients whose stories then boost the organization's fundraising efforts. *See First Resort,* 860 F.3d at 1273 ("solicitation of a non-paying client base directly relates to [plaintiff's] ability to fundraise"). In *Nat'l Inst. of Fam. & Life Advocs. v. Bonta*, a case nearly parallel to the instant one, the district court found *First Resort*'s logic and rationale to be determinative in concluding that NIFLA had an economic motivation. 2025 WL 1140450, at *5 (C.D. Cal. Mar. 6, 2025). The court stated that since one of the benefits that NIFLA provides to its members is advising on APR, and it is through their members that NIFLA raises funds, this was a "powerful economic motivation." *Id.*

24-cv-01338-GPC-KSC

Not only does *First Resort*'s logic apply to COLFS as well, there is a stronger case here for economic motivation. "NIFLA does not on its own provide any direct APR services to the public," *id.*, at *2, while COLFS actually provides the APR treatments itself to its own patients, Am. Compl. at 8. Although COLFS alleges that, as a religious nonprofit, it provides "numerous free services," including "free APR treatment," this belies the fact that it still accepts insurance and payment for APR treatments from women who *do* have the ability to pay. On COLFS's website, the "Abortion Pill Rescue FAQs" page states: "Cost of the treatment varies depending on the progesterone used. Insurance plans may cover treatment. COLFS Medical Clinics will cover expenses for our APR patients who do not have insurance or financial means to pay for treatment." Goyette Decl., Ex. H. Thus, it seems apparent that COLFS has an economic motivation behind its APR speech. But COLFS does not respond to these allegations in its motion or briefing.

The Court concludes that the subject speech is commercial.

2. <u>Whether the speech is false and misleading</u>

Next, the Court applies the *Central Hudson* test to determine whether a potential enforcement action against COLFS's commercial APR speech would be unlawful. *See Am. Academy of Pain Management v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).

As a threshold question, "*Central Hudson* specifies that if the regulated [commercial] speech concerns illegal activity or is misleading, the First Amendment extends no protection and the analysis ends." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 460 (9th Cir. 2018). Specifically, for "inherently misleading" commercial speech, there is no First Amendment protection at all. *Am. Academy of Pain Management*, 353 F.3d at 1107. For "potentially misleading" commercial speech, "the speech regulation must satisfy the remaining three factors specified in *Central Hudson*." *Id.*

24-cv-01338-GPC-KSC

1    This is not the first case where statements regarding the efficacy and safety of APR

2  have been subjected to First Amendment scrutiny.  Three district courts have struck down

3  state laws that required abortion providers, under threat of criminal sanction, to inform

4  patients about supplemental progesterone therapy in language providers objected to for

5  being untruthful or misleading.  *See Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134,

6  1147–52 (D.N.D. 2019); *Planned Parenthood of Tenn. & N. Miss. v. Slatery*, 523 F.

7  Supp. 3d 985, 1005 (M.D. Tenn. 2021); *All-Options, Inc. v. Atty. Gen. of Ind.*, 546 F.

8  Supp. 3d 754, 770 (D. Ind. 2021).  Two district courts have addressed the particular

9  procedural posture here: a pro-life organization asking for a preliminary injunction that

10  would disallow an attorney general from pursuing a hypothetical enforcement action

11  against them based on APR-related speech.  The courts went oppositely.  *See Nat'l Inst.*

12  *for Fam. & Life Advocs. v. James*, No. 24-CV-514 (JLS), 2024 WL 3904870, at *12

13  (W.D.N.Y. Aug. 22, 2024) (injunction granted after applying strict scrutiny); *Nat'l Inst.*

14  *for Fam. & Life Advocs. v. Bonta,* 2025 WL 1140450, at *5 (injunction denied after

15  applying *Central Hudson*).

16    The Court now turns to whether this commercial speech is false or misleading.

17  Because COLFS has alleged that they make the same or similar statements as those that

18  AG Bonta is targeting in the State Action, *see* Am. Compl. ¶¶ 97, 100, 102-05, the Court

19  will examine each of these statements to find whether they are inherently or potentially

24-cv-01338-GPC-KSC

1  false and misleading – or not.  The Court, in doing so, relies on the exhibits and expert

2  declarations submitted by both parties.[6,7]

3      **a.  Use of the terms "reverse" and "reversal"**

4      AG Bonta's civil enforcement action against Heartbeat International targets

5  statements that supplemental progesterone treatment "reverses" medical abortions.  These

6  statements are based on Dr. Delgado's theory that supplemental progesterone can

7  "outcompete" mifepristone to counteract or "reverse" the effects of mifepristone.

8

9  _____

10  [6] AG Bonta filed an objection to the declarations of Plaintiff's experts, Dr. Valley and Dr.

11  Kraus, on the grounds that neither are qualified to provide the opinions they offer in their

12  declarations, and that their opinions are not reliable.  ECF No. 28.  **The Court OVERRULES these objections**.  Both experts are qualified to opine on Abortion Pill

13  Reversal, as they are medical professionals who have practiced and specialized in the

14  OB/GYN field.  ECF No. 30-9 (Plaintiff's Response to Defendant's Evidentiary Objections).  Federal Rule of Evidence 702, which requires a testifying expert to be

15  qualified, "contemplates a broad conception of expert qualifications." *Hangarter v.

16  Provident Life & Accident Ins. Co*., 373 F.3d 998, 1015 (9th Cir. 2004) (citation omitted).

   Dr. Valley and Dr. Kraus's opinions are also reliable.  They are based on work

17  experience and medical literature, including peer-reviewed human studies.  *See Daubert

18  v. Merrell Dow Pharm. Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).  In any case, "the

   Federal Rules of Evidence do not strictly apply in the preliminary injunction context."

19  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir.

20  2024).

21  [7] On April 2, 2025, Plaintiff filed an ex parte application for leave to submit a

   supplemental declaration of Dr. Kraus in support of its motion for preliminary

22  injunction.  ECF No. 36.  **The Court GRANTS this ex parte application**.  Dr. Kraus's

   supplemental declaration opines on a new study published on March 19, 2025, which

23  examines the effects of progesterone on the inner lining of the uterus after ingestion of

24  mifepristone.  Because this study is relevant to the issues of this case, and because it was

   not yet published when briefing was concluded, the Court finds good cause to grant this

25  ex parte application, and will consider the supplemental declaration in its analysis herein.

26  The Court also accepts, for consideration, Defendant expert Dr. Creinin's declaration that

   was filed in response to Dr. Kraus's supplemental declaration.  ECF No. 40.

27

28

1   Connolly Decl. Ex. 3 at 16.  Typically, mifepristone acts as a "competitive binder of the

2   progesterone receptor – it binds to progesterone receptors at twice the avidity of

3   progesterone itself, thus blocking endogenous progesterone from acting to support a

4   pregnancy." Kraus Decl. ¶ 33; Creinin Decl. ¶ 21 (mifepristone "works by binding more

5   rightly and more preferentially to the progesterone receptors in the uterus and cervix").

6   "By preventing progesterone from binding with those progesterone receptors, the uterus

7   begins to shed its lining and becomes more sensitive to prostaglandins, like misoprostol,

8   that cause the uterus to contract." Creinin Decl. ¶ 21.

9        According to Plaintiff's expert Dr. Kraus, the influx of additional progesterone

10  could "bind the receptors, and can ultimately outcompete mifepristone for the receptors.

11  The effect is a competitive inhibition of the mifepristone that curbs and even negates its

12  effects." Kraus Decl. ¶ 33.  This is the pharmacology behind the theory of using

13  progesterone to "reverse" medication abortions after mifepristone is administered. *Id*.

14       However, as Defendant's expert Dr. Creinin notes, "[d]uring pregnancy, the

15  amount of progesterone the body produces increases substantially and these levels remain

16  high throughout the entire pregnancy." Creinin Decl. ¶ 37.  Thus, even given the high

17  amounts of progesterone, mifepristone is able to do its work in attaching to progesterone

18  receptors.  In other words, it's not for lack of progesterone that mifepristone is able to

19  work.  Simply adding more progesterone would be like "rain on a swimmer in a pool –

20  the swimmer cannot get more wet." *All-Options, Inc.*, 546 F. Supp. 3d at 768

21  (paraphrasing testimony from expert who did not believe additional progesterone would

22  prevent an abortion).

23       Dr. Kraus disagrees, asserting that "if the substrate concentration (progesterone) is

24  increased (that is, above normal levels in the body, which are already elevated), the

25  understood result is that it outcompetes the inhibitor at the receptor." Kraus Decl. ¶ 20.

26  "In these cases, it is still the administration of even more competition (in this case, more

27

28

15

24-cv-01338-GPC-KSC

1  progesterone) that overcomes the inhibitory action of the mifepristone bound to
2  progesterone receptors." *Id.* Dr. Kraus seems to believe that introducing more
3  progesterone would have some significant effect in outcompeting mifepristone, even
4  though there are already-inflated levels of progesterone.

5      In support, Plaintiff's other expert Dr. Valley asserts that there is scientific
6  evidence backing this premise that progesterone, on a molecular level, can outcompete or
7  reverse the effects of mifepristone. Valley Decl. ¶¶ 27, 29. He points to a study that was
8  part of the submission to the FDA during the New Drug Application process for
9  mifepristone. In this study, rats were given mifepristone with and without progesterone.
10  When given only mifepristone, the fetal loss rate was 66-100%. Valley Decl. ¶ 29. For
11  the group of rats given the highest dose of progesterone, the fetal loss rate was 10.78%.
12  *Id.* The authors of the study wrote, "Thus the abortifacient activity of RU486
13  (mifepristone) is antagonized by progesterone allowing for normal pregnancy and
14  delivery." *Id.* (citing Mifeprex Drug Approval Package, *Pharmacology Review(s),* FDA
15  16-17 (Sept. 28, 2000)).

16      Dr. Valley also points to another study done on rats. Three groups of pregnant rats
17  were studied: one was given only mifepristone, another was given both mifepristone and
18  progesterone, and a control group was given neither drug. *Id.* ¶ 32. The continued
19  pregnancy rate in the group receiving *both* mifepristone and progesterone was 81.3%,
20  similar to the continued pregnancy rate in the control group that received no mifepristone
21  and no progesterone. *Id.* The group given only mifepristone had no resulting viable
22  pregnancies. *Id.*

23      Of course, animal studies can be an important "pre-clinical tool to developing a
24  knowledge base about potential human safety and efficacy," Creinin Decl. ¶ 33, but
25  naturally, they are limited in justifying the clinical use of a drug on humans. This is all
26  the more apparent here because "there are significant differences between rat and human
27
28

16

24-cv-01338-GPC-KSC

1  pregnancies and progesterone's actions in each" and "[p]rogesterone receptors also vary

2  widely between species in their responsiveness to different molecules…" *Id.* ¶ 59.[8]  All

3  experts agree that the "gold standard for experimental research is a randomized controlled

4  trial" ("RCT") conducted on humans. *Id.* ¶ 32; Valley Decl. ¶ 19a; Kraus Decl. ¶ 34.

5       More persuasive, therefore, is a recently published study by lead author Pilar Vigil,

6  MD, PhD ("Vigil Study"), which was designed to examine the effects of progesterone

7  supplementation, after mifepristone administration, on the endometrium (the inner lining

8  of the uterus where implantation occurs).  This was a placebo-controlled trial.

9  Endometrial biopsies were obtained 7 days after ovulation and analyzed.  Dr. Kraus states

10  that the study's findings suggest that supplemental progesterone may help promote

11  restoration of the endometrium for implantation, counteracting the changes caused by

12  mifepristone.  ECF No. 36, Supplemental Declaration of Elena Kraus, M.D., Ph.D.

13  ("Kraus Supp. Decl.") ¶ 9.  The study's findings also suggest that "specific gene

14  expression that is affected by mifepristone in the human endometrium is reversed by

15

16

_____

17  [8] Dr. Creinin also argues that because the animals were given progesterone at the same

18  time as mifepristone, the studies did not accurately reflect how APR usually works
    (progesterone given at some point after mifepristone).  Creinin Decl. ¶ 58.  The analysis

19  therefore depends in part on *when* mifepristone actually works in the body.  This is a

20  point of contention between the experts.  Dr. Creinin states: "Mifepristone is absorbed
    quickly within one to two hours after ingestion, is metabolized slowly over the first 72

21  hours, then more quickly after 72 hours.  Thus, by the time that progesterone is taken in
    an attempt to halt the effects of the mifepristone, the mifepristone actions have largely

22  already occurred." Creinin Decl. ¶ 22.  Dr. Kraus, in turn, states that "mifepristone is

23  absorbed quickly, but its action occurs over a more prolonged period." Kraus Decl. ¶ 26.
    "During this period of activity in its target areas, mostly within about 72 hours,

24  supplemental progesterone would have time to counteract its effects, and hold potential

25  for being applicable for effectively outcompeting mifepristone and its actions at
    progesterone receptors." *Id.*  The Court does not presume to make a finding on the exact

26  timing of mifepristone's effects, but finds that it is possible that the fullest extent of

27  mifepristone's effects have not occurred within 72 hours.

17

28                                                                                    24-cv-01338-GPC-KSC

1   exogenous progesterone when administered 24 hours later." *Id.* ¶ 10. Dr. Kraus admits

2   that "[f]urther studies are needed to establish a direct regulatory effect of exogenous

3   progesterone administered after mifepristone" but that the study nevertheless provided

4   further support for the "potential effectiveness of supplemental progesterone in reversing

5   the effects of mifepristone when used for medication abortions." *Id.* ¶ 11.

6       Dr. Creinin found the new study unpersuasive because it used nine *nonpregnant*

7   individuals as subjects. ECF No. 40, Declaration of Dr. Mitchell Creinin Opposing Ex

8   Parte Application for Leave to Submit Supplemental Expert Declaration ("Creinin Supp.

9   Decl.") ¶ 10. The endometrial lining, uterus, and hormonal milieu of a pregnant person

10  are all "vastly different" from those of a nonpregnant person. *Id.* This extends to the

11  genetic transcription occurring within the endometrium as well: during pregnancy, the

12  specific genes that were examined in the Vigil Study undergo significant changes, such

13  that the genetic activity presents "a wholly different baseline upon which mifepristone

14  and progesterone administered during pregnancy will act." *Id.* Dr. Creinin also criticized

15  the study for its focus on examining tissue samples rather than "actual bodies," making it

16  more of a laboratory than clinical study, and for having a small sample size (9

17  individuals) which would mean that any findings would not be conclusive of causation

18  and instead would be at most "hypothesis generating." *Id.* ¶¶ 11, 13.

19      The Court concludes that the findings of the Vigil Study are inherently limited

20  because only a few nonpregnant individuals were studied. However, the Court finds that

21  the findings are still important and valuable to consider, especially given the weighty

22  ethical considerations that impede conducting RCTs in this area of study. Kraus Decl. ¶

23  34; Valley Decl. ¶ 57 ("It would not be ethical to ask women, who wanted to attempt to

24  reverse their medication abortion with progesterone, to enroll in a randomized controlled

25  trial where they would randomly receive either progesterone or placebo."). The Vigil

26

27

28

18

24-cv-01338-GPC-KSC

1  Study's findings may not be exactly on-point for the scientific question at issue, but this
2  goes to weight and not admissibility.

3      Finding that the science here is unclear on how exactly supplemental progesterone
4  reacts with mifepristone, the Court turns to the common understanding of the word
5  "reverse" to determine whether it accurately captures what we *do* know about the effects
6  of supplemental progesterone.  According to dictionary definitions, "reverse" means "to
7  change the direction, order, position, result, etc. of something to its opposite."[9]  Or, "to
8  turn completely about in position or direction" or "to undo or negate the effect of
9  (something, such as a condition or surgical operation)."[10]

10     Thus, a "reversal" of an abortion implies that there is a complete change in
11 direction or position, a negation of a condition, or an undoing of an effect.  That does not
12 seem to capture entirely and accurately what is happening here.  *See* Creinin Decl. ¶ 44
13 ("Medication abortion cannot be 'reversed,' which would imply putting an aborted
14 pregnancy back in the uterus.").  Supplemental progesterone possibly could be inhibiting
15 mifepristone's effects or competing with mifepristone for receptors.  But this does not
16 really mean – less so guarantee – a reversal of mifepristone's effects or of the abortion as
17 a whole.  *See Slatery*, 523 F. Supp. 3d at 1003 ("The word 'reversal' makes the mandated
18 message untruthful and/or misleading because it promises more than progesterone
19 therapy has even attempted to deliver.").

20     Not only has COLFS not provided evidence that greater amounts of progesterone
21 can unseat mifepristone from progesterone receptors, it may instead be the case that

---

24 [9] *Cambridge Dictionary*, "Reverse" (last updated May 5, 2025),
25 http://dictionary.cambridge.org/us/dictionary/english/reverse.
26 [10] *Merriam-Webster*, "Reverse" (last updated May 5, 2025),
27 http://www.MerriamWebster.com/dictionary/reverse.

28

19

24-cv-01338-GPC-KSC

"failing to continue taking the second drug in the medication abortion regimen, misoprostol, may result in continued pregnancy in some percentage of women who take mifepristone[.]" Creinin Decl. ¶ 46b. In the absence of such evidence, it would be at the very least potentially misleading to state that supplemental progesterone can "reverse" an abortion.

### b. "Effectiveness" statement

COLFS alleges that it engages in statements asserting that APR is effective and can increase the chances of continued pregnancy. *See* Am. Compl. ¶ 102.

COLFS relies heavily on Dr. Delgado's 2018 Report, which purportedly shows that progesterone increases the chances of a pregnancy continuing after taking mifepristone.[11] As AG Bonta notes, however, there are several methodological and structural flaws with this Report. Some patients were screened by ultrasound for viable pregnancies before joining the study, which biased the data towards pregnancies already likely to continue. Connolly Decl. Ex. 3 at 22. The Report also did not record how far along in her pregnancy each patient was or how much progesterone each patient took – even though mifepristone is less effective at terminating pregnancies as they progress in gestational age. Connolly Decl. Ex. 3 at 19. Finally, there were no controls in the study,

---

[11] Besides the 2018 Report, Plaintiff and experts draw conclusions from three other APR analyses: a 2012 case series by Delgado and Davenport with six patients, a 2017 case series involving three patients, and a 2023 pilot study with six patients. Connolly Decl. Ex. 2; Creinin Decl. Exs. P, GG (respectively). According to a statement by the American College of Obstetricians and Gynecologists, "[The 2012 case series] is not scientific evidence that progesterone resulted in the continuation of those pregnancies." Connolly Decl. Ex. 8 at 14. "Case series with no control groups are among the weakest forms of medical evidence." *Id*. at 15. Because of the small sample size of all these analyses – and other methodological flaws – the results of these analyses do not provide meaningful statistical support for the effectiveness of APR treatment. *See* Creinin Decl. ¶ 55.

20

24-cv-01338-GPC-KSC

1  especially as the patients were treated by 325 different medical providers.  *See All-*

2  *Options, Inc*., 546 F. Supp. 3d at 766.  For these reasons, the 2018 Report does not

3  support the accuracy of the statements that APR is "effective" in continuing pregnancies.

4       A significant assumption made by the 2018 Report, in purporting that

5  supplemental progesterone was effective, was that less than 25% of pregnancies will

6  continue after taking mifepristone alone.  Connolly Decl. Ex. 3 at 19.  To determine if

7  APR treatment is effective at continuing pregnancy, it is important to establish what is

8  called the "continuing pregnancy rate" for mifepristone alone, *without* misoprostol or

9  progesterone.  This rate would be the baseline, against which the continuing pregnancy

10  rate for mifepristone *plus* supplemental progesterone would be compared.  In theory, if

11  supplemental progesterone actually had an effect on fetal survival, the rates would be

12  significantly and statistically different.  In other words, if the continuing pregnancy rate

13  of **mifepristone + progesterone** was not meaningfully different from the continuing

14  pregnancy rate for **mifepristone alone**, then APR treatment would be considered

15  ineffective.

16       The problem is that there is no agreed-upon rate of continuing pregnancy for

17  mifepristone alone; no baseline rate has been universally accepted.[12]  A systematic review

18  ───────────────

19
20  [12] According to Dr. Creinin, "It is difficult to accurately estimate the rate of continuing
    pregnancy following mifepristone alone for a few reasons: (1) there are very few studies
21  showing the proportion of pregnancies in which mifepristone alone caused complete
    abortion due to the fact that during early studies (before FDA approval), researchers
22  understood that mifepristone alone was not very effective at ending a pregnancy but,
    when used in combination with a prostaglandin analogue, it became very effective; (2)
23  almost all studies of mifepristone-alone efficacy focused on pregnancies that were less
    than 49 days gestation and higher doses of mifepristone than the dosage used under the
24  FDA approval/guidance; (3) none of the studies of mifepristone alone have included a
    wide enough range of gestational ages, including up to 70 days gestation, to encompass
25  the upper gestational duration approved by the FDA for medication abortion with
26  mifepristone and misoprostol; and (4) there are no large population-based studies

27
                                    21

28                                                            24-cv-01338-GPC-KSC

1  of studies on embryo survival after mifepristone-only was published in 2015 ("Grossman

2  Systematic Review").  Valley Decl. ¶ 50.  The studies reviewed, however, were very

3  heterogenous, involving different doses of mifepristone, such that the authors concluded

4  that no conclusions could be made about continuing pregnancy rates with mifepristone

5  alone.  *Id.*  The continuing pregnancy rates ranged from 8% to 46%, depending on the

6  mifepristone regimen used.  *See id.*; Creinin Decl. ¶ 39.  The review's lead author, Dr.

7  Grossman, concluded that there was inadequate evidence to establish that supplemental

8  progesterone increased the likelihood of pregnancy continuation following mifepristone.

9  Kraus Decl. ¶ 38.

10      Another systematic review of pregnancy continuation after mifepristone alone was

11  conducted in 2017 ("Davenport Systematic Review").  Valley Decl. ¶ 51.  Most of the

12  studies that were reviewed involved a dosage level that was more than 200mg of

13  mifepristone, the current commonly prescribed dose.  *Id.*  The Davenport Systematic

14  Review also included studies that did not clearly define a continuing pregnancy as a

15  viable pregnancy (either by not defining the term or by including pregnancies that had

16  fetal death but not full tissue expulsion).  Creinin Decl. Ex. I at 2.  One study that used

17  the single mifepristone dose at 200mg showed a continuing pregnancy rate of 23.3%.

18  Valley Decl. ¶ 51.  This is the rate that the 2018 Report relied on as its baseline

19  percentage.  But this study only had a sample size of 30 women, not enough to glean a

20  "statistically reliable pregnancy continuation rate."  Creinin Decl. ¶ 40.

21      In a recent systematic review from 2024, the Stifani Systematic Review, the

22  continuing pregnancy rate for individuals with ≤ 7 weeks in gestational age who received

23  progesterone was determined to be 42% (confidence interval of 37-48) compared with

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  examining this question because very few women elect to discontinue their medication

27  abortion after having taken mifepristone."  Creinin Decl. ¶ 39.

    22

28  24-cv-01338-GPC-KSC

22% (confidence interval of 11-39) for mifepristone alone. While the difference between the rates appears significant, "[m]ost of the data in this analysis were collected as part of a large case series with ethical and methodological issues." Connolly Decl. Ex. 7 at 9. Namely, the 2018 Delgado Report, which purported a success rate of progesterone treatment of up to 68%. As analyzed above, however, the 2018 Report was flawed in many ways, including the fact that at least several women demonstrating no fetal heartbeat were excluded from the study. "Only selecting individuals who had gestational cardiac activity at the time they sought abortion reversal would falsely inflate progesterone's success rate…" *Id.* Since much of the data analyzed in the Stifani Systematic Review derived from the 2018 Delgado Report, the results of the systematic review are not free of the Report's original flaws. The authors concluded as much: "Based mostly on poor-quality data, it appears the ongoing pregnancy rate in individuals treated with progesterone after mifepristone is not significantly higher compared to that of individual receiving mifepristone alone." Connolly Decl. Ex. 7 at 2.

Well-respected professional organizations have also cast doubt on the effectiveness of APR: the American College of Obstetricians and Gynecologists, the Society of Obstetricians and Gynecologists of Canada, and the Royal College of Obstetricians and Gynecologists have all stated that there is no strong scientific evidence supporting or recommending APR. Creinin Decl. ¶ 47a.-c.

The Court finds that given the lack of robust scientific study on this issue, statements on the effectiveness of APR are potentially misleading.

### c. "Side effects" statement

There is not enough medical evidence to conclude with confidence that APR is safe. No study offered or used by COLFS appears to track health or safety outcomes for the pregnant individual. Connolly Decl. Ex. 7 at 9. No study affirmatively concludes that APR only has non-life-threatening side effects. The 2018 Report, the largest case

24-cv-01338-GPC-KSC

1  series on APR, "lacked any data about health or safety outcomes for the pregnant

2  patients." Creinin Decl. ¶ 53. There was only data on preterm delivery or birth defects,

3  but no other pregnancy complications were recorded, and there was no information on

4  what happened to the women for whom the pregnancy did not continue. *Id.*

5    Plaintiff's experts have emphasized the safe and common use of progesterone for

6  other issues arising in pregnancy. Valley Decl. ¶¶ 34-35; Kraus Decl. ¶ 32; Kraus

7  Rebuttal Decl. ¶ 42. Dr. Creinin notes that there are still some risks involved with

8  progesterone use, including hypertension, jaundice, and thyroid cancer, but does not

9  provide any information on any life-threatening risks. Creinin Decl. ¶¶ 68-69.

10    The issue is less so whether supplemental progesterone – in general and in other

11  prenatal contexts – is dangerous to women, but rather whether administering mifepristone

12  *without misoprostol* (and therefore halting the medication abortion halfway) would be

13  dangerous. *See* Creinin Decl. Ex. I at 221 (Dr. Creinin and Chen's 2019 commentary)

14  (progesterone "likely not" harmful "based on widespread use within obstetrics," but there

15  is no answer to whether "NOT using misoprostol [is] harmful, especially if the patient is

16  beyond 49 days of gestation"). The first and only randomized clinical study to attempt to

17  test the safety and efficacy of APR was initiated at UC Davis in 2019 by Dr. Creinin, but

18  had to stop because of the serious "safety concerns" after 3 of the 12 participants

19  experienced "severe bleeding" after taking mifepristone without misoprostol. Two of

20  those three received a placebo (one of them eventually required a blood transfusion); the

21  third person had been given progesterone and required no intervention. Dr. Valley

22  interpreted this to mean that "giving the progesterone after mifepristone was safe" and

23  that the "significant safety concerns were in the placebo arm only." Valley Decl. ¶ 43.

24  Dr. Creinin interpreted this to mean that taking mifepristone without following it up with

25  misoprostol could lead to severe bleeding. Creinin Decl. ¶ 66 ("Patients in early

26  pregnancy who use only mifepristone may be at risk of significant hemorrhage.").

27

28

24

24-cv-01338-GPC-KSC

1    Professional organizations have also expressed disconcertment with the lack of

2  evidence on the safety of APR treatment.  The American College of Obstetricians and

3  Gynecologists, on its website, states that it "ranks its recommendations on the strength of

4  the evidence and does not support prescribing progesterone to stop a medication

5  abortion." Connolly Decl. Ex. 8.  More directly, the Society of Obstetricians and

6  Gynecologists of Canada released a public statement on APR, saying that it "can also

7  result in serious complications for the patient." Connolly Decl. Ex. 9.  Finally, the Royal

8  College of Obstetricians & Gynaecologists, along with other professional groups in the

9  UK, released a joint statement on APR treatment and said that apart from the abandoned

10 Creinin Study, they "do not recognise the legitimacy of any other studies used to

11 evidence the safety or efficacy of progesterone as an abortion 'reversal' treatment

12 because they do not follow the usual standards of reporting and study design for

13 observational trials." Connolly Decl. Ex. 10.

14    Due to the dearth of medical evidence on the effects of mifepristone without

15 misoprostol and the effects of progesterone after mifepristone, the Court finds it

16 potentially misleading to say that APR can only cause non-life-threatening side effects.

17         **d. "Birth defects" statement**

18    AG Bonta's Enforcement Action alleges that Heartbeat International's statements

19 that the rate of birth defects following APR "is less or equal to the rate in the general

20 population" are false and misleading. Am. Compl., Ex. 3 at 26.  COLFS also propagates

21 similar statements on its website.  Am. Compl. at 34.  These statements are based on the

22 2018 Report, *see id*. at 32, 34, and the 2012 Delgado/Davenport small case series as well

23 as another case series from 2017 conducted in Australia, *id.* at 13.

24    Plaintiff's expert declarations support this reading of the 2018 Report.  *See* Kraus

25 Decl. ¶ 37; Valley Decl. ¶ 36 (the 2018 Report "did not show any increased risks of birth

26 defects compared to the expected rate in the population").  On the other hand, Dr. Creinin

27

28

24-cv-01338-GPC-KSC

1  stated that although the birth defect rate might be comparable to the background rate of

2  approximately 3%, the 2018 Report did not state *what* those defects were.  Creinin Decl.

3  ¶ 51e.  If the defects were all similar, this could indicate that pregnancies affected by

4  APR (no misoprostol plussupplemental progesterone treatment) have a higher likelihood

5  of certain birth defects than average.

6       It's unclear and difficult to make any definitive conclusions from these studies.  In

7  addition to all the flaws of the 2018 Report that are detailed above, the 2012

8  Delgado/Davenport and 2017 Australia case series are too limited in scope to support the

9  statement that the rate of birth defects following APR is equal to or less than the

10  background rate.

11       There is also some debate among the experts on whether supplemental

12  progesterone – apart from APR treatments – can increase the rate of genital

13  abnormalities.  *Compare* Creinin Decl. ¶ 67 (noting a "possible association" between

14  progesterone use and genital defects) *with* Kraus Decl. ¶ 32 and Kraus Rebuttal Decl. ¶

15  41 ("propensity of the data indicates that supplemental progesterone does not increase the

16  rate of genital abnormalities").

17       Given the lack of scientific evidence on this specific question, the Court finds the

18  statements on birth defects following APR to be potentially false and misleading.

19       **e.  "Success rate" statement**

20       That APR has a 64-68% success rate is unsupported, because it derives from the

21  2018 Report, which, as detailed above, is faulty.  In the 2018 Report, there was an overall

22  "reversal rate of 48%" but a purported 64% rate for a subgroup of those receiving

23  intramuscular injections and 68% (31 patients) for those in the high-dose oral subgroup.

24  Creinin Decl. ¶ 52.  Thus, different administration methods likely have different "success

25  rates."  According to COLFS's APR FAQs, patients will be prescribed progesterone

26  "given as a pill to be taken orally or vaginally or possibly by intramuscular injection."

27

28

24-cv-01338-GPC-KSC

Goyette Decl. Ex. H 4.  It is unclear what percentage of COLFS patients prescribed progesterone will take it via high-dose pills, vaginal intake, or intramuscular injection, and therefore unclear what the actual aggre ate  uccess ra e    u  b   Statements purporting a 64-68% success rate are therefore inherently false and misleading.

### f.  "Thousands of lives saved" statement

According to AG Bonta's Enforcement Action, Heartbeat International makes representations that "thousands of lives have been saved" through the use of APR.  Am. Compl., Ex. 3 at 19; Kraus Decl. ¶ 26 ("Data from Heartbeat International… indicates they receive approximately 150 calls a month from women seeking APR and have ultimately helped save over 5,000 lives.").  AG Bonta alleges that this statement is based primarily on two numbers: the number of pregnant people who undertook APR and were confirmed by Heartbeat International to remain pregnant at 13 weeks, *plus* the number of those who started APR (but Heartbeat cannot confirm remained pregnant) multiplied by a 64% success rate, obtained from the 2018 Report.  As analyzed above, the 64% success rate is not a reliable statistic because it is based on a specific administration method of progesterone, and there is no reason to generalize this statistic to all women who started APR.  The Court therefore finds these kinds of statements potentially false and misleading.

### g.  Statements on non-standard situations

AG Bonta is also targeting statements that APR is effective after 72 hours have passed from the ingestion of mifepristone and that APR is effective after taking the second pill of medication abortion (misoprostol).  Because APR is usually considered to be the administration of progesterone within 72 hours after the first pill (mifepristone), these statements refer to non-standard APR situations.  *See* Mot. for Prelim. Injunction at 5; *see also* Creinin Decl. ¶ 62 (describing design of study aimed to measure effects of standard APR).  From the Court's review, nothing from the expert declarations submitted

27

1   by COLFS even purports to support either of these statements.  In fact, although Dr.

2   Creinin and Dr. Kraus disagree about the exact timing of mifepristone's effects, *see supra*

3   fn. 5, Dr. Kraus concedes that mifepristone's "period of activity in its target areas [is]

4   mostly within about 72 hours."  Kraus Decl. ¶ 26.

5        Additionally, nothing in the 2018 Report supports these statements on non-

6   standard situations.  The Report actually eliminated patients who received misoprostol or

7   who had taken mifepristone outside of the 72-hour window.  Connolly Decl. Ex. 3 at 18.

8   Thus, the statements that APR treatment could work in non-standard situations are

9   inherently misleading.

10        3.  *Central Hudson* analysis

11        There are some statements that the Court has found to be inherently false and

12   misleading, and others to be only *potentially* so.  As such, the Court engages in the next

13   inquiry of the *Central Hudson* analysis.  AG Bonta's targeting of any of these statements

14   would pass *Central Hudson* intermediate scrutiny.

15        *Central Hudson* requires AG Bonta to demonstrate that this regulation directly

16   advances a substantial government interest.  This is easily met here.  According to the

17   Ninth Circuit, "[t]here is no question that California has a substantial interest in

18   protecting consumers from misleading advertising by medical professionals."  *Am.*

19   *Academy of Pain Management*, 353 F.3d at 1108.  Additionally, the U.S. Supreme Court

20   has "noted the special interest that states have in regulating professions."  *Id.* (citing *Fla.*

21   *Bar v. Went For It, Inc*., 515 U.S. 618, 625 (1994)).  The State of California has a

22   substantial interest in protecting women from false advertising regarding reproductive

23   rights.

24        Next, *Central Hudson* demands that AG Bonta show that the speech regulation

25   directly advances the asserted government interest and that it is not more extensive than

26   necessary to serve that interest.  Here, the regulation directly advances California's

27

28

28

24-cv-01338-GPC-KSC

1    interest in protecting women from false advertising because Sections 17200/17500 are

2    consumer protection statutes that aim to protect against false and misleading conduct and

3    speech.  This is a more than sufficient close fit.  Although this regulation involves

4    reproductive rights, AG Bonta is not aiming to limit the actual practice of APR.  And

5    reproductive choices are not apart from consumer choices: women, in exercising their

6    reproductive rights, are also consumers who must be given the correct information to

7    make knowledgeable decisions for themselves.

8         In any case, Plaintiff does not argue that the regulations fail to advance the asserted

9    interest or that the regulations are not narrowly tailored.  *See generally* Mot. for Prelim.

10   Injunction.

11         In sum, Plaintiff cannot carry its burden of showing likelihood of success.

12   Commercial speech that is inherently false or misleading does not receive First

13                For potentially misleading speech, the AG has more than carried

14   his burden under *Central Hudson.*

15   **B. Irreparable harm**

16         It is well established that a deprivation of constitutional rights "unquestionably

17   constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

18   However, as discussed above, Plaintiff has not established a likelihood of success on the

19   merits for its First Amendment claim.  Plaintiff does not aver any other injury that could

20   constitute irreparable harm.  And as AG Bonta noted, Plaintiff waited over a year after

21   the filing of the Enforcement Action before initiating the instant action.  Goyette Decl.

22   Ex. A.  This undermines Plaintiff's argument that it is at risk of some irreparable harm.

23   *See Lydo Enter., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).  Thus,

24   Plaintiff fails to meet its burden for this prong.

25   **C. Balance of the equities and public interest**

26

27                          29

28                                 24-cv-01338-GPC-KSC

"When the government is a party," the balance of equities and public interest "factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Because the Court finds that Plaintiff has not met the likelihood of success on the merits, Plaintiff also fails to meet these factors. Instead, this prong favors the Attorney General because if the preliminary injunction were granted, he would be unable to protect the public against false and misleading statements that advertise a medical procedure that has not been approved by the FDA. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")

## CONCLUSION

Based on the foregoing reasons, the Court DENIES Plaintiff's motion for preliminary injunction.

**IT IS SO ORDERED.**

Dated: June 13, 2025

Hon. Gonzalo P. Curiel
United States District Judge

30

24-cv-01338-GPC-KSC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CULTURE OF LIFE FAMILY SERVICES, INC., a California nonprofit corporation, | Case No. 3:24-cv-01338-GPC-KSC |
| Plaintiff, | **ORDER DENYING IN PART AND GRANTING IN PART THE MOTION TO DISMISS** |
| v. | |
| ATTORNEY GENERAL ROB BONTA, in his official capacity as the California Attorney General, | **[ECF No. 25]** |
| Defendant. | |

Plaintiff Culture of Life Family Services, Inc. ("COLFS" or "Plaintiff") brings a pre-enforcement action against California Attorney General Rob Bonta ("AG Bonta" or "Defendant") seeking declaratory and injunctive relief. In its Amended Complaint, COLFS alleges that several statements it makes about abortion pill reversal treatment is constitutionally protected, and that AG Bonta's alleged "attack against APR [abortion pill reversal]" puts COLFS at risk of incurring enforcement actions by the State. ECF No. 19 ¶ 12.

1

1  Before the Court is Defendant's motion to dismiss, or alternatively stay, the

2  Amended Complaint. ECF No. 25.

3  Based on the reasons below, the Court DENIES in part and GRANTS in part

4  Defendant's motion to dismiss.

5  ## FACTUAL BACKGROUND[1]

6  ### I.  Abortion Pill Reversal treatment

7  COLFS is a Catholic community health clinic in San Diego County that provides

8  free abortion pill reversal ("APR") treatment.[2]  ECF No. 19 ("Am. Compl.") ¶ 4, 19, 21.

9  APR is a medical procedure designed for pregnant women who have started the chemical

10  abortion process by ingesting mifepristone, the first pill out of two[3], and who later decide

11  to keep the unborn child.  *Id.* ¶ 2.  APR consists of taking the hormone progesterone in

12  order to counteract mifepristone's blocking of the body's natural supply of progesterone.

13  *See id.* ¶¶ 2, 3, 33-34.

14  COLFS alleges that "[s]upplemental progesterone itself is indubitably safe." *Id.*  ¶

15  30.  The "first known attempt to reverse the effects of mifepristone using bioidentical

16  progesterone" was in 2006, and the woman "went on to deliver a healthy baby."  *Id.* ¶ 31.

17  A few years later, COLFS's medical director, Dr. George Delgado "devised the APR

18  protocol for reversing the effects of mifepristone and began to advise doctors on APR."

19  *Id.* ¶ 32.  In 2012 and 2017, two small human case studies on progesterone therapy were

20

21  _____

22  [1] The factual background of this case was detailed in the Court's Order dated November 12, 2024, ECF No. 17, and is, for the most part, incorporated herein.

23  [2] The Court recognizes the term, "abortion pill reversal treatment," itself is contested,

24  since AG Bonta alleges that "reverse" or "reversal" are in fact fraudulent statements for describing the supplemental progesterone treatment that is at issue here.  Putting that

25  aside, the Court will refer to this medical treatment as "abortion pill reversal treatment"

26  or "APR treatment" throughout this Order, because that is the treatment's common name.

27  [3] The first pill contains mifepristone, the second misoprostol.  Am. Compl. ¶ 25.

28

2

24-cv-01338-GPC-KSC

1   published, one of which was co-authored by Dr. Delgado.  *Id.* ¶¶ 37, 38.  Dr. Delgado

2   then did a follow-up to his study in 2018, analyzing the charts of 547 women who had

3   ingested mifepristone and then received progesterone therapy within 72 hours.  *Id.* ¶ 39.

4   The overall fetal survival rate was 48%, but was higher for the subgroup that received

5   progesterone intramuscularly (64%) and the subgroup that received a high dose of oral

6   progesterone followed by daily oral progesterone until the end of the first trimester

7   (68%).  *Id.*  The study concluded that these were two viable APR protocols.  *Id.*

8       Based on these studies and a "scoping review" published in July 2023 and "over a

9   decade of widespread successful use of APR," COLFS alleges that APR has been

10  endorsed by the American Association of Pro-Life Obstetricians & Gynecologist, the

11  Catholic Medical Association, and Canadian Physicians for Life.  *Id.* ¶ 42.

12      As COLFS acknowledges, there have been criticisms of APR, including one study

13  that was performed by Dr. Mitchell Creinin and funded by Danco Laboratories, the

14  principal manufacturer of mifepristone ("Danco/Creinin Study"), which looked at severe

15  bleeding resulting from APR.  *Id.* ¶ 52.  The study involved twelve pregnant women who

16  took mifepristone.  Half then took progesterone, and the other half took a placebo.  One

17  woman who took progesterone went to the hospital with "severe bleeding" while two

18  women who took the placebo experienced severe bleeding.  *Id.* ¶ 54.  COLFS argues that

19  the Danco/Creinin study actually therefore lends support to the conclusion that

20  administering progesterone after mifepristone "gives a pregnant woman a better chance

21  of avoiding severe bleeding over doing nothing."  *Id.* ¶ 55.

22  **II.     Heartbeat International and the Enforcement Action**

23      In light of what were viewed as successful APR interventions, COLFS's medical

24  director, Dr. George Delgado, set up a website and hotline in May 2012 to educate

25  pregnant women seeking to counteract the effects of mifepristone and to connect them

26  with licensed medical professionals.  *Id.* ¶ 43.  This became known as the "APR

27

28

24-cv-01338-GPC-KSC

Network." *Id.* In 2018, to "ensure expansion of the APR Network and increased public awareness of the APR protocol," COLFS transferred the Network for the nominal sum of $1 to Heartbeat International, a nationwide trade group that represents pro-life pregnancy resource organizations. *Id.* ¶ 44.

On September 21, 2023, Rob Bonta, the California Attorney General and the Defendant in this case, filed a complaint in California state court seeking a permanent injunction, civil penalties, and other equitable relief against Heartbeat International et al. for false and misleading advertising of APR treatment. ECF No. 25-2, Request for Judicial Notice ("RJN"), Ex. 1. AG Bonta's complaint against Heartbeat International et al. ("Enforcement Action" or "Action") alleges that there is no credible scientific evidence that supports the theory that progesterone counteracts mifepristone without harmful effects or that APR is safe. RJN Ex. 1 ¶¶ 32, 33, 37, 40-45.

The Enforcement Action alleged two causes of action under California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200 *et seq.*, and False Advertising Law ("FAL"), Business and Professions Code section 17500 *et seq. Id.* ¶¶ 96-101. The Action alleged that Heartbeat International et al. promulgated eight statements in their APR advertisements and communications that are false and misleading because they are unsupported by credible scientific evidence: (1) the use of the terms "reverse" and "reversal"; (2) that APR "has been shown to increase the chances of allowing the pregnancy to continue"); (3) that APR has a success rate of 64-68%; (4) that the rate of birth defects following APR is "less or equal to the rate in the general population"; (5) that "thousands of lives have been saved" through APR; (6) that APR may be effective beyond a 72-hour window following mifepristone administration; (7) that APR may be effective following administration of misoprostol and methotrexate; and (8) that APR can cause only non-life-threatening side effects, even though it can cause severe bleeding. *Id.* ¶¶ 97, 100.

24-cv-01338-GPC-KSC

Heartbeat International and the other defendant RealOptions, Inc. filed demurrers asking the state court to dismiss the action, based on constitutional grounds.  In June 2024, the state court overruled the demurrers. RJN Ex. 3.  The defendants filed their joint answer, including as part of their affirmative defenses that the Action is unconstitutional under the First Amendment's Free Exercise and Free Speech Clauses and under the Fourteenth Amendment's Substantive Due Process Clause.  RJN Ex. 2.

### III.    COLFS and the current complaint

There are a number of ties between COLFS and Heartbeat International.  Dr. Delgado, the medical director of COLFS who devised the APR protocol and published two articles studying APR's effectiveness, *see* Am. Compl. ¶ 31-32, 37, 39, is on the Heartbeat International's Medical Advisory Board, *id.* ¶ 44.  COLFS also sold to Heartbeat International the APR Network that Dr. Delgado created, which included a website, a hotline, and a network of providers willing to provide APR treatment.  *Id.* ¶¶ 43-44.  Heartbeat International et al. and COLFS have the same counsel representing them in these litigation matters.  *Id.* at 1; RJN Exs. B, C, D, E.

COLFS has characterized the Enforcement Action against Heartbeat International et al. as "lawfare," Am. Compl. ¶ 1, or an "*in terrorem* lawsuit" that is "motivated by [AG Bonta's] retaliatory animus against pro-life speech and expressive association of all pro-life pregnancy help resource organizations," *id*. ¶ 83.  COLFS alleges the Enforcement Action is an "attempt to restrict APR," *see id*. ¶ 114.  COLFS alleges that the Enforcement Action has created its need for pre-enforcement relief from AG Bonta because COLFS alleges it makes same or similar statements as those targeted in the Enforcement Action against Heartbeat International.  *See id.* ¶¶ 97, 100, 102-05.

In bringing this claim against AG Bonta, COLFS alleges that "Bonta's attack on APR is chock full of constitutional implications" that infringe on COLFS's and their patients' rights.  *Id.* ¶ 56.  These "constitutional implications" involve violations of the

5

1 free exercise of religion, the right to free speech, and the right to make reproductive
2 decisions. *Id.*

3      Specifically, COLFS alleges that the Enforcement Action constitutes a content-
4 based restriction on speech about APR and thus violates the Free Speech Clause. *Id.* ¶
5 112. COLFS also alleges that the Enforcement Action violates the Free Speech Clause's
6 protection of patients' "right to receive information." COLFS alleges that doctors have
7 "third-party standing to assert the interests of their patients so long as the physician has
8 also suffered injury himself." *Id.* ¶ 145 (citing *McCormack v. Herzog*, 788 F.3d 1017,
9 1027 (9th Cir. 2015)).

10      Furthermore, COLFS alleges that the Enforcement Action violates the Free
11 Exercise Clause because it is not a generally applicable policy, since the Action does not
12 apply to off-label uses of progesterone. *Id.* ¶ 137.[4]

13      Finally, COLFS alleges that the Enforcement Action violates the Substantive Due
14 Process Clause of the 14th Amendment, because "Bonta's assertion that APR must be
15 restricted violates COLFS's patients' right to "procreation, reproductive privacy, and to
16 reject unwanted medical treatment." *Id.* ¶ 159.

### PROCEDURAL HISTORY

18      On July 30, 2024, COLFS filed its original complaint. ECF No. 1. On August 21,
19 2024, AG Bonta filed a motion to dismiss, or alternatively stay, COLFS's complaint.
20 ECF No. 4. On November 5, 2024, COLFS filed a motion for preliminary injunction.
21 ECF No. 13.

22
23 _____
24
25 [4] COLFS feels "religiously obligated to offer Abortion Pill Reversal" by nature of its
religious mission, so the provision of APR treatment, according to COLFS, is an exercise
26 of religious freedom and expression that is protected under the First Amendment. *See*
27 Am. Compl. ¶ 122.

28

24-cv-01338-GPC-KSC

On November 12, 2024, this Court granted AG Bonta's motion to dismiss, based on the finding that COLFS had not sufficiently alleged pre-enforcement standing, and granted COLFS leave to amend.  ECF No. 17.  The following day, the Court denied COLFS's preliminary injunction request as moot.  ECF No. 18.  On November 15, 2024, COLFS filed its amended complaint and re-filed its preliminary injunction motion.  ECF Nos. 19, 21. On December 10, 2024, AG Bonta filed a motion to dismiss COLFS's amended complaint simultaneously with his opposition to COLFS's preliminary injunction request.  ECF Nos. 25 ("Motion" or "Mot."), 27.  On January 3, 2025, COLFS responded to the motion to dismiss, ECF No. 29, and filed a reply in support of its motion for preliminary injunction, ECF No. 30.  On January 17, 2025, AG Bonta filed a reply in support of his motion to dismiss.  ECF No. 31.

The Court now considers AG Bonta's Motion to Dismiss.

## LEGAL STANDARDS

### I.     Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), a court must grant a motion to dismiss for lack of subject-matter jurisdiction, including lack of Article III standing. Fed. R. Civ. P. 12(b)(1); *see In re Apple iPhone Antitrust Litigation*, 846 F.3d 313, 319 (9th Cir. 2017).   A motion to dismiss under Rule 12(b)(1) may be facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the movant asserts that the allegations in the complaint are insufficient on their face to invoke federal jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  For a factual attack, the movant disputes the truth of the allegations, which if true would otherwise invoke federal jurisdiction.  *Id.*  This facial/factual distinction has certain implications for how the Court should approach the motion to dismiss: the "district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)" (accepting plaintiff's allegations as true and drawing reasonable inferences in the plaintiff's favor), while factual attacks require the plaintiff to

24-cv-01338-GPC-KSC

1   "support her jurisdictional allegations with 'competent proof.'" *Leite v. Crane Co*., 749
2   F.3d 1117, 1121 (9th Cir. 2014).

3   **II.      Federal Rule of Civil Procedure 12(b)(6)**

4           A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint and
5   whether it has "state[d] a claim upon which relief can be granted." Fed. R. Civ. P.
6   12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a
7   cognizable legal theory or sufficient facts to support a cognizable legal theory.  *See*
8   *Balistreri v. Pacifica Police Dep't*., 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean*
9   *Witter Reynolds, Inc*., 749 F.2d 530, 534 (9th Cir. 1984).

10          A complaint may survive a motion to dismiss only if, taking all well-pleaded
11  factual allegations as true, it contains factual matter that "state a claim to relief that is
12  plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*
13  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim is facially plausible when the
14  factual allegations allow "the court to draw the reasonable inference that the defendant is
15  liable for the misconduct alleged." *Id.*

16          Where a motion to dismiss is granted, "leave to amend should be granted 'unless
17  the court determines that the allegation of other facts consistent with the challenged
18  pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc*.,
19  957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture*
20  *Co*., 806 F.2d 1393, 1401 (9th Cir. 1986)).

21  **III.    Abstention**

22          The Ninth Circuit has "not squarely held whether abstention is properly raised
23  under Rule 12(b)(6), Rule 12(b)(1), both, or neither." *Courthouse News Serv. v. Planet*,
24  750 F.3d 776, 779 n.2 (9th Cir. 2014).  However, several courts in this circuit consider
25  motions seeking dismissal on abstention grounds under the framework of Rule 12(b)(1),
26  *e.g., Applied Underwriters, Inc. v. Lara*, 530 F. Supp. 3d 914, 923 (E.D. Cal. 2021);

27

28                                          8

                                                          24-cv-01338-GPC-KSC

*Willamette Family, Inc. v. Allen*, 643 F. Supp. 3d 1180, 1188 (D. Or. 2022); *Green v. Aranas*, 775 F. App'x 310, 311 (9th Cir. 2019).

In the instant case, the distinction between Rule 12(b)(1) and (6) is immaterial, since all documents extrinsic to the pleadings that are necessary for adjudication of this motion are subject to judicial notice or incorporated by reference into the pleadings. Thus, the instant case may be treated as a facial attack to subject-matter jurisdiction *or* an attack for failure to state a claim, which are governed by similar standards. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012). Under either standard, the Court must determine whether the complaint, documents incorporated therein, and documents subject to judicial notice demonstrate "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678.

## REQUEST FOR JUDICIAL NOTICE

Generally, on a motion to dismiss, courts will limit their review to the contents of the complaint and may only consider extrinsic evidence that is properly presented as part of the complaint. *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001). However, under Federal Rule of Evidence 201, a district court may take notice of facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). AG Bonta seeks judicial notice of four documents: (1) the complaint by AG Bonta in *People v. Heartbeat International, Inc. et al.*, Case No. 23CV044940 (Alameda Cnty. Sup. Ct., Sept. 21, 2023) (Ex. 1); (2) Defendants' answer to the complaint (Ex. 2); (3) Order by Superior Court Judge Michael Markman denying the demurrers filed by Heartbeat International and Real Options, Inc. (Ex. 3); and (4) the scheduling order for the state case (Ex. 4). RJN at 2. All exhibits are relevant to the instant case and are matters of public record, so the Court may take judicial notice of them "without

9

24-cv-01338-GPC-KSC

1  converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at

2  689 (quotations and citations omitted). But the Court will not take judicial notice of the

3  truth of any disputed facts contained in those public records. *See id*.

**DISCUSSION**

5  **A. Standing**

6       As a threshold matter, a plaintiff "bears the burden of establishing standing."

7  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). A plaintiff "must demonstrate

8  standing for each claim he or she seeks to press and for each form of relief sought."

9  *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citing

10  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). To establish Article III

11  standing, an injury must be "concrete, particularized, and actual or imminent; fairly

12  traceable to the challenged action; and redressable by a favorable ruling." *Clapper v.*

13  *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation omitted). This is the

14  "irreducible constitutional minimum" of standing that Article III demands. *Lujan v.*

15  *Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A court may raise the issue of standing

16  *sua sponte* in order to ensure that it has jurisdiction. *See, e.g.*, *Adarand Constructors,*

17  *Inc. v. Mineta*, 534 U.S. 103, 110 (2001) (per curiam).

18       Although neither party directly briefed on this issue, the Court finds that Plaintiff

19  here fails to establish standing for its claim for damages. In order to have standing for

20  damages, Plaintiff must show that it has suffered a "concrete" injury, *Clapper*, 568 U.S.

21  at 409, but Plaintiff has not pled any injury other than the future threat of enforcement

22  against it by Defendant AG Bonta. This will not suffice for a claim for damages. The

23  Court accordingly DISMISSES Plaintiff's claim for damages, as standing is absent.

24  / / /

25  / / /

26  / / /

27

28

10

24-cv-01338-GPC-KSC

**B. Abstention**

1. *Younger* abstention

*Younger* abstention is premised on the desire of Congress, subject to few exceptions, "to permit state courts to try state cases free from interference by federal courts." *Younger v. Harris*, 401 U.S. 37, 43 (1971). It permits federal courts to "preserve respect for state functions such that the national government protects federal rights and interests in a way that will not 'unduly interfere with the legitimate activities of the States.'" *Younger*, 401 U.S. at 44. Under *Younger* abstention doctrine, a federal court may abstain from hearing a case in the following types of cases: (1) parallel, pending state criminal proceedings; (2) state civil proceedings akin to criminal prosecutions; and (3) state civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts. *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019) (citing *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)).

The Ninth Circuit invokes a "five-prong test" to determine "whether a civil case is *Younger*-eligible." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 63 (9th Cir. 2024). "*Younger* abstention is appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *Rynearson v. Ferguson*, 903 F.3d 920, 924-25 (9th Cir. 2018). If these elements are met, then the court should consider a fifth prong: "(5) 'whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to *Younger* applies.'" *Id.* (quoting *ReadyLink Healthcare*, 754 F.3d at 759).

Here, the first and second prong are easily met because the Enforcement Action is an "ongoing" state quasi-criminal enforcement action. The Attorney General began the

11

1   Enforcement Action in September 2023, and the case is still pending.  It was "initiated

2   before any proceedings of substance on the merits have taken place in the federal court,"

3   and this federal action has not "moved beyond an embryonic stage." *Credit One Bank,*

4   *N.A. v. Hestrin*, 60 F.4th 1220, 1225 (9th Cir. 2023) (citations omitted).

5       The third prong is also met because the Attorney General seeks to protect

6   Californians from false and misleading advertising regarding APR services.  *See* RJN,

7   Ex. 1.  The Ninth Circuit has held that "[w]here the state is in an enforcement posture in

8   the state proceedings, the 'important state interest' requirement is easily satisfied."

9   *Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 884 (9th Cir. 2011); *see*

10  *Credit One Bank*, 60 F.4th at 1228 (finding an important state interest where the district

11  attorney was seeking to enforce California's consumer protection laws).

12      The fourth prong is satisfied by "an *opportunity* to present the federal issue" in

13  state court.  *Fresh Int'l Corp. v. Agric. Labs. Rels. Bd*., 805 F.2d 1353, 1362 (9th Cir.

14  1986) (emphasis in original).  Federal courts assume that state courts have the jurisdiction

15  to hear federal claims, *see Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823

16  (1990) and that state procedures "afford an adequate remedy," *Baffert v. Cal. Horse*

17  *Racing Bd*., 332 F.3d 613, 619 (9th Cir. 2003).  "[T]the burden on this point rests on the

18  federal plaintiff to show 'that state procedural law barred presentation of [its] claims.'"

19  *Pennzoil Co. v. Texaco, Inc*., 481 U.S. 1, 14 (1987) (quoting *Moore v. Sims*, 442 U.S.

20  415, 432 (1979)).  Because COLFS has not pled or argued that it is barred by California

21  state procedural law from intervening as a party in the ongoing state case, the fourth

22  prong is met.

23      Turning to the fifth prong, the Court now addresses the crux of the issue.  This

24  prong is met when the requested relief "seeks to enjoin or has the *practical effect* of

25  enjoining the ongoing state judicial proceeding." *Arevalo v. Hennessy*, 882 F.3d 763, 765

26  (9th Cir. 2018).  "Direct interference" is not required.  *Gilbertson*, 381 F.3d at 977-78.

27

28

12

24-cv-01338-GPC-KSC

However, "*Younger*'s scope is closely circumscribed to parties actually involved in state litigation; even the presence of co-plaintiffs representing identical interests in state proceedings does not extend *Younger* to parties not actually involved in those proceedings." *Benavidez v. Eu*, 34 F.3d 825, 832 (9th Cir. 1994) (citing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 927-29 (1975)).  While *Younger* abstention <u>can</u> apply to entities that are not parties to the state case, *see Hicks v. Miranda*, 422 U.S. 332, 349-50 (1975), the non-party must have a "sufficiently close relationship or sufficiently intertwined interests" with a party to the state case.  *Herrera*, 918 F.3d at 1047.

Plaintiff COLFS is not the party that is subject to the Enforcement Action in state court.  In his motion to dismiss, Defendant AG Bonta argues that COLFS has a "sufficiently close relationship or sufficiently intertwined interests" with Heartbeat International because of six reasons:

(1)  Delgado created the APRN, including its website and hotline, before it was transferred to Heartbeat International.  Am. Compl. ¶ 43.

(2)  Delgado remains "in charge of medical protocols and research" for the APRN, as he agreed to do so when HBI received the APRN from COLFS.  *See* Connolly Decl. Ex. B 70:13-21.

(3)  COLFS remains "responsible for maintaining the APR Protocol" as part of its "partnership with Heartbeat International." *Id*. Ex. D 165.

(4)  Delgado, as part of the HBI Advisory Team, is tasked with providing "current knowledge, critical thinking, and analysis on various medical issues presented in the course of [HBI's] provision of APR-related services." *Id*. Ex. A 53.

(5)  HBI's Training Kit includes Delgado's "approval" of the APR protocol; his note to providers about methotrexate treatment; and his creation of FAQs for APRN providers to use with potential patients. *Id*. Ex. C 104, 105, 109.

13

1       (6) Delgado co-authored the 2012 Case Series and the 2018 Report with

2            RealOptions's medical director, Davenport.  The HBI Defendants rely on

3            these reports to defend themselves in the Enforcement Action.  *See* RJN Ex. 3

4            74-75.

5 *See* Mot. at 9.  AG Bonta further argues that each of COLFS's claims "arise directly out

6 of the Enforcement Action" and that they also mirror the HBI Defendants' defenses in the

7 Enforcement Action.  *Id*. at 11.

8      Certainly, Delgado and HBI have a longstanding close relationship.  However, the

9 Court does not find this to be sufficient intertwining between COLFS and HBI and

10 RealOptions for the sake of *Younger* abstention.  Caselaw from the Supreme Court, this

11 Circuit, and sister Circuits have demanded more.  In *Doran v. Salem Inn, Inc.*, a town

12 ordinance was passed that prohibited topless dancing.  *Doran*, 422 U.S. 922, 924-26

13 (1975).  Two bars stopped the practice; one bar did not and was prosecuted.  *Id.*  All three

14 bars together brought a federal civil rights action challenging this ordinance.  *Id.*  The

15 Supreme Court held that only the bar being prosecuted was subject to *Younger* abstention

16 because although the other bars were "represented by common counsel, and have similar

17 business activities and problems [as the prosecuted bar], they are apparently unrelated in

18 terms of ownership, control, and management."  *Id.* at 928-29.

19      In the same Term, the Supreme Court issued a ruling in *Hicks*, in which the

20 employees of an adult theater were charged with violating California's obscenity statute,

21 and the theatre's four copies of the pornographic film were seized.  *Hicks v. Miranda*,

22 422 U.S. 332, 334-36 (1975).  The theatre's owners filed an action in federal court,

23 asking for a declaration that the obscenity statute was unconstitutional and for an order

24 returning their property (the four copies of the film).  *Id.* at 337-38.  The Court held that

25 *Younger* abstention applied here because the interests of the theatre owners "and those of

26

27                      14

28                                            24-cv-01338-GPC-KSC

1  their employees were intertwined" and "the federal action sought to interfere with the

2  pending state prosecution." *Id.* at 348-49.

3          While the federal action in *Hicks* was clearly an interference with the pending state

4  prosecution, the federal action brought by the two bars in *Doran* was not so clearly such

5  an interference with the pending state prosecution against the one bar.  This case is more

6  like *Doran* than it is *Hicks.*  Despite the fact that COLFS and Delgado started the APRN,

7  and COLFS transferred it to HBI, and continues to offer support and guidance regarding

8  APR to HBI, these connections between the two organizations do not rise to the level of

9  any sort of ownership, control, or management.  The "partnership" between COLFS and

10  HBI is not legal in nature.  *See* Delgado Decl. ¶¶ 10-17.  And according to the APRN

11  Policies and Procedures Manual, APRN Advisory Team members are "volunteers" and

12  "shall not be deemed an employee of APRN or Heartbeat International."  Connolly Decl.

13  Ex. A at 53-54.  And even if there *were* actual legal or organizational ties between the

14  two entities, this may not be sufficient.  *See Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33

15  (1st Cir. 2012) (finding *Younger* did not apply to industry association even though some

16  of its members were state-court civil defendants); *Bickham v. Lashof*, 620 F.2d 1238,

17  1244 (7th Cir. 1980) (finding *Younger* did not apply because the interests of a

18  corporation, the state-court defendant, and "its sole shareholder" were insufficiently

19  intertwined).  *Cf. Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 882 (8th Cir.

20  2002) (applying *Younger* to a non-party in whom state-court defendant, the parent

21  corporation, had a "controlling interest").

22          The cases cited by AG Bonta in support of *Younger* abstention do not persuade the

23  Court.  In *Spargo*, the court found that *Younger* applied because the federal court

24  plaintiffs' claim was "entirely derivative of whatever rights that" the state-court

25  defendant may have.  *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 83

26  (2d Cir. 2003).  The court reasoned that because federal plaintiffs had a protected interest

27

28

15

24-cv-01338-GPC-KSC

in hearing the state-court defendant Spargo speak *only if* Spargo had an underlying First Amendment right to engage in his speech, it would be "impossible for the District Court to analyze plaintiffs' claims independently without first analyzing Spargo's constitutional right to engage in the charged conduct…" *Id.* at 84; *see also Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 636 (6th Cir. 2005) (finding that the rights of federal plaintiffs are "merely derivative" of the rights of the state-court defendants). That is not the situation here. COLFS has First Amendment rights to speak that are entirely separate from those of HBI and RealOptions.

The other cases cited by AG Bonta involve federal plaintiffs seeking relief that is directly related to the state-court proceedings. In *Herrera*, the court applied *Younger* abstention to the federal claims brought by two operators of a motel, Bill and Mona Herrera, and their children and the LLC that owned the motel, Palmdale Lodging. *Herrera v. Palmdale*, 918 F.3d 1037, 1047 (9th Cir. 2019). There was a state-court nuisance action against only Bill and the LLC, seeking an order shutting down their motel. The court found that the federal claims of Mona and her children "present[ed] the same risk of interference in the state proceeding as d[id] the federal claims of Bill and Palmdale Lodging," because all federal plaintiffs sought "the same relief from the state court proceedings." *Id.* *See also Women's Cmty. Health Ctr. of Beaumont, Inc. v. Tex. Health Facilities Comm'n*, 685 F.2d 974, 982 (5th Cir. 1982) (the "only relief requested" by the federal plaintiffs was an order allowing the state-court defendant to continue operating its business); *Kuhn v. Thompson*, 304 F. Supp. 2d 1313, 1323 (M.D. Ala. 2004) (plaintiffs sought to "directly interfere" with the prosecution of the state-court defendant by asking for an injunction reinstating defendant to original position). COLFS here is not asking for any relief that directly involves HBI or RealOptions. Its requests for declaratory and injunctive relief only involve its own organization.

24-cv-01338-GPC-KSC

1    Although "direct interference" with the state-court proceeding is not required in

2    order to have the practical effect of interference,[5] the simple prospect of preclusion or

3    precedent cannot suffice as interference.  *See Rio Grande Cmty. Health Ctr., Inc. v.*

4    *Rullan,* 397 F.3d 56, 71 (1st Cir. 2005) ("Normal res judicata effects of federal actions on

5    state actions… are of course not enough to trigger *Younger*."); *Robinson v. Stovall*, 646

6    F.2d 1087, 1091 (5th Cir. 1981) (finding that federal plaintiffs' sought-out relief would

7    affect the pending state proceedings "if at all, only through the operation of ordinary

8    principles of collateral estoppel" but that "such an attenuated impact cannot be the basis

9    for *Younger* abstention," citing to *Doran* and *Steffel v. Thompson*, 415 U.S. 452 (1974));

10   *Mass. Delivery Ass'n,* 671 F.3d at 47 (finding that the asked-for declaratory relief could

11   create judicial precedent, but that "did not warrant *Younger* abstention," relying on *Doran*

12   and *Steffel*).  In other words, "parallel challenges to the constitutionality of a state statute

13   or policy are typically not barred by *Younger*…"  *Spargo*, 351 F.3d at 83.

14       There are good public policy reasons for applying *Younger* to non-parties in only

15   "certain limited, exceptional circumstances."  *Mass. Delivery Ass'n v. Coakley*, 671 F.3d

16   at 46 (collecting circuit cases that limit *Younger*'s application to non-parties).  The

17   district court in *Cobb* stated it clearly:

18       "a City could foreclose totally any federal constitutional challenge to an

19       ordinance… merely by prosecuting one individual among the many at whom the

20       ordinance was directed. This result truly 'would turn federalism on its head' and

21       would impose an exhaustion requirement upon § 1983 actions, which the Supreme

---

[5] Note that in *Gilbertson v. Albright*, where the Ninth Circuit held that "direct interference" is not required, the court was <u>not</u> dealing with the exceptional situation of non-parties, since the federal plaintiff was the same state-court defendant.  *Gilbertson*, 381 F.3d at 968.

17

24-cv-01338-GPC-KSC

1    Court has refused to do. Further, it would constitute an abrogation of the

2    paramount duty of the federal courts to protect constitutional rights."

3    *Cobb v. Beame*, 402 F. Supp. 19, 25 (S.D.N.Y. 1975).

4        For the above reasons, the Court finds that the connections between COLFS and

5    Heartbeat International are not sufficiently intertwined such that they may be "treated

6    similarly for purposes of *Younger* abstention." *Herrera*, 918 F.3d at 1047.  The Court

7    therefore **DENIES** AG Bonta's motion to dismiss on these grounds.

8        2.  *Colorado* River abstention

9        In "exceptional circumstances," a federal court may decline to exercise its

10   "virtually unflagging obligation" to exercise federal jurisdiction, in deference to pending

11   parallel state proceedings.  *Col. River Water Conservation Dist. v. United States*, 424

12   U.S. 800, 817 (1976).  *Colorado River* abstention is based on "considerations of wise

13   judicial administration, giving regard to conservation of judicial resources and

14   comprehensive disposition of litigation."  *Id.*  The "task in [potential abstention] cases…

15   is not to find some substantial reason for the *exercise* of federal jurisdiction by the district

16   court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the

17   'clearest of justifications' that can suffice… to justify the *surrender* of that jurisdiction."

18   *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983)

19   (emphasis in original); *see Martinez v. Newport Beach City*, 125 F.3d 777, 785 (9th Cir.

20   1997) ("the Supreme Court has indicated that *Colorado River* abstention has even rarer

21   application than does *Younger* abstention").

22       To that end, the decision to abstain "does not rest on a mechanical checklist, but on

23   a careful balancing of the important factors as they apply in a given case, with the

24   balance heavily weighted in favor of the exercise of jurisdiction."  *Moses H. Cone*

25   *Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983).  There are eight factors

26   to be considered:

27

28

24-cv-01338-GPC-KSC

1   "(1) which court first assumed jurisdiction over any property at stake; (2) the

2   inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4)

3   the order in which the forums obtained jurisdiction; (5) whether federal law or state

4   law provides the rule of decision on the merits; (6) whether the state court

5   proceedings can adequately protect the rights of the federal litigants; (7) the desire

6   to avoid forum shopping; and (8) whether the state court proceedings will resolve

7   all issues before the federal court."

8   *R.R. Street & Co. Inc. v. Transport Ins. Co*., 656 F.3d 966, 978-79 (9th Cir. 2011).  "No

9   one factor is necessarily determinative."  *Col. River*, 424 U.S. at 818-19.  "Any doubt as

10  to whether a factor exists should be resolved against a stay" or dismissal.  *Seneca Ins.*

11  *Co., Inc. v. Strange Land, Inc*., 862 F.3d 835, 842 (9th Cir. 2017).  We address each

12  factor as it applies to this case.[6]

13      **a.  Inconvenience of the federal forum**

14      Defendant AG Bonta admits that the "forum itself is not inconvenient for the

15  Attorney General."  Mot. at 14.  As such, the Court finds that this factor weighs in favor

16  of exercising jurisdiction.

17      **b.  The desire to avoid piecemeal litigation**

18      While there may be a "highly interdependent" relationship between the state and

19  federal claims, *R.R. Street*, 656 F.3d at 978, it is also true that "conflicting results,

20  piecemeal litigation, and some duplication of judicial effort is the unavoidable price of

21  preserving access to the federal relief which section 1983 assures."  *Tovar v. Billmeyer,*

22  609 F.2d 1291, 1293 (9th Cir. 1979).  And in fact, unlike the fact pattern of *Colorado*

23  *River*, which dealt with complicated water systems and rights, here, the adjudication of

24  each party's claim does not necessarily imply or immediately affect the other party's

25  _____

26

27  [6] The first factor is irrelevant because there is no dispute over property.

19

28                                                                                  24-cv-01338-GPC-KSC

1   claim.  Regardless of the outcome of the state case, the resolution of the federal
2   constitutional claims will determine the instant case.  The Court finds this factor weighs
3   more towards exercising jurisdiction.

### c.  The order in which the forums obtained jurisdiction

5   Undisputably, the HBI litigation was filed first, RJN Ex. 1, and has been going on
6   for over a year.  The Enforcement Action is currently in discovery.  RJN Ex. 4.  The
7   Court finds that this factor favors abstention.

### d.  Whether federal or state law provides the rule of decision

9   Defendant AG Bonta tries to argue, in the Reply, that the issue in these federal and
10  state actions is whether the UCL and the FAL apply to the APR statements.  "If so, the
11  speech is both commercial and false and misleading…"  Reply at 7.  AG Bonta has it
12  flipped: the issue is whether the APR statements are commercial speech and whether they
13  are false and misleading.  If yes to both, then the UCL and FAL apply.  Since the
14  threshold question is constitutional, federal law provides the rule of decision.

15  "If the state and federal courts have concurrent jurisdiction over a claim, this factor
16  becomes less significant."  *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989)
17  (citing *Moses H. Cone,* 460 U.S. at 25).  State courts are competent and able to resolve
18  federal constitutional questions.  However, "the presence of federal-law issues must
19  always be a major consideration weighing against surrender."  *Moses H. Cone*, 460 U.S.
20  at 26.  The Court finds this factor to weigh in favor of exercising jurisdiction.

### e.  Adequacy of the state court proceedings

22  The state court would be adequate to hear Plaintiff COLFS's claims, and COLFS
23  has not alleged otherwise.  Because this factor is "of little or no weight" unless it
24  counsels in favor of federal jurisdiction, the Court finds that it is neutral.  *Travelers*
25  *Indem. Co. v. Madonna*, 914 F.2d 1364, 1370 (9th Cir. 1990).

### f.  The desire to avoid forum shopping

20

24-cv-01338-GPC-KSC

1    Defendant AG Bonta argues that this case is a "clear example of forum shopping,"

2  citing to the fact that shortly after receiving an unfavorable order in the Enforcement

3  Action suit, the HBI Defendants' counsel filed this federal lawsuit on behalf of COLFS.

4  Mot. at 15.  While the Court is not blind to the strategic litigation at play here, it is

5  important to note that while counsel is the same across the state and federal actions, there

6  are different parties in each action.  In *Nakash*, the federal plaintiff had become

7  dissatisfied with a state court ruling and then he himself sought out a new forum in the

8  federal courts.  *Nakash v. Marciano*, 882 F.2d 1411, 1417 (9th Cir. 1989).  Here, the HBI

9  Defendants received an unfavorable ruling in the Enforcement Action, but they did not

10  themselves then use the federal courts as a workaround.  An entirely new plaintiff,

11  COLFS, is the party in this case.  While this may indicate strategic litigation by counsel,

12  the fact that the HBI Defendants cannot directly use COLFS's litigation for their own

13  relief attenuates the benefit they would receive from whatever forum-shopping.  The

14  Court finds this factor neutral.

15    **g.  Whether the state court proceedings will resolve all issues**

16    To abstain from the federal action, the court must "conclude[] that the parallel

17  state-court litigation will be an adequate vehicle for the complete and prompt resolution

18  of the issues between the parties. If there is any substantial doubt as to this, it would be a

19  serious abuse of discretion to grant the stay or dismissal at all." *Moses H. Cone*

20  *Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983).  "Thus, the decision to

21  invoke *Colorado River* necessarily contemplates that the federal court will have nothing

22  further to do in resolving any substantive part of the case…" *Id.*

23    Although the court in *Nakash* held that exact parallelism (same parties, same

24  claims) was not required, this was because it found that Nakash's "attempts to distinguish

25  between the two actions" were "unavailing" and "disingenuous." *Nakash*, 883 F.2d at

26  1416.  The only difference between the two cases was the absence in one case of the

27

28

21

24-cv-01338-GPC-KSC

1  corporate entities owned and operated by the parties. The federal action was simply a

2  "spin-off" of more comprehensive state litigation. *Id.* at 1417. Here, the federal action is

3  no such "spin-off" where COLFS and HBI are not entities owned or operated by the

4  other. *See supra* for discussion on their legal distinctiveness.

5      While it is true that the claims brought by COLFS mirror the HBI Defendants'

6  defenses in the Enforcement Action, Mot. at 15, no action in this federal case would

7  immediately or actually bind the HBI Defendants. There is no legal relationship between

8  COLFS and HBI Defendants; the relief sought by COLFS is for itself only. For any

9  effect to take place on HBI Defendants, there would have to be further litigation making

10 use of preclusion law. *Cf. Montanore Minerals Corp. v. Bakie*, 867 F.3d 1160, 1170 (9th

11 Cir. 2017) (finding that although there was not exact parallelism, the state court claims

12 would have fully resolved the issues pertaining to the *pertinent* parties, who were

13 involved in both actions). The Court finds this factor weighs in favor of exercising

14 jurisdiction.

15     Thus, upon review and consideration of all the factors listed above, the Court does

16 not find that exceptional circumstances exist here such that *Colorado River* would apply,

17 and therefore the Court **DENIES** the motion to dismiss on these grounds.

18 **C. Failure to state a claim**

19     Defendant AG Bonta argues that COLFS has failed to "state a claim upon which

20 relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court takes each of COLFS's

21 claims in turn.

22     1. Free Speech Clause claim

23     COLFS avers that AG Bonta's enforcement of the UCL and FAL against the

24 targeted APR statements would violate its free speech rights under the First Amendment.

25     "The First Amendment, applicable to the States through the Fourteenth **\*1148**

26 Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family and*

27

28

1   *Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("NIFLA"). The right to free

2   speech includes "the right to speak freely and the right to refrain from speaking at all."

3   *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). However, the right to speak or to refrain

4   from speaking is not absolute. If "the State's interest is to disseminate an ideology, no

5   matter how acceptable to some, such interest cannot outweigh an individual's First

6   Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at

7   717.

8        Factors that determine the level of scrutiny include determining (1) whether the

9   speech regulation is content-based or content-neutral regulations of speech; and (2)

10   whether the speech is commercial speech or non-commercial speech.

11        **a. Content-Neutral Regulation**

12        In applying the First Amendment, the Court distinguishes between content-based

13   and content-neutral regulations of speech. In a public forum the government may impose

14   reasonable restrictions on the time, place, or manner of protected speech, provided the

15   restrictions "are justified without reference to the content of the regulated speech, that

16   they are narrowly tailored to serve a significant governmental interest, and that they leave

17   open ample alternative channels for communication of the information." *Clark v.*

18   *Community for Creative Non–Violence,* 468 U.S. 288, 293 (1984). Content-based

19   regulations "target speech based on its communicative content." *Reed v. Town of Gilbert*,

20   576 U.S.155, 163 (2015). Generally, a content-based regulation cannot withstand a

21   challenge unless the government proves the law is narrowly tailored to serve a

22   compelling state interest. *NIFLA*, 585 U.S. at 766. This stringent standard reflects the

23   fundamental principle that the government has "no power to restrict expression because

24   of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v.*

25   *Mosely*, 408 U.S. 92, 95 (1972).

26

27

28

24-cv-01338-GPC-KSC

1    Here the statutes at issue are general application laws that prohibit false and

2    misleading statements.  On their face, they do not focus on messages in favor or against

3    abortion.  Ultimately, the laws are agnostic by targeting all statements directed at

4    consumers that are misleading.  The Court finds that the UCL and FAL are content-

5    neutral and do not trigger strict scrutiny.

6            **b.  Commercial or Non-Commercial Speech**

7    Commercial speech is "usually defined as speech that does no more than propose a

8    commercial transaction."  *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)

9    (citing *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 762

10   (1976)).  Next, because "the degree of protection afforded by the First Amendment

11   depends on whether the activity sought to be regulated constitutes commercial or non-

12   commercial speech," the Court "must first determine the proper classification" of the

13   speech at issue. *Bolger v. Youngs Drug Prod. Corp*., 463 U.S. 60, 65 (1983).  In general,

14   laws regulating commercial speech are subject to a lesser standard of scrutiny.  *See id.* at

15   64-65.  Inherently false and misleading statements in commercial speech are given little

16   constitutional protection.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of*

17   *N.Y.*, 447 U.S. 557, 563 (1980). Because "[t]he First Amendment's concern for

18   commercial speech is based on the informational function of advertising ... there can be

19   no constitutional objection to the suppression of commercial messages that do not

20   accurately inform the public about lawful activity." *Central Hudson Gas & Elec. Corp. v.*

21   *Public Serv. Comm'n of New York,* 447 U.S. 557, 563 (1980).  As a result, it is

22   permissible to "ban forms of communication more likely to deceive the public than to

23   inform it." *Id.; see Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638 (1985)

24   ("The States and the Federal Government are free to prevent the dissemination of

25   commercial speech that is false, deceptive, or misleading").

26

27                                    24

28                                                          24-cv-01338-GPC-KSC

1    More specifically, the Supreme Court has held that speech may be "characterized

2    as commercial when (1) the speech is admittedly advertising, (2) the speech references a

3    specific product, and (3) the speaker has an economic motive for engaging in the speech."

4    *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir.2004) (citing *Bolger*,

5    463 U.S. at 66–67). While "[t]he combination of all of these characteristics ... provides

6    strong support for the ... conclusion that [the communication is] properly characterized as

7    commercial speech," *Bolger*, 463 U.S. at 67, it is not necessary that each of the

8    characteristics "be present in order for speech to be commercial," *id*. n. 14.

9    Defendant AG Bonta argues that the APR statements propagated by COLFS are

10   commercial speech.  He states that COLFS uses its APR statements to advertise the APR

11   treatment to its patients.  *See, e.g.*, Am. Compl. ¶ 104 (COLFS website "tells women to

12   reach out to COLFS even if they have a non-standard situation since COLFS will always

13   do what it can to provide them with care").  According to AG Bonta, these statements

14   "induce or encourage potential patients to obtain care with COLFS" and therefore qualify

15   as commercial speech.  Mot. at 20.  AG Bonta also states that COLFS has expressly

16   alleged an economic motivation to use these APR statements, specifically for its

17   fundraising efforts, citing to Am. Compl. ¶ 103 ("For example, every year, COLFS holds

18   an annual fundraising gala. Every year COLFS mentions its work, including Abortion Pill

19   Reversal.").

20   Many of the disputed statements appear on COLFS's website, specifically on a

21   FAQs page that describes the purported scientific principles and support underlying APR

22   (e.g. that APR has a high success rate, and that there are no birth deects, that it works in

23   non-standard situations).  Abortion Pill Rescue FAQs, COLFS Medical Clinic,

24   https://colfsclinic.org/abortion-pill-rescue-faqs/; Am. Compl. ¶ 104.  The FAQS address

25   general questions about APR, and there are only a few mentions of COLFS providing the

26   service. The introduction at the top of the FAQs states: "At COLFS Medical Clinic we

27

28

24-cv-01338-GPC-KSC

can help you <u>learn everything</u> you need to know about the APR procedure and where you can get the help you need in your <u>local community</u>." (emphasis added). Abortion Pill Rescue FAQs. The FAQs appear more informational and educational than intended to solicit clients and promote COLFS own services.  In other words, it is a close call whether the FAQs are placed in a "commercial context" or an "exchange of ideas."

AG Bonta cites exclusively to *First Resort, Inc*. for legal support.  In *First Resort, Inc*., a limited services pregnancy clinic brought an action for declaratory and injunctive relief challenging the constitutionality of a city ordinance that prohibited use of false or misleading advertising made by limited services pregnancy centers.  *First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017).  The Ninth Circuit held that the ordinance did not regulate First Resort's protected speech because the ordinance targeted commercial speech.  *Id*. at 1276.  While First Resort provided counseling and basic medical services free of charge, these services still had "monetary value," and First Resort used its online and print advertisements, including Google's Adwords, to "compete [against abortion providers] in a competitive marketplace" for the "attention of online viewers."  *Id*.  The court found that these advertisements "constitute[d] commercial speech because they are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas."  *Id*. (citation omitted).  The Ninth Circuit also noted that First Resort has a "clear economic motivation to produce successful advertisements" because its ability to attract new clients would boost its fundraising efforts.  *Id*.  As such, a majority of First Resort's fundraising communications referenced the benefits of its services and incorporated client stories; employees were eligible for a bonus compensation based, in part, on the number of new clients.  *Id*.  Because First Resort's communications constituted promotional advertising of services, the statements were deemed "classic examples of commercial speech."  *Id*.

24-cv-01338-GPC-KSC

1    Here, while COLFS disseminates the targeted APR statements at their annual

2    fundraising galas, *see* Am. Compl. ¶ 103, at the pleading stage, it is less clear if this

3    conduct rises to the level of economic motivation as shown in *First Resort*.   In *First*

4    *Resort*, evidence presented to the district court demonstrated that a "majority" of First

5    Resort's fundraising communications included the targeted advertising language at issue,

6    giving rise to an inference of economic motivation.  Here, the Amended Complaint does

7    not indicate that is true for COLFS, and AG Bonta does not argue otherwise.  And unlike

8    First Resort's employee compensation scheme, there are no other allegations that speak

9    to a possible economic motivation.  Additionally, COLFS has not averred that it views its

10   online advertising as competing with that of abortion providers.  *Cf. First Resort, Inc.*,

11   860 F.3d at 1274.

12   Instead, COLFS alleges that it provides "free material[s] and support to needy

13   women" and as such, there is "no economic motivation of any kind."  Am. Compl. ¶ 68

14   (citing *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill.

15   2023)); *see also Nat'l Inst. for Fam. & Life Advocs. v. James*, No. 24-CV-514 (JLS), 2024

16   WL 3904870, at *12 (W.D.N.Y. Aug. 22, 2024) ("morally and religiously motivated

17   offering of free services cannot be described as a bare 'commercial transaction.'").

18   However, at the motion hearing on February 7, 2025, COLFS acknowledged that in

19   exchange for its APR services, it accepts insurance and/or payment from women who

20   have insurance or the means to pay.  Despite this, COLFS reiterated at the hearing that it

21   is a religious non-profit that helps women regardless of their ability to pay and provides

22   free treatment.  *See also* Am. Compl. ¶ 98 (COLFS alleging that "it is a religious

23   nonprofit and is morally obligated to provide life-affirming care to any woman who

24   requests it from COLFS").

25   While AG Bonta's arguments raise the possibility of COLFS's underlying

26   economic motivations, economic motivation is "insufficient by itself to turn the materials

27

28

24-cv-01338-GPC-KSC

1   into commercial speech." *Bolger*, 463 U.S. at 67; *see also Fargo Women's Health Org.,*
2   *Inc. v. Larson*, 381 N.W. 2d 176, 180-81 (N.D. 1986) ("we do not believe that factor [of
3   women being charged for services by the clinic] is dispositive of our determination that
4   the communication involved is commercial speech").  The Court must instead look at all
5   the *Bolger* factors in a "fact-driven" analysis, given the "inherent difficulty of drawing
6   bright lines that will clearly cabin commercial speech in a distinct category." *First*
7   *Resort*, 860 F.3d at 1272 (citations and quotations omitted).

8        Here, a fact-driven analysis is not possible given the paucity of the record.
9   Reviewing the FAC and properly judicially noticed documents, the Court finds that
10  COLFS has sufficiently pled that its APR statements do <u>not</u> constitute commercial speech
11  and therefore deserve constitutional protection under the First Amendment.  Plaintiff has
12  pled "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550
13  U.S. at 570.

14       If the speech at issue is protectible, then it is protected, by some level of scrutiny,
15  even if it is false speech. *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (rejecting
16  notion that false speech should be in a general category that is presumptively
17  unprotected).  Since the Court has determined that Plaintiff has sufficiently alleged that
18  the APR statements constitute protectible noncommercial speech, the Court need not
19  examine parties' arguments for whether the APR statements promulgated by COLFS are
20  false and misleading.  Furthermore, at this pleading stage, the Court will not weigh the
21  scientific evidence offered in the FAC. *See Ferrari v. Nat. Partners, Inc.*, 2016 WL
22  4440242, at *5 (N.D. Cal. Aug. 23, 2016) (citing *Jones v. Johnson*, 781 F.2d 769, 772,

23
24
25
26
27
28

28

24-cv-01338-GPC-KSC

1  n.1 (9th Cir. 1986) ("[A]ny weighing of the evidence is inappropriate on a 12(b)(6)

2  motion")).[7]

3       2.  Free Exercise Clause claim

4       A plaintiff may bring a Free Exercise claim if it can show that a government entity

5  has "burdened [its] sincere religious practice pursuant to a policy that is not 'neutral' or

6  'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).  "If

7  the purpose of the law is to restrict practices *because of* the religious motivations of those

8  performing practices, the law is not neutral."  *Tingley v. Ferguson*, 47 F.4th 1055, 1085

9  (9th Cir. 2022).  The UCL and FAL protect consumers by prohibiting false and

10  misleading advertisements – because of the stated interest in consumer protection, not

11  because of any sort of motivations underlying those advertisements – and as such these

12  laws are neutral.  *See* Cal. Bus. & Prof. Code §§ 17200, 17500.

13       "Broadly speaking, there are two ways a law is not generally applicable. The first

14  is if there is a 'formal mechanism for granting exceptions' that 'invite[s] the government

15  to consider the particular reasons for a person's conduct.' The second is if the law

16  'prohibits religious conduct while permitting secular conduct' that also works against the

17  government's interest in enacting the law."  *Tingley*, 47 F.4th at 1087-88 (citing *Fulton v.

18  City of Philadelphia*, 593 U.S. 522, 534, 537 (2021)).  Neither the UCL nor the FAL have

19  a formal mechanism that allows "individual exceptions" because all false and misleading

20  advertising is prohibited under these statutes.  *See* Cal. Bus. & Prof. Code §§ 17200,

21  17500.

22

23

24  _____

25  [7] The Court will conduct a full analysis of the parties' arguments on this point (whether

26  the APR statements are false or misleading) in a separate Order ruling on the motion for

27  preliminary injunction.

                          29

28                                         24-cv-01338-GPC-KSC

1      Furthermore, these statutes do not treat "any comparable secular activity more

2   favorably than religious exercise." *Tingley*, 47 F.4th at 1088. The UCL and FAL

3   prohibit all false and misleading advertisements, regardless of whether the actor had

4   secular or religious motives, and the California Attorney General "regularly enforces"

5   these laws against secular entities. Mot. at 21 (citing to Am. Compl. ¶ 101, listing past

6   enforcement actions).

7      COLFS argues that the statutes are not generally applicable because they do not

8   apply to public entities or political speech. Am. Compl. ¶¶ 132-33. It is faulty to assume

9   that the UCL and FAL must apply to every type of entity in order to be considered

10  "generally applicable" laws. Under the current Free Exercise caselaw, a law does not

11  need to apply to every entity in order to be considered "generally applicable." Instead, it

12  must not treat comparable secular activities more favorably than religious activities.

13  *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The emphasis is on the "comparable" nature

14  of the activities. "Whether secular and religious activity are 'comparable' is evaluated

15  'against the asserted government interest that justifies the regulation at issue' and requires

16  looking at the *risks* posed, not the reasons for the conduct." *Tingley*, 47 F.4th at 1088

17  (citing *Tandon*, 593 U.S. at 62) (emphasis added).

18      The risks are different here. According to AG Bonta, "[n]either public entities nor

19  political speech present the same risks as deceptive advertisements or business practices

20  by private corporations." Mot. at 22. Public entities are exempted because the state is a

21  "sovereign entity representing the people." *Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th

22  1198, 1203 (1999). Political speech is exempted because it runs against the First

23  Amendment, since false and misleading *political* speech is protected while inherently

24  false and misleading commercial speech is not. *See Cent. Hudson*, 447 U.S. at 563. Both

25  public entities and political speech also benefit from a separate accountability

26

27                                          30

28                                                          24-cv-01338-GPC-KSC

mechanism, namely that of elections. Thus, AG Bonta argues, the risks posed by public entities and political speech are not the same as those posed by private corporations. The Court finds these arguments persuasive in showing that public activities and political speech activities are <u>not</u> comparable to the commercial activities regulated by these state laws.

The Court also notes here that COLFS's "generally applicable" arguments regarding the UCL (and its enforcement) potentially encroach upon the constitutional principles of sovereign immunity and federalism. First, COLFS's argument that the UCL is not enforceable against public entities fails to recognize that "[i]t is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued…" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citations and quotations omitted). This principle of sovereign immunity extends to states, as well. *See Alden v. Maine*, 527 U.S. 706 (1999); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). Only with consent of the government can a law be enforced against it. COLFS implies that statutes need to be enforceable against public entities in order to be "generally applicable," but the *status quo* is that statutes are *not* enforceable against federal, state, and local governments. And here, the State of California has not consented to being sued under the UCL. (This is entirely reasonable, given that the UCL is a consumer protection law aimed at *business practices*.)

Additionally, COLFS states that because AG Bonta's Enforcement Action "limit[s] off-label uses of progesterone in one context only – APR – while allowing it in all other contexts," Opp. at 24, AG Bonta has violated COLFS's Free Exercise rights. *See Am. Compl.* ¶ 61 ("Allowing bioidentical progesterone to be prescribed for everything except APR treatment is not neutral and generally applicable…"). However, laws do not need to cure every problem or aspect of a problem. Where there are matters of local concern, the "States traditionally have had great latitude under their police powers to legislate as to the

1  protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc.*
2  *v. Lohr*, 518 U.S. 470, 475 (1996) (citing *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S.
3  724, 756 (1985)).  This latitude is not only a *consequence* of our federalism, but a
4  significant *advantage* of it.  "The federal structure allows local policies more sensitive to
5  the diverse needs of a heterogeneous society, *permits innovation and experimentation*,
6  enables greater citizen involvement in democratic processes, and makes government
7  more responsive by putting the States in competition for a mobile citizenry." *Bond v.*
8  *United States*, 564 U.S. 211, 221 (2011) (citations and quotations omitted) (emphasis
9  added).  Here, California is entirely within its prerogative to regulate progesterone
10  differently in different contexts.  Again, to be clear, AG Bonta is not banning APR
11  treatment, but is enforcing consumer protection laws against specific advertisements of
12  APR treatment.  This is entirely acceptable, and does not render the UCL (or its
13  enforcement) not generally applicable so as to trigger the Free Exercise Clause.

14       COLFS also argues that the Attorney General has selectively enforced the UCL
15  and FAL against COLFS but has refused to enforce these laws against Planned
16  Parenthood.  *See* Am. Compl. ¶ 136.  This argument lacks merit in that COLFS's
17  statements and Planned Parenthood's statements present *different* harms to the public.
18  COLFS's statements refer to a medical treatment that has only undergone studies for
19  efficacy and safety since 2012, *see* Am. Compl. ¶¶ 37-40, while Planned Parenthood's
20  statements speak to an FDA-approved medical procedure, Am. Compl. ¶ 27.  There are
21  greater, and different, risks involved: one involves the *unknown* risks of an unapproved
22  treatment; the other involves the known risks of a treatment studied and approved by the
23  FDA.  Because of this difference in risk, COLFS's statements about APR treatment and
24  Planned Parenthood's statements about the abortion pill are not comparable.

25       Also, for COLFS's allegation of selective prosecution to be plausible, Planned
26  Parenthood's statements would have to actually be in violation of the UCL and FAL, but
27
28

32

24-cv-01338-GPC-KSC

1    there is no indication that they are. COLFS, in a conclusory manner, alleges that

2    "Planned Parenthood also misleads women about the safety, efficacy, and side-effects of

3    the Abortion Pill." Am. Compl. ¶ 136. COLFS's primary support for this is the

4    allegation that Planned Parenthood does not disclose to women some of the serious

5    consequences of an abortion. Am. Compl. ¶ 88-89. However, as AG Bonta points out in

6    the motion to dismiss, COLFS cherry-picks information from Planned Parenthood's

7    website. On the "How Safe Is the Abortion Pill?" page, there *is* information on the rare

8    but serious complications that can occur with a medication abortion. Connolly Decl. Ex.

9    I. There are no allegations that Planned Parenthood has promulgated false and

10    misleading statements about its own services. Since Planned Parenthood is facially not in

11    violation of the UCL or the FAL, the Attorney General has nothing to prosecute, and

12    therefore selective prosecution is not at work.

13       Because COLFS has not sufficiently alleged that the UCL and the FAL – and their

14    enforcement by AG Bonta – violate the Free Exercise Clause, the Court **GRANTS**

15    Defendant's motion to dismiss this second cause of action **without leave to amend**.

16       3. <u>"Right to Receive Information" claim</u>

17       COLFS also alleges a "right to receive information" claim on behalf of its patients.

18    Even if COLFS had third-party organizational standing here, which the Court does not

19    decide, the "listeners" (its patients) must independently also have standing. While the

20    Supreme Court has recognized a First Amendment right to 'receive information and

21    ideas,' "it has identified a cognizable injury only where the listener has a concrete,

22    specific connection to the speaker." *Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (citing

23    *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). In *Murthy*, the Supreme Court found

24    that plaintiffs had no standing for its right-to-listen claim because they "do not point to

25    any specific instance of content moderation that caused them identifiable harm" nor

26

27

28

24-cv-01338-GPC-KSC

1  identify any "specific speakers or topics that they have been unable to hear or follow."
2  *Id.*

3       Here, COLFS's allegations do not come close to pleading a "concrete, specific
4  connection" between the speech at issue and the patients.  The Court notes that the
5  "connection" here is not about whether there is a connection between COLFS and its
6  patients, which undoubtedly there is, via the patient-doctor relationship.  Rather, the
7  question is whether or not there is a "connection" <u>between the speech at issue (the eight</u>
8  <u>target statements) and the patients</u>.  *Cf. Kleindienst*, 408 U.S. at 762-65 (finding that a
9  certain group of professors had a First Amendment interest in challenging the visa denial
10  of a person whom they had invited to speak at a conference).  In *Kleindienst*, the court
11  was not concerned about the relationship between the professors and the *person* of
12  Mandel, the invited guest.  Instead, it looked to the relationship between the professors
13  and their "access to Mandel's *ideas*" and the value of "sustained, face-to-face debate,
14  discussion and questioning" with Mandel.  *Id.* at 765 (emphasis in first part).

15       It's unclear what "concrete, specific connection" exists between COLFS patients
16  and the eight statements targeted by the Enforcement Action, especially those made
17  outside of the doctor-patient context like in websites, podcasts, and galas.  COLFS makes
18  no allegations showing that COLFS's patients have been injured by the alleged
19  suppression of this speech or even what the nature of their injury would be.  *See* Am.
20  Compl. ¶ 150 (conclusory statement that "COLFS's patients have no adequate remedy at
21  law and will suffer serious and irreparable harm to their constitutional rights absent
22  declaratory and injunctive relief").

23       The Court **GRANTS** Defendant's motion to dismiss this **claim with leave to**
24  **amend.**

25         4.  <u>Substantive Due Process claim</u>
26
27                                      34
28                                          24-cv-01338-GPC-KSC

COLFS brings a Substantive Due Process claim, alleging that AG Bonta's attempts to restrict speech about APR "violates COLFS's patients' rights to procreation, reproductive privacy, and to reject unwanted medical treatment" as guaranteed by the Fourteenth Amendment. Am. Compl. ¶ 159. COLFS alleges that restricting speech about APR violates women's rights to "not be forced to undergo or continue an abortion." *Id.* ¶ 158.

While undisputedly there is a liberty interest in "bodily integrity," *Wash. v. Glucksberg*, 521 U.S. 702, 720 (1997), and the right to refuse "unwanted medical treatment," *Cruzan v. Mo. Dept' of Health*, 497 U.S. 261, 278 (1990), those interests are not implicated in the Enforcement Action brought by AG Bonta. First, there is no state action forcing unwanted medical treatment on women. Second, to the extent that COLFS is arguing that the Enforcement Action is preventing pregnant women from exercising their right to continue their pregnancy, *see* Am. Compl. ¶ 158, this is an overly attenuated claim. The Enforcement Action is targeting eight specific statements – not all APR-related speech writ large, and certainly not the practice of APR treatment itself. COLFS alleges, in a conclusory manner, that the restriction of these eight statements "will have the practical effect of banning APR altogether." Am. Compl. ¶ 11; 137. However, it provides no support for how the restriction of this speech would lead to that effect.

Plaintiff inserts another, slightly different, point in its Opposition: that AG Bonta's alleged speech restrictions would prevent physicians from providing full and complete counsel to women seeking medical counsel about their pregnancy situation. "A woman has the right to make her reproductive decisions 'in accordance with her licensed physician's best judgment.'" *Doe v. Bolton*, 410 U.S. 179, 197 (1973). However, nothing in the Amended Complaint suggests that AG Bonta's restrictions on certain statements about APR would cloud a physician's best judgment or force a woman to undergo or continue an abortion.

24-cv-01338-GPC-KSC

1    Because COLFS does not allege the infringement of any liberty interest, the Court

2    **GRANTS** Defendant's motion to dismiss the fourth cause of action **with leave to**

3    **amend**.

4                                        **CONCLUSION**

5    Based on the foregoing reasons, the Court DISMISSES Plaintiff's claims for

6    damages, DENIES Defendant's motion to dismiss as to the first count, GRANTS

7    Defendant's motion to dismiss count two without leave to amend, and GRANTS

8    Defendant's motion to dismiss counts three and four with leave to amend.

9    **IT IS SO ORDERED.**

10   Dated:  June 13, 2025

11                                             Hon. Gonzalo P. Curiel
                                               United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                        36

28                                                                    24-cv-01338-GPC-KSC