No. 25-3828

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CULTURE OF LIFE FAMILY SERVICES, INC.,

Plaintiff-Appellant,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

Defendant-Appellee.

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:24-cv-01338-GPC

## APPELLEE'S ANSWERING BRIEF

ROB BONTA
  *Attorney General of California*
NELI N. PALMA
  *Senior Assistant Attorney General*
KARLI EISENBERG
KATHLEEN BOERGERS
  *Supervising Deputy Attorneys
  General*
ERICA CONNOLLY
HAYLEY PENAN
LAUREN ZWEIER
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7755
Fax: (916) 327-2319
Erica.Connolly@doj.ca.gov
  *Attorneys for Defendant-Appellee
  Attorney General Rob Bonta*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................ 1

ISSUES PRESENTED FOR REVIEW .......................................... 2

STATEMENT OF THE CASE ................................................ 3

    I.    Overview of "Abortion Pill Reversal" ...................... 3

        A.    Mechanism of Mifepristone in Medication Abortion ..... 3

        B.    Development of APR ....................................... 5

        C.    Leading Medical Organizations Have Concluded that No Evidence Supports APR .................................. 16

        D.    Three Other Federal District Courts Have Concluded that Representations about APR's Efficacy Are Misleading ................................ 17

    II.    The Attorney General's State Enforcement Action ............... 18

    III.    COLFS' Advertisement of APR ............................ 19

    IV.    Proceedings Below ................................... 21

SUMMARY OF THE ARGUMENT .......................................... 24

STANDARD OF REVIEW .............................................. 26

ARGUMENT ....................................................... 27

    I.    The District Court Correctly Dismissed COLFS' Free Exercise, Substantive Due Process, and Right to Receive Information Claims .................................. 27

        A.    The District Court Correctly Dismissed COLFS' Free Exercise Claim .................................. 28

        B.    The District Court Correctly Dismissed COLFS' Substantive Due Process Claim .................................... 35

        C.    The District Court Properly Dismissed COLFS' Right to Receive Information Claim .......................... 36

    II.    The District Court Correctly Denied COLFS' Preliminary Injunction Request .................................. 37

i

## TABLE OF CONTENTS
### (continued)

Page

A.    The District Court Properly Held that COLFS Is Unlikely to Prevail on its Free Speech Claim............... 37

B.    The District Court Correctly Held that COLFS Is Not Suffering Irreparable Harm.................................... 61

C.    The District Court Correctly Held that the Balance of the Equities and the Public Interest Favor the Attorney General........................................................... 62

CONCLUSION ............................................................................ 63

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. County of Sacramento*
143 F.4th 1027 (9th Cir. 2025) ................................................................ 61

*Adibi v. Cal. State Bd. of Pharm.*
461 F. Supp. 2d 1103 (N.D. Cal. 2006) .................................................... 23

*All-Options, Inc. v. Att'y Gen. of Ind.*
546 F. Supp. 3d 754 (S.D. Ind. 2021) ................................................ 17, 33

*Am. Acad. of Pain Mgmt. v. Joseph*
353 F.3d 1099 (9th Cir. 2004) ........................................................ *passim*

*Am. Beverage Ass'n v. City & County of San Francisco*
916 F.3d 749 (9th Cir. 2019) (en banc) .................................................... 27

*Am. Med. Ass'n v. Stenehjem*
412 F. Supp. 3d 1134 (D.N.D. 2019) .................................... 17, 18, 53, 54

*Ariix, LLC v. NutriSearch Corp.*
985 F.3d 1107 (9th Cir. 2021) ........................................................... 38, 39

*Baccei v. United States*
632 F.3d 1140 (9th Cir. 2011) ................................................................. 34

*Bella Health & Wellness v. Weiser*
--- F. Supp. 3d ---, 2025 WL 2218970 (D. Colo. 2025) ...................... 53, 54

*Bellion Spirits, LLC v. United States*
7 F.4th 1201 (D.C. Cir. 2021) ........................................................... 48, 54

*Bernardo v. Planned Parenthood Fed'n of Am.*
115 Cal. App. 4th 322 (2004) ........................................................... 41, 56

*Bolger v. Youngs Drug Prods. Corp.*
463 U.S. 60 (1983) .......................................................................... *passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics*
29 F.4th 468 (9th Cir. 2022) ....................................................... 26

*California v. ARC Am. Corp.*
490 U.S. 93 (1989) ...................................................................... 19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
447 U.S. 447 (1980)............................................................... 30, 43

*Charles v. City of Los Angeles*
697 F.3d 1146 (9th Cir. 2012) .................................................... 43

*Colo. Fellowship of Christian Athletes v. San Jose Unified Sch.*
*Dist. Bd. of Educ.*
82 F.4th 664 (9th Cir. 2023) ....................................................... 31

*Colo. River Water Conservation Dist. v. United States*
424 U.S. 800 (1976)..................................................................... 22

*Conformis, Inc. v. Aetna, Inc.*
58 F.4th 517 (1st Cir. 2023)......................................................... 55

*Counterman v. Colorado*
600 U.S. 66 (2023)....................................................................... 57

*Cruzan v. Dir., Mo. Dept. of Health*
497 U.S. 261 (1990)..................................................................... 35

*DISH Network Corp. v. FCC*
653 F.3d 771 (9th Cir. 2011) ...................................................... 61

*Eastman Chem. Co. v. PlastiPure, Inc.*
775 F.3d 230 (5th Cir. 2014) ...................................................... 55

*ECM BioFilms, Inc. v. FTC*
851 F.3d 599 (6th Cir. 2017) ...................................................... 54

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Fields v. Palmdale Sch. Dist.*
427 F.3d 1197 (9th Cir. 2005) ................................................................. 26

*First Resort, Inc. v. Herrera*
860 F.3d 1263 (9th Cir. 2017) ....................................................... *passim*

*Fowler v. Guerin*
899 F.3d 1112 (9th Cir. 2018) ................................................................. 39

*Free Speech Coal., Inc. v. Paxton*
606 U.S. ___, 145 S.Ct. 2291 (2025) ..................................................... 60

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*
879 F.3d 101 (4th Cir. 2018) ................................................................... 43

*Health Freedom Def. Fund, Inc. v. Carvalho*
104 F.4th 715 (9th Cir. 2024) ................................................................. 35

*Hodsdon v. Mars, Inc.*
891 F.3d 857 (9th Cir. 2018) ................................................................... 50

*Hoye v. City of Oakland*
653 F.3d 835 (9th Cir. 2011) ................................................. 31, 57, 58, 60

*Kennedy v. Bremerton Sch. Dist.*
597 U.S. 507 (2022) ................................................................................. 28

*Kleindienst v. Mandel*
408 U.S. 753 (1972) ................................................................................. 37

*Loffman v. Cal. Dep't of Educ.*
119 F.4th 1147 (9th Cir. 2024) ............................................................... 26

*Lopez-Vasquez v. Holder*
706 F.3d 1072 (9th Cir. 2013) ................................................................. 48

# TABLE OF AUTHORITIES
## (continued)

Page

*Lydo Enters., Inc. v. City of Las Vegas*
745 F.2d 1211 (9th Cir. 1984) ..................................................62

*Madigan v. Telemarketing Assocs., Inc.*
538 U.S. 600 (2003)...................................................................57

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*
179 F.3d 1244 (9th Cir. 1999) ..................................................29

*Maryland v. King*
567 U.S. 1301 (2012) (Roberts, J., in chambers) .................62, 63

*Masterpiece Cakeshop v. Civ. Rights Comm'n*
584 U.S. 617 (2018)...................................................................31

*Meinecke v. City of Seattle*
99 F.4th 514 (9th Cir. 2024) .....................................................27

*Milkovich v. Lorain Journal Co.*
497 U.S. 1 (1990).......................................................................57

*Murdock v. Commonwealth of Pennsylvania*
319 U.S. 105 (1943)...................................................................43

*Murthy v. Missouri*
603 U.S. 43 (2024).....................................................................37

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
585 U.S. 755 (2018)...................................................................57

*Nat'l Rifle Ass'n of Am. v. Vullo*
602 U.S. 175 (2024)...................................................................60

*Noguera v. Davis*
5 F.4th 1020 (9th Cir. 2021) .....................................................36

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*
720 F.3d 490 (2d Cir. 2013) .................................................54, 55

vi

# TABLE OF AUTHORITIES
## (continued)

Page

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*
63 F.4th 240 (3d Cir. 2023) ....................................................... 57

*Pearson v. Shalala*
164 F.3d 650 (9th Cir. 1999) ..................................................... 63

*Pimental v. Dreyfus*
670 F.3d 1096 (9th Cir. 2012) ................................................... 26

*Planned Parenthood of Tenn. & N. Miss. v. Slatery*
523 F. Supp. 3d 985 (M.D. Tenn. 2021) ............................. 17, 49

*Pleasant Grove City, Utah v. Summum*
555 U.S. 460 (2009) ................................................................. 60

*POM Wonderful, LLC v. FTC*
777 F.3d 478 (D.C. Cir. 2015) .................................................. 54

*R.A.V. v. City of St. Paul*
505 U.S. 377 (1992) ............................................................ 60, 61

*Reed v. Town of Gilbert, Arizona*
576 U.S. 155 (2015) ................................................................. 60

*Resort Car Rental Sys., Inc. v. FTC*
518 F.2d 962 (9th Cir. 1975) ..................................................... 56

*Sears, Roebuck & Co. v. FTC*
676 F.2d 385 (9th Cir. 1982) ..................................................... 54

*Skinner v. State of Ok. ex rel. Williamson*
316 U.S. 535 (1942) ................................................................. 36

*Smith v. Helzer*
95 F.4th 1207 (9th Cir. 2024) ................................................... 27

*Snyder v. Phelps*
562 U.S. 443 (2011) ................................................................. 60

vii

## TABLE OF AUTHORITIES
### (continued)

Page

*Soos v. Cuomo*
    470 F. Supp. 3d 268 (N.D.N.Y. 2020)...................................31, 32

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014)..................................................................38

*Tingley v. Ferguson*
    47 F.4th 1055 (9th Cir. 2022) .......................................28, 29, 42

*Underwager v. Salter*
    22 F.3d 730 (7th Cir. 1994) .........................................................57

*United States v. Alvarez*
    567 U.S. 709 (2012)...................................................................61

*United States v. Armstrong*
    517 U.S. 456 (1996)...................................................................59

*United States v. Elias*
    921 F.2d 870 (9th Cir. 1990) ...............................................14, 33

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*
    425 U.S. 748 (1976)...................................................................42

*Veera v. Banana Republic, LLC*
    6 Cal. App. 5th 907 (2016) .........................................................56

*Waln v. Dysart Sch. Dist.*
    54 F.4th 1152 (9th Cir. 2022) .......................................31, 32, 57

*Washington v. Glucksberg*
    521 U.S. 702 (1997)...................................................................35

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008)................................................................26, 61

*Yelp, Inc. v. Paxton*
    137 F.4th 944 (9th Cir. 2025) ...........................31, 33, 34, 58, 60

# TABLE OF AUTHORITIES
## (continued)

Page

*Younger v. Harris*
401 U.S. 37 (1971)................................................................22, 23, 60

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
471 U.S. 626 (1985)...................................................................46

**STATUTES**

Cal. Bus. & Prof. Code
§ 17200, *et seq* ...................................................................*passim*
§ 17500, *et seq.* ..................................................................*passim*

## INTRODUCTION

In 2012, Plaintiff-Appellant Culture of Life Family Services, Inc. ("COLFS") and its medical director, Dr. George Delgado, created a website and hotline to advertise a purported "medical treatment" called "Abortion Pill Reversal" or "APR." That website and hotline—which COLFS transferred to Heartbeat International, Inc. ("HBI") in 2018—is the subject of a state court civil enforcement action that Defendant-Appellee Attorney General Rob Bonta ("Attorney General") brought against HBI and another defendant, RealOptions Inc. ("RO"), in September 2023 ("Enforcement Action"). With the Enforcement Action, the Attorney General seeks to protect California residents from specific false and/or misleading statements in advertising about APR. The Attorney General's purpose is to ensure that pregnant individuals in time-sensitive situations receive accurate medical information so they can make well-informed decisions.

In July 2024, after HBI and RO failed to get the Enforcement Action dismissed, COLFS filed this lawsuit, claiming that the Enforcement Action violated its free speech and free exercise rights, and its patients' "right to receive information" and substantive due process rights. In November 2024—more than a year after the Attorney General filed the Enforcement Action—COLFS sought a preliminary injunction to block the Attorney General from enforcing California's

consumer protection laws against COLFS' own use of false and/or misleading APR advertisements.

COLFS seeks an unprecedented exemption from California's consumer protection laws, claiming in essence that the First Amendment's Free Exercise and Free Speech clauses shield its use of false and/or misleading statements in its advertisements for APR. The district court properly rejected that request by dismissing COLFS' free exercise, "right to receive information," and substantive due process claims, correctly holding that COLFS failed to allege any violation of those rights by the Attorney General. The district court also properly denied the preliminary injunction on COLFS' single remaining free speech claim, correctly determining that COLFS' APR advertisements are at least potentially misleading commercial speech. This Court should affirm.

## ISSUES PRESENTED FOR REVIEW

Whether the district court properly dismissed, in part, COLFS' amended complaint and denied a preliminary injunction, where COLFS advertises its APR services by claiming that: 1) APR "reverses" a medical abortion; 2) APR is "effective" and can increase the chances of continued pregnancy; 3) APR causes only non-life-threatening side effects; 4) the rate of birth defects following APR is "less or equal to the rate in the general population"; 5) APR has a 64-68% success rate; 6) APR has saved "thousands of lives"; and 7) APR is effective in "non-

2

standard" situations, despite no scientific evidence showing that any of these statements is accurate.

## STATEMENT OF THE CASE

### I.   OVERVIEW OF "ABORTION PILL REVERSAL"

At the core of both the Enforcement Action and COLFS' litigation are advertisements essentially claiming that APR is a safe and effective method to "reverse" the first drug in the two-drug medication abortion regimen. 5-ER-0730-32, 0933. The scientific evidence about APR does not support those advertisements.

### A.   Mechanism of Mifepristone in Medication Abortion

In 2000, the Federal Drug Administration ("FDA") approved a two-drug protocol consisting of mifepristone and misoprostol to terminate pregnancies up to 49 days' gestation. 3-ER-0342. Following a revision in 2016, the current FDA-approved regimen consists of oral administration of 200mg of mifepristone, followed by 800mcg of misoprostol 24 to 48 hours later, up to 70 days' gestation. 3-ER-0343.

Mifepristone blocks progesterone receptors in a pregnant individual's uterus and cervix and increases the sensitivity of the uterus and cervix to prostaglandins, which are hormones that induce contractions in the uterus. 3-ER-0345, 0350. To maintain a pregnancy, the body floods itself with progesterone—with levels remaining high throughout pregnancy—to ensure that the uterus maintains its

3

lining and does not contract, which would result in expulsion of pregnancy tissue. 3-ER-0351.

Mifepristone binds tightly to progesterone receptors in the uterus and cervix, with those receptors preferring mifepristone over progesterone. 3-ER-0345. Mifepristone thereby obstructs progesterone from connecting with those receptors and from affecting the uterus and cervix. 3-ER-0345, 0350. As a result, the body's extra progesterone becomes ineffective: the uterine lining breaks down, separating from the uterine wall, the body starts to produce prostaglandins that contribute to uterine contraction, and the uterus becomes more sensitive to prostaglandins that cause contractions. 3-ER-0350. The second drug, misoprostol, a prostaglandin analogue, triggers uterine contractions, leading to the expulsion of pregnancy tissue. 3-ER-0350–51.

Misoprostol effectively terminates pregnancies on its own, but higher doses are required with greater risks of side effects. 3-ER-0344. Mifepristone serves as a "pre-treatment" for misoprostol, increasing misoprostol's effectiveness through mifepristone's prostaglandin-sensitizing action, resulting in a regimen that uses a lower dose of misoprostol with higher overall efficacy and fewer side effects. 3-ER-0344–45.

The two-drug regimen's effectiveness wanes further along in pregnancy, and no sufficient data exists to determine mifepristone's effectiveness at terminating

4

pregnancies on its own, particularly at the current regimen's dosage. 3-ER-0351–52, 360. According to one 2015 review of studies in which subjects received only mifepristone, the rate of "continuing pregnancy proportions ranged from 8% to 46% with the different regimens." 3-ER-0351–52, 0375. A 2017 literature review by an APR proponent similarly found that "[t]aking all studies into consideration, with daily doses of 50-600 mg and total doses of 200-1000 mg, the percentage of [continued pregnancies] varied from 0-50%." 3-SER-0614. Because the few available studies "suggest[] a very wide range" of possible outcomes, it is impossible to "infer a rate of continuing pregnancy following mifepristone alone." 3-ER-0352.

## B. Development of APR

### 1. The APR Protocol

The APR protocol is the brainchild of Delgado, COLFS' medical director. 2-ER-0319–20. The protocol consists of administering high doses of supplemental progesterone to individuals who have taken mifepristone but not misoprostol. 4-ER-0586–87. Under the protocol, patients ideally take supplemental progesterone within the first 24 to 72 hours of taking mifepristone. 4-ER-0583; 5-ER-0865.

The protocol directs that patients should have an initial in-person visit with a medical provider that includes an ultrasound to confirm pregnancy viability. 4-ER-0509; 5-ER-0866. Assuming the pregnancy is viable, providers either 1) prescribe

5

progesterone for the patients or 2) immediately administer progesterone, with "continuing care" of repeated progesterone administration for at least two weeks and ultrasounds every one to two weeks for at least twelve weeks. 4-ER-0586–88. For patients that receive progesterone injections, they must return to the provider for every injection. 4-ER-0586.

### 2. Theory Underlying APR

Delgado based his APR protocol on his understanding that "mifepristone and progesterone compete to reversibly bind to the progesterone receptor."[1] 2-ER-0319–20. He theorized that additional progesterone will "outnumber and outcompete" the mifepristone, resulting in the "revers[al]" of the mifepristone, and the pregnancy continuing. *Id.*; 4-ER-0594.

Delgado's theory, however, ignores that progesterone receptors prefer mifepristone over progesterone and bind more tightly to mifepristone than progesterone, with the mifepristone thereby blocking progesterone from acting on the uterus and cervix. 3-ER-0345, 0351. The theory also fails to address that during pregnancy, progesterone levels in the body are much higher, but mifepristone's progesterone-blocking action nevertheless remains effective. 3-ER-0351.

---

[1] COLFS points to early studies of mifepristone in animals to claim that mifepristone acts "reversibly" on progesterone receptors. Op. Br. 8. As outlined below, animal studies cannot establish how potential treatments work in humans. *See infra* pp. 8-9.

### 3.    APR Studies

According to COLFS' own expert, "[t]here is limited high-quality data on mifepristone reversal with progesterone." 5-ER-0887; *see also id.* (research "shows [APR] *could* be beneficial to continuing pregnancy") (emphasis added); *see also* 5-ER-0886 (referring to "*possibility* of [APR]") (emphasis added). In support of its preliminary injunction motion, COLFS offered only weak scientific evidence that does not establish that APR is safe or effective. 6-ER-0948–50.

### a.    Hierarchy of Scientific Research

Scientific research is necessary to determine whether a particular medical treatment, such as APR, is safe and effective. 3-ER-0348. But not all scientific research is the same. The medical field ranks types of scientific research based on the reliability to show that a particular treatment is safe and effective. *Id.*; 5-ER-0906–07; 3-SER-0597–98. The "gold standard" is the randomized controlled trial ("RCT"), an experimental form of research in which the proposed treatment is the only difference between two groups of subjects who are randomly assigned to receive either the proposed treatment or a placebo. 3-ER-0349; 5-ER-0906–07; 3-SER-0598. This structure helps RCTs eliminate as much as possible researcher and participant bias. 3-ER-0349; 5-ER-0906–07; 3-SER-0598. As such, RCTs are reliable sources for determining whether a particular treatment *caused* a particular outcome. 3-ER-0349; 5-ER-0906–07; 3-SER-0598.

7

Case series are less reliable scientific research than RCTs. 3-ER-0349; 5-ER-0906–07; 3-SER-0599. Case series are observational research: researchers report on outcomes following treatments for specific subjects who have particular diagnoses. 3-ER-0349; 3-SER-0599. Because they consist only of observations, case series do not involve random selection of subjects who receive the proposed treatment; do not have control groups; and are not rigorously structured to eliminate bias. 3-ER-0348–49; 3-SER-0599. Case series cannot show that a proposed treatment *caused* an outcome; case series can only suggest that a possible outcome might occur and raise questions for further research. 3-ER-0349; 3-SER-0599.

Animal studies are even less reliable scientific research. 3-ER-0349–50, 0364–65. They can help develop hypotheses about the safety and efficacy of a proposed treatment, but—unsurprisingly—they cannot establish how proposed treatments will work in humans. 3-ER-0364.

COLFS' evidence in support of its APR advertisements falls within the weakest forms of scientific research.

### b. Animal Studies

To support its claims that APR is safe and effective, COLFS pointed to a 1989 rat study, a 2023 rat study, and a summary of animal studies in the FDA's pharmacological review of mifepristone. 6-ER-0948–49. Because these studies

8

were conducted on animals, they cannot show how APR works in humans. 3-ER-0364–65.

The animal studies also have limited applicability to APR. In the 1989 rat study and the studies in the FDA's pharmacology review, researchers administered mifepristone and progesterone simultaneously. 3-ER-0364; 2-ER-0305–06. In APR, by contrast, patients receive progesterone hours or even days after taking mifepristone. 4-ER-0587; 5-ER-0865. And the 2023 rat study, which delayed administration of progesterone, nevertheless noted "potential differences and similarities in gestation between the animal and human pregnancy." 3-SER-0655.

These animal studies do not establish that APR is effective or safe.

### c. Endometrial Tissue Study

COLFS also relied on a study looking at the effect of mifepristone on tissue from the endometrial lining of nine non-pregnant subjects. 2-ER-0077–80, 0082–91. During two menstrual cycles, the nine subjects took mifepristone, followed either by progesterone or placebo. 2-ER-0070–71, 0083–84. The researchers took samples of the subjects' endometrial lining to determine whether the progesterone had an effect on the gene expression of the cells in the lining. 2-ER-0070–71, 0083–84. The study concluded that progesterone after "postovulatory mifepristone could revert to a large extension [sic], but not completely, the transcriptional effects of progesterone receptor antagonization." 2-ER-0070–72, 0083–84.

9

Unlike the circumstances where APR is administered—when an individual is pregnant—this study looked at nonpregnant individuals. 2-ER-0070–71, 0083–84. The uterus and endometrial lining of pregnant individuals differ significantly from those in nonpregnant individuals. 2-ER-0070–71, 0083–84. Further, the study cautions that its results "should be taken with caution because of the limited sample size involved." 2-ER-0090. The study does not establish that APR is effective or safe.

### d.  APR Case Series

COLFS and its experts cited two small case series to support its APR claims, neither of which establish that APR is safe or effective.[2] 6-ER-0949. The first case series was authored in 2012 by Delgado, along with Dr. Mary Davenport ("2012 Case Series"). *Id.*; 3-ER-0380. It followed six women who had taken mifepristone but wanted to continue their pregnancies. 3-ER-0381–82. Of the six subjects, four had continuing pregnancies resulting in live births; one subject had a completed abortion; and the sixth subject was lost to follow up. *Id.*

Although each subject received supplemental progesterone, the dosage, method of administration, gestational age, and time between taking mifepristone and progesterone all differed, muddying any link between supplemental

---

[2] A third case series that followed nine subjects who received APR noted that "[a]s a pilot trial, clinical recommendations cannot be made from the data presented." 3-ER-0363; 3-SER-0689.

progesterone and pregnancy continuation. *Id.* The 2012 Case Series also features different variables that make it impossible to determine whether the supplemental progesterone *caused* the four subjects' pregnancies to continue. 3-ER-0357.

The second was a 2017 case series following three subjects who took progesterone after mifepristone. 6-ER-0949; 3-SER-0667–71. The authors were explicit: "A weakness of this study is the small number of women whose cases were reported." 3-SER-0669. The authors further noted that "[t]here is currently no definitive evidence for the success of using progesterone to prevent the abortifacient effect of mifepristone." *Id*.

### e.    2018 Report and 2017 Literature Review

The linchpin of COLFS' evidence is a 2018 "retrospective analysis" by Delgado and Davenport ("2018 Report"), that likewise does not establish that APR is safe or effective. Deploying a treatment protocol developed in the 2012 Case Series, 3-ER-0382, Delgado and COLFS created a website and hotline to connect patients to medical providers willing to provide APR, 2-ER-0320. The 2018 Report used data from patients treated through that website and hotline. 3-ER-0389.

According the 2018 Report, there were 1,668 calls to Delgado's hotline. 3-ER-0389. Of those 1,668 calls, 754 individuals (i.e., 45%) started APR. *Id.* As Delgado advised the 2012 Case Series, 3-ER-0382, medical providers probably used ultrasound to screen some (possibly all) of the 1,668 individuals for viable

11

pregnancies, likely biasing the sample towards individuals with pregnancies likely to continue without APR. 3-ER-0393 ("It is possible that those embryos who were alive at the time of sonogram may have survived without progesterone therapy.").

The 2018 Report excluded 207 more individuals from its results: 1) 38 participants who took progesterone more than 72 hours after taking mifepristone or who took misoprostol before receiving progesterone; 2) 112 participants with whom the researchers lost contact before 20 weeks' gestation; and 3) 57 participants who chose to complete their abortion. 3-ER-0389. Removing "lost contact" participants potentially further skewed the results because pregnancy loss could have been the reason for losing contact with subjects; the 2018 Report does not account for that possibility. *Id.*

The remaining 547 participants in the study were treated by 325 different medical providers and took progesterone in a variety of ways: high dose oral capsules (31 individuals); intramuscular injections (125 individuals); oral capsules (119 individuals); oral capsules administered vaginally (156 individuals); and vaginal suppositories (34 individuals). 3-ER-0391. There is little detail about the dosage of progesterone that each individual took, with only the dosage for the 31 individuals who received the "high dose oral" treatment provided. 3-ER-0390. The 2018 Report does not consider whether this variability affected its results.

12

The 2018 Report also fails to correlate the "reversal rates" of particular treatments with the gestational age of the participants who underwent that treatment, 3-ER-0391–92, which matters because, as explained earlier, medication abortion's effectiveness for terminating pregnancies decreases as pregnancies progress.

The 2018 Report also provides no information about health outcomes for the participants who took the supplemental progesterone and no information at all about the 50% of participants whose pregnancies did not continue. 3-ER-0385–95.

Despite these flaws, the 2018 Report nevertheless claims an "overall rate of reversal" of 48% and that APR "appears to be both safe and effective." 3-ER-0390, 0393.

The 2018 Report's claim that APR is effective is based on its assumption that only 25% of pregnancies continue after taking only mifepristone, citing as support a 2017 literature review by Davenport ("2017 Literature Review"). 2-ER-0320–21; 3-ER-0388–89, 0394; 3-SER-0605–20.

Purporting to look only at studies of mifepristone-only administration that used ultrasound to distinguish between "continuing pregnancies" and "incomplete uterine evacuations" (i.e., pregnancy tissue remaining in the uterus but with no viable pregnancy), the 2017 Literature Review concludes that mifepristone "produces…continuing pregnancy rates of <25% with doses of 200-600 mg at

early gestations ≤49 days." 3-SER-0619. That conclusion appears to be based on a single study of 30 subjects who took a single 200mg dose of mifepristone, with 23.3% of the subjects having continuing pregnancies. 3-SER-0616–17; 3-ER-0352–53; 3-SER-0663. The 2017 Literature Review appears to ignore the other eleven studies that met its criteria and had mifepristone dosages ranging from 200mg to 1000mg, with pregnancy continuation rates ranging from 0% to 50%. 3-SER-0616–17.

### f.    RCTs

In support of the preliminary injunction motion, COLFS and its experts offered two RCTs: 1) a 2019 study at UC Davis ("2019 Davis Study") and 2) an RCT looking at a different drug, depot medroxyprogesterone acetate ("DMPA") ("DMPA Study"), neither of which support that APR is effective or safe. 5-ER-0887–88.

In the 2019 Davis Study, Dr. Mitchell Creinin, a board-certified obstetrician/gynecologist and professor at the University of California, Davis Medical School, sought to test the APR theory using rigorous RCT standards.[3] 3-

---

[3] COLFS improperly cites new evidence to this Court, specifically an alleged FDA warning letter purportedly sent to Dr. Creinin in 2002. Op. Br. 24. This letter was "not presented to the district court" and therefore is "not part of the record on appeal." *United States v. Elias*, 921 F.2d 870, 874 (9th Cir. 1990). Nor could this document be judicially noticed because it contains insufficient indicia of authenticity. Fed. R. Evid. 201. This letter does not appear on the FDA's website;

(continued…)

14

ER-0366–68; 3-SER-0639–46. Creinin sought to employ forty pregnant subjects who wanted abortions and agreed to take mifepristone followed by either a placebo or supplemental progesterone for two weeks before planned surgical abortions. 3-ER-0366–68; 3-SER-0641.

After enrolling twelve subjects, Creinin stopped the study when three subjects had "severe bleeding requiring ambulance transport to an emergency department." 3-ER-0366–68; 3-SER-0641–42. One participant took progesterone 24 hours after mifepristone, and a day later, had "brisk bleeding" and a completed abortion. 3-ER-0366–68; 3-SER-0641. Two others took placebos following mifepristone, and both needed surgical intervention to complete their abortions. 3-ER-0366–68; 3-SER-0641–42. One subject required a blood transfusion. 3-ER-0366–68; 3-SER-0641. Overall, four of five subjects in the progesterone group and two of five subjects in the placebo group had "gestational cardiac activity" two weeks after taking mifepristone. 3-ER-0366–68; 3-SER-0641.

Because it includes only twelve subjects, the study does not reach a conclusion about the effectiveness of APR. 3-ER-0366–68; 3-SER-0643. The study cautions, however, that "[p]atients who use mifepristone for a medical

---

COLFS appears to have pulled it from a website that claims to track FDA warning letters. Op. Br. 24 n.13. This Court should disregard this letter.

abortion should be advised that not using misoprostol could result in severe hemorrhage, even with progesterone treatment." 3-SER-0643.

The DMPA Study, for its part, looked at the simultaneous use of mifepristone with DMPA, a progestin contraceptive. 3-ER-0363; 3-SER-0674–75. DMPA is not the same as supplemental progesterone: it is a "highly potent progestin injectable contraceptive method." 3-ER-0363. And subjects received DMPA at the same time as mifepristone, contrary to the APR protocol. *Id.*; 3-SER-0675. The results ultimately showed only a slight increase in the risk of ongoing pregnancy. 3-ER-0363–64; 3-SER-0678–79.

### C. Leading Medical Organizations Have Concluded that No Evidence Supports APR

Given the lack of scientific evidence supporting APR, multiple medical organizations have issued public statements cautioning against the APR protocol. The American College of Obstetricians and Gynecologists ("ACOG"), which has more than 60,000 physician-members and "ranks its recommendations on the strength of evidence," stated that "[c]laims regarding abortion 'reversal' treatment are not based on science and do not meet clinical standards." 3-ER-0355–56; 3-SER-0623. The Society of Obstetricians and Gynaecologists of Canada ("SOGC") stated that it "does not support prescribing progesterone to stop a medical abortion" because "claims regarding so-called abortion 'reversal' treatments are not based on scientific evidence." 3-ER-0355–56; 3-SER-0630. And the United

16

Kingdom's Royal College of Obstetricians and Gynaecologists ("RCOG") was clear: "There are no reputable national or international clinical guidelines that recommend the use of progesterone to reverse the effect of mifepristone, and no evidence that it increases the likelihood of continuing pregnancy, compared to expectant management alone." 3-ER-0355–56; 3-SER-0633.

### D. Three Other Federal District Courts Have Concluded that Representations about APR's Efficacy Are Misleading

In challenges to state legislation mandating that abortion providers tell patients that mifepristone can be "reversed," three federal district courts evaluated evidence nearly identical to the record in this case and held that the term "reverse" was false and/or misleading in the context of APR. *See* 1-SER-0002–3-SER-594. In *All-Options, Inc. v. Attorney General of Indiana*, the district court held that "the medical studies in the record do not justify" a statement that "some evidence" supports that mifepristone could be "reversed" "because those studies do not support causation." 546 F. Supp. 3d 754, 767 (S.D. Ind. 2021). In *Planned Parenthood of Tennessee & North Mississippi v. Slatery*, the district court held that "[t]he word 'reversal' makes the mandated message untruthful and/or misleading because it promises more than progesterone therapy has even attempted to deliver." 523 F. Supp. 3d 985, 1003 (M.D. Tenn. 2021). And in *American Medical Ass'n v. Stenehjem*, the district court held that "the statement that 'it may be

17

possible to reverse the effects of an abortion-inducing drug' is misleading at best."

412 F. Supp. 3d 1134, 1151 (D.N.D. 2019).

## II. THE ATTORNEY GENERAL'S STATE ENFORCEMENT ACTION

To protect California residents from false and/or misleading APR advertisements, on September 21, 2023, the Attorney General filed the Enforcement Action in Alameda County Superior Court. 5-ER-0705. The Attorney General brought two claims: (1) for violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.; and (2) for violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. 5-ER-0730–32.

The Attorney General's suit alleges that eight statements that HBI and RO use in their APR advertisements are false and/or misleading: 1) that APR can "reverse" a medication abortion ("Reversal Statement"); 2) that APR is an "effective" process that "has been shown to increase the chances of allowing the pregnancy to continue" ("Effectiveness Statement"); 3) that APR has a 64-68% success rate ("Success Rate Statement"); 4) that APR may be effective beyond the 72-hour window following mifepristone administration ("Timing Statement"); 5) that the rate of birth defects after APR "is less or equal to the rate in the general population" ("Birth Defects Statement"); 6) that APR has resulted in "thousands of lives" saved ("Thousands of Lives Statement"); 7) that APR may be effective after

taking mifepristone and misoprostol or after taking methotrexate (collectively with the Timing Statement, "Non-Standard Situations Statement"); and 8) that APR can cause only non-life-threatening side effects without also stating that APR can cause severe, life-threatening bleeding ("Side Effects Statement") (collectively, the "APR Statements"). 6-ER-1023–25.

As the Enforcement Action makes clear, the Attorney General is not challenging clinical decisions to administer APR, or speech about APR writ large.[4] The very small percentage of pregnant people who may reconsider their abortion decision are entitled to accurate information as they face emotional turmoil in a time-sensitive situation. The Attorney General seeks only to ensure those individuals are not deceived about their options. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (State has responsibility to "'prevent the deception of consumers'").

## III. COLFS' ADVERTISEMENT OF APR

COLFS "pioneered APR," with Delgado "spearheading" its development. 2-ER-0320; 4-ER-0649. Delgado created the APR website, hotline, and physician network (known as the "Abortion Pill Rescue Network," "Abortion Pill Reversal Network," or "APRN"). *Id.* Even after its 2018 transfer of the website, hotline, and

---

[4] COLFS claims that the Attorney General has "urged the Ohio Attorney General to also sue Heartbeat." Op. Br. 20 (citing 6-ER-1023–25). There is no support in the record for this claim.

APRN to HBI, COLFS maintains a "partnership with" HBI and remains "responsible for maintaining the APR Protocol." 4-ER-0649; 2-ER-0321–22. Delgado also serves on HBI's APR medical advisory board. 2-ER-0322.

COLFS also continues to provide APR as a treatment to patients, 5-ER-0793, advertising on its website:

- "The abortion pill can be reversed by a process called 'APR… - Abortion Pill Rescue. COLFS Medical Clinic can perform the APR process, but you must contact us immediately." 5-ER-0831.

- "Have you taken the first dose of the ABORTION PILL? Do you regret your decision and wish to reverse the effects of the abortion pill? We are here to help you! There is an effective process for reversing the abortion pill." 5-ER-0836.

- "Regret taking the abortion pill? Please call now! Escondido Clinic: 760-741-1224[,] 24/7 Rescue Line: 877-558-0333." *Id.*

- "An antidote is available to stop the effects of the abortion pill. It is not uncommon for a woman to have feelings of regret after taking the abortion pill. At COLFS Medical Clinic we can help you learn everything you need to know about the APR procedure and where you can get the help you need in your local community." 5-ER-0864.

COLFS bills to patients' insurance—and receives payments—for its APR treatments. 2-ER-0110; *see also* 5-ER-0867 ("How much will this cost? Costs of the treatment varies depending on the progesterone used. Insurance plans may cover treatment. COLFS Medical Clinics will cover expenses for our APR patients who do not have insurance or financial means to pay for treatment.").

COLFS also uses its APR services to fundraise. "[E]very year, COLFS holds an annual fundraising gala," and "[e]very year [it] mention[s] [its] work, including Abortion Pill Reversal." 5-ER-0794. Those "mentions" of APR consist of videos showing stories of patients who underwent APR. 5-ER-0794; 5-ER-0847–60; *see also* 5-ER-0849 ("Without that faith-filled generosity that comes from the donors, without the prayers that come from our community, we wouldn't have the ability to do the work that we do."). COLFS also features a story on its website about a patient who underwent APR, which includes the statement "SUPPORT WOMEN LIKE STACY: DONATE NOW" and multiple links to donate to COLFS. 5-ER-0838–43.

## IV. PROCEEDINGS BELOW

More than ten months after the Attorney General filed the Enforcement Action—and shortly after HBI failed in its attempted dismissal—COLFS filed its initial complaint. 6-ER-1076. That complaint included four claims: that the Enforcement Action violated 1) the Free Speech Clause of the First Amendment;

2) the Free Exercise Clause of the First Amendment; 3) its patients' "right to receive information" under the First Amendment; and 4) its patients' substantive due process rights under the Fourteenth Amendment. 6-ER-1107–16. The Attorney General moved to dismiss, arguing that the close connections between COLFS and HBI warranted abstention under *Younger v. Harris*, 401 U.S. 37 (1971) and *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), that COLFS lacked standing, and that each of COLFS' claims failed. 6-ER-1061– 62. Just before oral argument on that motion, COLFS sought a preliminary injunction. 6-ER-1123–24. The district court agreed that COLFS lacked standing, dismissed the initial complaint on those grounds, and denied COLFS' preliminary injunction motion as moot. 6-ER-1069–75, 1124.

COLFS filed an amended complaint with the same four claims but with additional allegations to substantiate its standing. 6-ER-0937–84. COLFS also re-filed its preliminary injunction motion, seeking to block the Attorney General from enforcing the UCL or FAL based on COLFS' use of the APR Statements "on its website or to individual women." 5-ER-0932–33.

The Attorney General again moved to dismiss, reasserting that the district court should abstain and that each of COLFS' four claims failed, 5-ER-0790, and opposed COLFS' preliminary injunction request, 3-ER-0453–82.

The district court granted-in-part and denied-in-part the motion to dismiss. 1-ER-0033. The court dismissed COLFS' claim for damages, finding that it lacked standing. 1-ER-0041. The court held that neither *Younger* nor *Colorado River* abstention applied.[5] 1-ER-0042–53. The court further held that COLFS failed to sufficiently plead its free exercise, "right to receive information," and substantive due process claims, but had sufficiently pled a free speech claim. 1-ER-0053–66. The district court granted COLFS leave to amend its "right to receive information" and substantive due process claims; it did not grant COLFS leave to amend its free exercise claim. 1-ER-0067.

The district court also denied COLFS' preliminary injunction request. Because it had determined that COLFS failed to adequately plead its free exercise, "right to receive information," and substantive due process claims, the district court considered only COLFS' free speech claim for the preliminary injunction. 1-ER-0009–10.

In a thorough order that walked through the evidence, the court held that COLFS was unlikely to prevail on the merits of its free speech claim because its

---

[5] The Attorney General maintains that the connections between COLFS and the defendants in the Enforcement Action warrant abstention. The Attorney General intends to conduct discovery into those connections and reserves the right to reassert abstention as the case proceeds. *See Adibi v. Cal. State Bd. of Pharm.*, 461 F. Supp. 2d 1103, 1109 (N.D. Cal. 2006) (permitting renewed motion for abstention at summary judgment stage).

23

APR advertisements, which qualified as commercial speech, were either inherently or potentially false and/or misleading. 1-ER-0010–29. The district court further held that for the potentially false and/or misleading statements, the Enforcement Action satisfied intermediate scrutiny. 1-ER-0029–30.

The district court further held that because COLFS failed to show likelihood of success on its free speech claim, COLFS also had failed to show irreparable harm. *Id.* The district court also determined that the balance of equities and public interest weighed in favor of the Attorney General and against granting the injunction. 1-ER-0031.

## SUMMARY OF THE ARGUMENT

The district court properly dismissed COLFS' free exercise, "right to receive information," and substantive due process claims, and therefore properly denied COLFS' preliminary injunction request as to those claims. The district court also correctly denied COLFS a preliminary injunction on its free speech claim.

*First*, the district court correctly dismissed COLFS' free exercise claim without leave to amend because the UCL and FAL are neutral and generally applicable laws, and COLFS failed to allege the Attorney General engaged in selective enforcement.

*Second,* the district court correctly dismissed COLFS' substantive due process claim because COLFS failed to allege that the Enforcement Action infringes a liberty interest that the substantive due process clause protects.

*Third,* the district court properly dismissed COLFS' "right to receive information" claim because COLFS failed to allege a "concrete, specific connection" between the APR Statements and COLFS' patients. 1-ER-0065.

*Fourth,* COLFS failed to show that it was likely to prevail on its single remaining free speech claim. The district court correctly held that COLFS' APR advertisements qualify as commercial speech and that each of COLFS' APR advertisements are, at minimum, potentially misleading due to the lack of evidence supporting their accuracy. The district court also correctly held that COLFS was unlikely to succeed on its content and viewpoint discrimination arguments because COLFS did not show a "policy" or "practice" of discriminatory enforcement decisions.

*Fifth,* the district court correctly held that the remaining preliminary injunction factors weigh in the Attorney General's favor. There is no irreparable harm because COLFS did not establish a likelihood of success on the merits and waited more than a year before seeking a preliminary injunction. Because the Enforcement Action seeks to protect California residents, the balance of the equities and public interest tip in the Attorney General's favor.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order granting a motion to dismiss. *See Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1203 (9th Cir. 2005). Where the district court denies a motion for a preliminary injunction based on an earlier dismissal of claims, the Court limits its review to the dismissal order and remands (if necessary) for the district court to consider in the first instance whether to award a preliminary injunction. *See, e.g.*, *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1171-72 (9th Cir. 2024).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking an injunction must establish: 1) likelihood of success on the merits; 2) likelihood of irreparable harm absent preliminary relief; 3) that the balance of equities tips in its favor; and 4) that an injunction is in the public interest. *Id.* at 20. "'[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement.'" *Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). Only upon that showing does the burden "'shift[] to the government to justify the restriction on speech.'" *Id.*

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Pimental v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Legal

questions are reviewed de novo. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc).

There is a lack of clarity about whether in the First Amendment preliminary injunction context district courts' findings of constitutional facts are subject to abuse of discretion or *de novo* review. *Compare Smith v. Helzer*, 95 F.4th 1207, 1213-14 (9th Cir. 2024) ("[A]n abuse of discretion occurs only when the district court 'rests its decision…on a clearly erroneous finding of fact.'") *and Am. Beverage*, 916 F.3d at 754 ("'We review conclusions of law de novo and findings of fact for clear error.") *with Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) ("'[W]e review constitutional facts *de novo*'"). As such, the Attorney General argues the district court's findings of constitutional facts under the *de novo* standard.

## ARGUMENT

## I.  THE DISTRICT COURT CORRECTLY DISMISSED COLFS' FREE EXERCISE, SUBSTANTIVE DUE PROCESS, AND RIGHT TO RECEIVE INFORMATION CLAIMS

COLFS argues that the claims the district court dismissed could be the basis for its preliminary injunction motion. Op. Br. 47, 54. COLFS' arguments are meritless; the district court properly dismissed those claims.

27

### A. The District Court Correctly Dismissed COLFS' Free Exercise Claim

The district court correctly dismissed COLFS' facial and as applied free exercise challenges without leave to amend. 1-ER-0060–64. Because the UCL and FAL are neutral and generally applicable and because there has been no selective enforcement, this Court should affirm.

### 1. The District Court Correctly Held That the UCL and FAL Are Neutral and Generally Applicable

To state a free exercise claim, COLFS must allege that the Attorney General has "burdened [its] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). As the district court appropriately held, the UCL and FAL are neutral and generally applicable. 1-ER-0060–64. As the district court correctly explained, the UCL and FAL protect consumers by prohibiting false and/or misleading advertisements "because of the stated interest in consumer protection, not because of any sort of motivations underlying those advertisements – and as such these laws are neutral." 1-ER-0060.

The UCL and FAL are also generally applicable. "Broadly speaking, there are two ways a law is not generally applicable": (1) "if there is a 'formal mechanism for granting exceptions' that 'invite[s] the government to consider the particular reasons for a person's conduct,'" i.e., a "formal and discretionary

28

mechanism for individual exceptions" or (2) "if the law 'prohibits religious conduct while permitting secular conduct' that also works against the government's interest in enacting the law." *Tingley v. Ferguson*, 47 F.4th 1055, 1085, 1087-88 (9th Cir. 2022).

Neither the UCL nor FAL have "a formal and discretionary mechanism for individual exceptions," and they do not treat "any comparable secular activity more favorably than religious exercise." *Id.* at 1088. Instead, they ban all false and/or misleading advertisements, regardless of secular or religious motive. *See* Cal. Bus. & Prof. Code § 17500, *et seq.*, § 17200, *et seq*; *cf. Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249-50 (9th Cir. 1999) (UCL applied to religious organizations because of its "neutral principles").

COLFS claims the UCL and FAL are not generally applicable because they do not apply to public entities. Op. Br. 49–50. As the district court correctly noted, however, government speech is not comparable to COLFS' APR advertisements. 1-ER-0061 (citing *Tingley*, 47 F.4th at 1088). "Whether secular and religious activity are 'comparable' is evaluated 'against the asserted government interest that justifies the regulation at issue' and requires looking at the *risks* posed, not the reasons for the conduct." *Tingley*, 47 F.4th at 1088 (emphasis added).

As the district court explained, public entities do not present the same risks as deceptive advertisements by private entities: "Public entities are exempted

because the state is a 'sovereign entity representing the people.'" 1-ER-0061 (quoting *Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th 1198, 1203 (1999)). Public entities, which represent California residents and are accountable to those residents, can reasonably be excluded from statutes that seek to regulate private business entities' relationships with their consumers. And, given that the UCL and FAL are consumer protection laws concerning misleading business practices, they do not apply to the government at all; there is no selective exception in the statute.

As the district court further explained, "[p]olitical speech is exempted because it runs against the First Amendment, since false and/or misleading *political* speech is protected while inherently false and/or misleading commercial speech is not." 1-ER-0061 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 447, 563 (1980)). And, as the court observed, both political and public entity speech benefit from accountability from elections, unlike misleading commercial speech by private actors. *Id.* In short, the risks posed by political and public entity speech materially differ from the risks from private entity speech; they are not comparable. *Id.* Thus, the district court properly rejected COLFS' facial free exercise challenge to the UCL and FAL. 1-ER-0061–62.

## 2. There Is No Selective Enforcement

COLFS next argues that the Attorney General "selectively exempts deceptive speech by abortion providers," and therefore the UCL and FAL are not

"generally applicable." Op. Br. 50-52. COLFS essentially claims that so long as it can allege that a single secular entity engages in comparable misconduct, the Free Exercise clause protects its own misconduct from prosecution. *Id.* Although "[g]eneral applicability requires, among other things, that the laws be enforced evenhandedly," *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022), as this Court recently observed, "state enforcement arms will not be able to pursue every false or misleading statement or other law violation, and it would read too much into their enforcement decisions invariably to presume bias, selective retaliation, or unconstitutional harassment." *Yelp, Inc. v. Paxton*, 137 F.4th 944, 954 (9th Cir. 2025).

Instead, as in the free speech selective enforcement context, COLFS should have to show that "the existence of an unconstitutional policy by extrapolating from a series of enforcement actions" to show that the Attorney General is selectively enforcing the UCL and FAL.[6] *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011); *see also Soos v. Cuomo*, 470 F. Supp. 3d 268, 280 ("when the challenged law does not carve out an exemption on its face, the *history of*

---

[6] The other cases COLFS cites are inapposite. Op. Br. 51-52; *see Masterpiece Cakeshop v. Civ. Rights Comm'n*, 584 U.S. 617, 634 (2018) (commission members disparaged plaintiff's religious belief); *Colo. Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687 (9th Cir. 2023) (school district used "uncertain exemptions or exceptions" in applying policy).

31

*enforcement* is relevant to the existence of an exemption") (emphasis added). COLFS points to a single entity that it claims—incorrectly—is comparable. 6-ER-0969; Op. Br. 51. COLFS has not come close to the "formidable task" of alleging an intentional policy.

COLFS has also failed under its own standard. COLFS' allegations demonstrate that the Attorney General regularly enforces the UCL and FAL against secular entities, thereby undermining any claim that the Attorney General uses the UCL and FAL to target religious practice. 6-ER-0969.

COLFS' alternative claim that the Attorney General has selectively enforced the UCL and FAL by failing to prosecute Planned Parenthood is equally meritless. Op. Br. 51. "'[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue,'" as well as whether "the permitted secular conduct that contravened the legitimate government interests underlying the policy" did so "*to the same degree*." *Waln*, 54 F.4th at 1159 (emphasis in original).

With the Enforcement Action, the Attorney General asserts his interest in protecting consumers from false and/or misleading statements about medical treatments. 6-ER-0998–1027; *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1108 (9th Cir. 2004). As the district court correctly held, however, COLFS failed

even to allege that Planned Parenthood engaged in false and/or misleading advertisements for medical treatments. 1-ER-0063.

First, in contrast to COLFS' claims otherwise, Planned Parenthood discloses the rare but serious side effects of the FDA-approved medication abortion regimen.[7] 6-ER-0964; 4-ER-0693–94. Second, as to COLFS' argument that Planned Parenthood deceptively states that APR has not been "tested for safety, effectiveness, or the likelihood of side effects," Op. Br. 51, COLFS' own cited studies, 6-ER-0947–50, do not establish that APR is safe, effective, or has no or low risks of side effects, *see supra* pp. 7-18; *see also* 3-ER-0385–95 (no health outcomes tracked in 2018 Study); *All-Options, Inc.*, 546 F. Supp. 3d at 766 (Delgado "admitted that his studies 'cannot prove' causation.").

As the district court correctly held, "[s]ince Planned Parenthood is facially not in violation of the UCL or the FAL, the Attorney General has nothing to prosecute, and therefore selective prosecution is not at work." 1-ER-0064; *cf. Yelp*, 137 F.4th at 955-56 ("state Attorneys General and other state officials are entitled to have enforcement priorities and policy positions"; "an enforcement action

---

[7] This Court should disregard the link to a webpage for "Abortion in San Diego, CA" for a San Diego-based Planned Parenthood clinic that COLFS introduced for the first time in its brief. Op. Br. 51. This evidence was "not presented to the district court" and is "not part of the record on appeal." *Elias*, 921 F.2d at 874. Even if this Court were to consider this evidence, the webpage has a hyperlink to information about medication abortion, including its rare side effects.

consistent with that policy direction" is not "enough to establish a retaliatory motive").

COLFS' argument that the Attorney General selectively exempts other off-label uses of progesterone fares no better. Op. Br. 52-53. First, COLFS points to no providers who falsely advertise other off-label uses of progesterone. Second, as the district court correctly held, and as COLFS acknowledges, the Enforcement Action does not seek to regulate APR as a treatment.[8] 1-ER-0063; *see also* Op. Br. 53. It solely seeks to prohibit eight false and/or misleading advertisements regarding APR. 6-ER-1023–1025.

This Court should affirm the district court's dismissal of COLFS' Free Exercise claim without leave to amend.

---

[8] COLFS' argument that the Attorney General not targeting APR as a treatment in the Enforcement Action undermines the Attorney General's "purported interest in restricting speech about APR" is meritless. Op. Br. 53. First, COLFS forfeited this argument by failing to raise it with the district court. *Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011). Second, the Attorney General is not restricting speech about APR writ large. 5-ER-730–732. Third, physicians advising a new or experimental treatment after deploying their best judgment in the face of weak or nonexistent medical evidence—alongside disclosure of the state of that evidence and the treatment's potential risks—is wholly different from advertising to the general public that the same treatment is "safe and effective" as COLFS does. *See* 3-SER-0601.

### B. The District Court Correctly Dismissed COLFS' Substantive Due Process Claim

COLFS perfunctorily argues that its substantive due process claim justifies a preliminary injunction because APR is a "medical treatment" that individuals can use to "exercise[] [their] constitutional right to refuse additional medical treatment (misoprostol)." Op. Br. 55-56. The district court correctly held that COLFS failed to allege a substantive due process claim.

COLFS claims that the Enforcement Action implicates substantive due process protections for the right to avoid unwanted medical treatment. Op. Br. 55. To state such a claim, COLFS must allege a cognizable liberty interest and infringement of that interest, to be assessed by "'balancing [the] "liberty interests against relevant state interests.'" *Cruzan v. Dir., Mo. Dept of Health*, 497 U.S. 261, 279 (1990). The liberty interest in avoiding unwanted medical treatment occurs in circumstances where the government *imposes* medical treatments. *See, e.g.*, *Cruzan*, 497 U.S. at 265 (imposition of artificial feeding and hydration equipment on individual in vegetative state); *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024) (vaccine mandate); *see also Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) (right to avoid unwanted medical treatment stems from "the common-law rule that forced medication was a battery.").

COLFS also claims that the Enforcement Action infringes on its patients' substantive due process "to bear or beget a child." Op. Br. 55. Infringement of the

"right to procreation" occurs where the government prevents individuals from having offspring. *See, e.g.*, *Skinner v. State of Ok. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (Oklahoma statute permitting sterilization of thrice-convicted criminals).

As the district court correctly held, the liberty interests that COLFS identifies "are not implicated in the Enforcement Action" because "there is no state action forcing unwanted medical treatment on women." 1-ER-0066. Further, COLFS has not alleged how the Enforcement Action effectively bans APR, nor explained how restrictions on the eight targeted statements "would cloud a physician's best judgment or force a woman to undergo or continue an abortion." 1-ER-0066; *see, e.g.*, 6-ER-0981.

This Court should affirm the district court's dismissal of COLFS' substantive due process claim.

### C. The District Court Properly Dismissed COLFS' Right to Receive Information Claim

In a footnote, COLFS challenges the dismissal of its "right to receive information" claim. Op. Br. 33-34 n.14. "'The summary mention of an issue in a footnote, without reasoning in support of the [party's] argument is insufficient to raise the issue on appeal.'" *Noguera v. Davis*, 5 F.4th 1020, 1029 n.3 (9th Cir. 2021). As such, COLFS has waived this argument.

36

Regardless, the district court properly dismissed this claim. 1-ER-0065. COLFS asserts that the district court erred by not considering speech between patients and doctors. Op. Br. 33-34 n.14. Not so. The district court acknowledged the connection between COLFS and its patients but correctly held that COLFS failed to allege a "concrete, specific connection" between the APR Statements and COLFS' patients. 1-ER-0065. Such connection between targeted speech and the audience is essential to a "right to receive information" claim. *See Murthy v. Missouri*, 603 U.S. 43, 46 (2024) (plaintiff failed to "point to any specific instance of content moderation that caused them identifiable harm"); *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) ("'It is the right of the public to receive suitable access to…ideas and experiences which is crucial here.'").

This Court should affirm the district court's dismissal of COLFS' "right to receive information" claim.

## II. THE DISTRICT COURT CORRECTLY DENIED COLFS' PRELIMINARY INJUNCTION REQUEST

### A. The District Court Properly Held that COLFS Is Unlikely to Prevail on its Free Speech Claim

The district court correctly held that COLFS failed to make a colorable free speech claim because (1) its APR advertisements are commercial speech, 1-ER-0010–13, and (2) those advertisements are at least potentially false and/or

misleading, 1-ER-0013–29. The district court also correctly held that the Attorney General's Enforcement Action satisfied intermediate scrutiny. 1-ER-0029–31.

### 1. The District Court Correctly Held That COLFS' APR Advertisements Qualify as Commercial Speech

Because commercial speech has "greater potential for deception or confusion in the context of certain advertising messages" it receives less protection under the First Amendment than other forms of expression.[9] *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983). "Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021). But because "speech that does not propose a commercial transaction on its face can still be commercial speech," "[c]ourts view 'this definition [as] just a starting point'" and "try to give effect to 'a common-sense distinction between commercial speech and other varieties of speech.'" *Id.*

"'Where the facts present a close question, "strong support" that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has

---

[9] To the extent COLFS' speech is noncommercial, its pre-enforcement standing is questionable, because the statutory bases for the Enforcement Action require commercial speech. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (pre-enforcement standing requires showing conduct is "proscribed by statute" and that there is a "credible threat of prosecution").

an economic motivation.'" *Id.* at 1115-16. "These so-called *Bolger* factors are important guideposts, but they are not dispositive." *Id.* at 1116; *see also Bolger*, 463 U.S. at 67 n.14 (1983). The district court properly applied the *Bolger* factors and concluded that COLFS' APR advertisements qualify as commercial speech.[10] 1-ER-0010–13.

### a. The District Court Properly Held That All Three *Bolger* Factors Are Satisfied

The district court properly held that COLFS' APR advertisements satisfied the first and second *Bolger* factors. 1-ER-0012. This Court has held that medical services qualify as "specific products." *Am. Acad.*, 353 F.3d at 1106. And traditional indicia of advertisements include "price or availability information" as well as "touting their products and services." *Ariix*, 985 F.3d at 1116. APR is a medical service, i.e. a "specific product," and COLFS tells consumers both that it will provide APR and how they can pay for it. 5-ER-0836 ("Regret taking the abortion pill? Please call now!"); 5-ER-0867 ("Costs of the treatment varies depending on the progesterone used. Insurance plans may cover treatment.").

---

[10] This Court could also affirm without reaching the *Bolger* factors, which only apply in close cases, because COLFS' APR advertisements do no more than propose a commercial transaction. *See Bolger*, 463 U.S. at 66; *Fowler v. Guerin*, 899 F.3d 1112, 1118 (9th Cir. 2018) (court may affirm on any basis supported in the record). There is no dispute that COLFS offers consumers a specific medical service—APR—6-ER-939, and that it accepts payment for that service from those with insurance or the means to pay, 5-ER-0867, 2-ER-0110.

As to the third *Bolger* factor, the district court correctly held that COLFS had economic motivation because it solicits a paying patient base and uses that patient base to fundraise. 1-ER-0012–13. "[S]oliciting a patient base" satisfies the economic motivation requirement. *Am. Acad.*, 353 F.3d at 1106. And there is no dispute that COLFS receives payments for at least some patients treated with APR, either through insurance or direct patient payments. 5-ER-0867 (COLFS' APR FAQs regarding cost); 2-ER-0110 ("COLFS would accept insurance payments for those who do have insurance and some, maybe part of the cost for those who don't have insurance but have some means to pay for part of it[.]").

In addition, this Court, in *First Resort, Inc. v. Herrera*, held that the economic motivation factor was satisfied where non-profit medical providers solicited non-paying patients and then used that patient base in fundraising efforts. 860 F.3d 1263, 1272-73 (9th Cir. 2017). The same is true here: "[E]very year, COLFS holds an annual fundraising gala," and "[e]very year [it] mention[s] [its] work, including Abortion Pill Reversal." 5-ER-0794. COLFS also uses patient stories about APR to solicit donations. 5-ER-0838-39. The district court thus properly held that COLFS' fundraising, coupled with COLFS' acceptance of insurance and out of pocket payments, established COLFS' economic motivation. 1-ER-0012–13.

### b. COLFS' APR Advertisements Are Commercial Speech Even Absent Economic Motivation

Because COLFS' APR advertisements "relate[] to the provision of certain medical services, not the exchange of ideas," they qualify as commercial speech, regardless of COLFS' economic motivation. *First Resort*, 86 F.3d at 1273. "'[T]he potential commercial nature of speech does not hinge solely on whether the [speakers have] an economic motive, as even *Bolger* does not preclude classification of speech as commercial in the absence of the speaker's economic motivation.'" *Id*. Where, as here, the State "regulates advertising designed to attract a patient base in a competitive marketplace for commercially valuable services," the State "regulates 'classic examples of commercial speech.'" *Id.* at 1274.

COLFS' APR advertisements solicit patients to receive APR and therefore "'are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas.'" *Id.* at 1273. COLFS provides no information about criticisms of APR or weaknesses in studies underlying the medical treatment, underscoring that its purpose is to promote APR, not educate the public. *See, e.g.*, 5-ER-0828–36, 0863–71; *cf. Bernardo v. Planned Parenthood Fed'n of America*, 115 Cal. App. 4th 322, 331-32, 344 (2004) (webpage was "educational" not "commercial" where it provided information on both sides of debate). Instead, pregnant individuals who stumble onto COLFS' APR webpages

41

only see advertisements for APR, promising more than the scientific research supports. *See supra* pp. 7-18, 19-20. And, if they have insurance or the ability to pay, COLFS will accept payment for the treatment. 5-ER-0867, 2-ER-0110.

The Enforcement Action seeks only to prevent patients from encountering those type of false and/or misleading advertisements. "The First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 772 (1976); *cf. Tingley*, 47 F.4th at 1083 ("The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients.").

The district court correctly held that COLFS' APR advertisements qualify as commercial speech.

### c.  COLFS' Arguments That Its APR Advertisements Are Not Commercial Speech Lack Merit

COLFS' raises three meritless arguments in response.

*First*, COLFS' argues that it has no economic motivation, claiming that it offers "APR solely out of religious devotion to helping women in need," including by "offering access to APR 'regardless of ability to pay.'" Op. Br. 35. But COLFS *does* accept payment for APR from those with insurance and who can pay out of pocket, thus establishing its economic motive. 5-ER-0867, 2-ER-0110; *Am. Acad.*,

42

353 F.3d at 1106. That fact also undermines COLFS' reliance on *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore* because the parties there received "no remuneration of any kind[.]" 879 F.3d 101, 108 (4th Cir. 2018).

COLFS also tries to liken itself to the Jehovah's Witnesses who sold religious books and pamphlets for the primary purpose of evangelization in *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943). Op. Br. 35-36. Here, unlike Jehovah's Witnesses evangelizing door-to-door, COLFS' APR advertisements do not disclose any religious motives. *See, e.g.*, 5-ER-0829–34, 863–71; *see also Murdock*, 319 U.S. at 111 (First Amendment protects "clearly religious activity" and "spreading…religious beliefs through the spoken and printed word"); *Charles v. City of Los Angeles*, 697 F.3d 1146, 1153 (9th Cir. 2012) (*Murdock* plaintiffs "distribute[d] literature as part of a religious mandate of evangelism"); *see also Cent. Hudson*, 447 U.S. at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising."). Instead, COLFS advertises itself as a medical provider selling a medical service. *See, e.g.*, 5-ER-0863–68. Accordingly, COLFS' reliance on *Murdock* is misplaced.

*Second*, COLFS contends that its APR FAQs page directs visitors "not just to its own services but to a national helpline and numerous third-party websites hosting scientific studies over which it has no control and from which it obtains no

43

revenue." Op. Br. 36. But the FAQs bear COLFS' logo, its telephone number, and a link to schedule an APR appointment with COLFS. 5-ER-0863. The FAQs also contain statements such as:

- "At COLFS Medical Clinic we can help you";

- "COLFS Medical Clinic serves APR patients throughout San Diego County regardless of their ability to pay";

- "COLFS Medical Clinics will cover expenses for our APR patients who do not have insurance or financial means to pay"; and

- "At COLFS we have years of experience. Please contact us. We are here to help you." 5-ER-0863–68.

Thus the record amply supports the district court's holding that COLFS' statements are advertisements intended to "solicit women to become potential clients." 1-ER-0012. That the FAQs cite in footnotes third-party articles—notably none critical of APR—does not render the speech noncommercial. *See Bolger*, 463 U.S. at 68 ("Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.").[11]

---

[11] There is no merit to COLFS' argument that the FAQs are akin to general informational pamphlets. Op. Br. 36, (citing *Bolger*, 463 U.S. at 67 n.13). The FAQs direct consumers to COLFS for APR services throughout, so the webpage materially differs from the general information pamphlets *Bolger* described.

*Third*, COLFS argues that the district court "erred in finding COLFS' pro-APR statements commercial simply because it uses those statements and stories about its APR patients in separate fundraising efforts." Op. Br. 36. The district court did not base its holding solely on fundraising, instead looking to COLFS' acceptance of payment for APR services. 1-ER-0012. Regardless, the court correctly concluded that COLFS uses the APR stories for fundraising and, under *First Resort,* such fundraising constitutes economic motivation. 860 F.3d at 1272-73.

COLFS attempts to distinguish *First Resort*, stating that, there, (1) the majority of fundraising communications referenced the benefits of client services and client stories; and (2) members of the management team received bonuses based, in part, on the number of new clients. Op. Br. 36-37. *First Resort* did not limit its holding to identical facts, and this case presents even stronger evidence of economic motivation because COLFS both solicits paying clients and uses patient stories to fundraise. *Id.* at 1272-73.

The district court correctly held COLFS' APR advertisements are commercial speech.

45

### 2. The District Court Correctly Held That the Success Rate Statement and the Non-Standard Situations Statements Are Inherently False and Misleading

Commercial speech that is "inherently misleading" "enjoys no First Amendment protection." *Am. Acad.*, 353 F.3d at 1106-07. "[F]alse, deceptive, or misleading" speech may be banned outright. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 638 (1985). The district court properly held that COLFS' Success Rate Statements and Non-Standard Situations Statements are inherently false and/or misleading, 1-ER-0029, and the record provides ample support for those determinations.

*Success Rate Statements*. The district court correctly determined that COLFS' statement that APR has a 64-68% success rate is inherently misleading because (1) the 2018 Report purportedly supporting that success rate suffers from serious methodological flaws, rendering its conclusions unreliable, and (2) even setting aside those flaws, the 2018 Report concluded there was an overall success rate of 48%, not 64-68%. 1-ER-0027–28. The 2018 Report showed different success rates for different methods of progesterone administration: 68% for high-dose oral administration, 64% for intramuscular administration, and 32% to 39% for vaginal administration. 3-ER-0391. COLFS' APR FAQs state that APR patients will receive "a pill to be taken orally or vaginally or possibly by intramuscular injection." 5-ER-0866. Nothing in the record indicates how many patients receive

each method of progesterone administration.[12] Thus, the record supports the district court's determination that COLFS' advertising of the 64-68% success rate is inherently false and/or misleading.

*Non-Standard Situations Statements.* The district court also correctly determined that statements that APR may work in non-standard situations, i.e. after administration of misoprostol, methotrexate, or more than 72 hours after taking mifepristone, are inherently false and/or misleading.[13] 1-ER-0028–29. That finding is supported because no studies examine whether APR is effective in any of these situations. As to the Timing Statement, COLFS highlights a statement by its expert that mifepristone's "period of activity" in its target areas "is only '*mostly* within *about* 72 hours.'" Op. Br. 44 (emphasis in original). That mifepristone might still circulate in the body after 72 hours says nothing about whether APR is "effective" if started after 72 hours—more logically, by that point, mifepristone likely has taken full effect, with APR having no effect. 3-ER-0345. COLFS further argues that the district court cited no evidence that APR cannot "safely work after 72

---

[12] To overcome this deficiency, COLFS claims that Delgado "'endorse[s] the better-performing protocols.'" Op. Br. 44. But COLFS' own FAQs support that whatever Delgado may "endorse," COLFS offers the full range of treatment methods. 5-ER-0866. And the 2018 Report states that the full range of treatment methods has a 48% successful reversal rate. 3-ER-0390.

[13] COLFS argues that it has "never" used statements that APR is effective after mifepristone or methotrexate. Op. Br. 44. But COLFS listed these statements in its preliminary injunction notice. 5-ER-0933.

hours," Op. Br. 44, but no such evidence is required. *See, e.g.*, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1212 (D.C. Cir. 2021) (statement was inherently misleading because it lacked scientific support).

### 3. The District Court Correctly Held that the Enforcement Action Satisfies Intermediate Scrutiny for the Remaining APR Statements

The district court held that COLFS' Reversal Statements, Effectiveness Statements, Side Effects Statements, Birth Defects Statements, and Thousands of Lives Statements are potentially misleading.[14] 1-ER-0013–29. The government may regulate "potentially misleading" commercial speech, so long as the government asserts a "'substantial'" interest, the "'regulation directly advances the governmental interest asserted,'" and the regulation "'is not more extensive than is necessary to serve that interest,'" i.e., the regulation must satisfy intermediate scrutiny. *Am. Acad.*, 353 F.3d at 1106-07. The district court properly held that the Enforcement Action satisfies intermediate scrutiny.

COLFS did not challenge the district court's determinations that the remaining statements are potentially misleading and therefore has waived such arguments. *See Lopez-Vasquez v. Holder*, 706 F.3d 1072, 1079-80 (9th Cir. 2013)

---

[14] The Attorney General maintains that these statements are inherently—rather than potentially—false and/or misleading.

48

(issues not argued in opening brief are waived). Nor could it; the record amply supports each of the district court's determinations.

*Reversal Statements*. The district court properly held that COLFS' statements that APR can reverse medication abortions are potentially false and/or misleading. 1-ER-0015–21. COLFS' experts provided only their theory that supplemental progesterone can "outcompete" mifepristone and thus inhibit mifepristone's effect, and they offered no facts that undermine that mifepristone binds more tightly and more preferentially to progesterone receptors, nor to the fact that pregnant bodies already are flooded with progesterone. 3-ER-351; 2-ER-0257–58, 275–83. In short, COLFS offered only theory—not evidence—that greater amounts of progesterone can unseat mifepristone once it has bound to progesterone receptors, i.e. "reverse" the mifepristone. *See Slatery*, 523 F. Supp. 3d at 1002 ("[T]he word 'reverse' does not accurately describe to patients the medical research on progesterone therapy.").

*Effectiveness Statements.* The district court also properly held that COLFS' statements that APR is effective and can increase the chances of continued pregnancy are potentially false and/or misleading. 1-ER-0021–22. The district court correctly noted that the 2018 Report's methodological flaws undermine its conclusions. Specifically, the 2018 Report: (1) selectively screened APR patients in a manner that biased the data towards pregnancies already likely to continue; (2) failed to compare each participant's APR treatment to their gestational age, even

though medication abortion is less effective later in pregnancy; and (3) lacked controls, which is especially problematic since the patients were treated by 325 different medical providers. *See supra* pp. 11-14.

The record also supports the district court's determination that there is no agreed-upon rate of pregnancy continuation after taking mifepristone alone. 3-ER-351–52, 360. Thus, the district court properly concluded that "given the lack of robust scientific study on this issue, statements on the effectiveness of APR are potentially misleading." 1-ER-0024.

*Side Effects Statements.* The district court properly held as potentially false and/or misleading COLFS' statements that APR can cause only non-life-threatening side effects without also disclosing the possibility that halting a medication abortion halfway may increase the risk of severe bleeding.[15] 1-ER-0024–26. Specifically, the district court correctly determined that "[t]here is not enough medical evidence to conclude with confidence that APR is safe," 1-ER-

---

[15] COLFS argues that the Side Effects Statement raises compelled speech issues. Op. Br. 33, 46-47. Not so. COLFS has chosen to affirmatively represent that APR causes only non-life-threatening side effects. 5-ER-0866. Setting aside that the statement is not supported by evidence, choosing to advertise that APR only causes non-life-threatening side effects, without disclosing that it may increase the risk of severe bleeding is inherently misleading. *See e.g.*, *Hodsdon v. Mars, Inc.* 891 F.3d 857, 863 (9th Cir. 2018) ("partial representations" can be misleading under California's consumer protection laws when "some other material fact has not been disclosed"). COLFS can either provide full information *or* can remove the potentially misleading statement.

0024, because (1) no study offered by COLFS tracked health or safety outcomes for pregnant individuals, *see supra* pp. 7-16, (2) no study establishes that APR only has non-life threatening side effects, *id.*, (3) as the 2019 Davis Study illustrates, administering mifepristone without misoprostol might cause severe bleeding, 3-ER-0366–68; 3-SER-0641–42, and (4) professional organizations have issued statements regarding the lack of evidence of safety of APR, 3-ER-0355–56; 3-SER-0623–36.

*Birth Defects Statement*. The district court also correctly determined that COLFS' statement that the rate of birth defects following APR "is less than or equal to the rate in the general population" is potentially false and/or misleading because (1) the 2018 Report is too flawed to support the statement (*see supra* pp. 11-14) and (2) the other case series are too limited in scope to support the statement. 1-ER-0026–27.

*Thousands of Lives Statement.* The record also supports the district court's determination that the representation that "thousands of lives have been saved through APR" is potentially false and/or misleading because the statement is calculated, in part, using the inherently misleading 64% success rate. 1-ER-0028. *See* 5-ER-0723 (explaining how thousands of lives are calculated); *supra* pp. 46-47 (64% success rate is inherently misleading).

The district court correctly concluded that the Enforcement Action satisfied intermediate scrutiny as a regulation of these potentially false and/or misleading advertisements. 1-ER-0029-30.

*First*, the Attorney General has a "substantial interest" in regulating potentially misleading claims about medical treatments. *See Am. Acad.*, 353 F.3d at 1108 ("There is no question that California has a substantial interest in protecting consumers from misleading advertising by medical professionals.").

*Second*, the Enforcement Action directly advances the Attorney General's interest and is narrowly tailored to achieve the ultimate goal of protecting consumers. The "fit" between the State's interest and its regulation "need not be perfect nor the single best to achieve those ends" nor must it be "the least restrictive means available." *Id.* at 1111. All that is required is that the chosen means be "one whose scope is narrowly tailored to achieve the legislative objective." *Id.*

Through the Enforcement Action, the Attorney General deployed California's consumer protection laws to address the APR Statements, which the Attorney General has determined are false and/or misleading, 6-ER-1023–25, and the Attorney General has marshalled significant evidence supporting those claims, *see supra* pp. 7-18. And the Enforcement Action is narrowly tailored, prosecuting only

eight statements without attempting to ban APR outright or prohibit all commercial speech about APR. 6-ER-1023–25.

In challenging the district court's holding, COLFS mischaracterizes the Enforcement Action as an attempt to ban all speech regarding APR. Op. Br. 59-61. COLFS, however, remains free to administer APR and speak about APR so long as it refrains from advertising in a manner that is false and/or misleading. Accordingly, the district court correctly held that the Enforcement Action satisfies intermediate scrutiny.

### 4. COLFS' Scientific Debate and Opinion Arguments Lack Merit

COLFS largely does not challenge the district court's evidentiary determinations and instead argues, incorrectly, that its statements are protected because they reflect a scientific debate regarding a matter of public concern. Op. Br. 37-47. COLFS raises two interrelated and meritless arguments.

First, COLFS claims that there is an ongoing scientific debate about APR, and so only provably false statements are unprotected by the First Amendment. Op. Br. 39-40. COLFS is wrong. Because there is no scientific evidence showing APR works, there is no "debate."[16] *See Stenehjem*, 412 F. Supp. 3d at 1151 ("the record

---

[16] The recent summary judgment order in *Bella Health & Wellness v. Weiser* is not to the contrary. --- F. Supp. 3d ---,  2025 WL 2218970 (D. Colo. 2025). In dicta, the district court observed that "the clinical efficacy of [APR] remains

(continued…)

reveals no real, serious debate within the medical profession" about APR). And in the commercial speech context, a lack of scientific evidence supporting particular claims can render them false and/or misleading without offending the First Amendment. *See, e.g., Bellion Spirits*, 7 F.4th at 1212 ("Our precedents confirm that commercial speech lacking any reliable support is properly characterized as misleading and thus may be proscribed consistent with the First Amendment."); *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 615-16 (6th Cir. 2017) (similar holding); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 486-88, 490-91 (D.C. Cir. 2015) (similar holding); *cf. Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 399 (9th Cir. 1982) (FTC "may require prior reasonable substantiation of product performance claims after finding violations of the [FTC] Act, without offending the first amendment.").

Second, COLFS, relying primarily on *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013), claims that its speech is protected because it accurately describes the purportedly nonfraudulent studies underpinning its APR advertisements. Op. Br. 40, 42-43. *ONY* is inapplicable. There, the Second Circuit addressed a medical manufacturer's claims of false advertising by another medical manufacturer in a study published in a peer-reviewed journal, noting the statements

---

debatable," thereby underscoring that COLFS' unequivocal statements to consumers are misleading. *Id.* at *1.

were "made as part of an ongoing scientific discourse about which there is considerable disagreement." 720 F.3d at 494.

In contrast, COLFS targets *consumers*, not other scientists, with its APR advertisements. 6-ER-0967. "The First Amendment ensures a robust discourse in the pages of academic journals, but it does not immunize false or misleading commercial claims." *Eastman Chem. Co. v. PlastiPure, Inc.*, 775 F.3d 230, 237 (5th Cir. 2014); *see also Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 534 (1st Cir. 2023) (*ONY* did not apply to "explanatory document" with target audience of "laypeople seeking to determine whether a certain procedure is covered by their medical insurance"). COLFS deploys its APR advertisements to consumers through its webpages and "in other contexts" 6-ER-0967—a far cry from the "peer-reviewed journals" with the "scientific public sit[ting] as jury" that *ONY* contemplated. 720 F.3d at 497. Moreover, COLFS' APR advertisements do not mention that a purported scientific debate exists. *See supra* pp. 20. That absence is glaring because COLFS' target audience consists of individuals unlikely to know about this so-called debate. *See Eastman*, 775 F.3d at 236 ("'statements [were] made without the necessary context presented by a full scientific study'").

That COLFS does not disclose this purported scientific debate in its APR advertisements underscores that its advertisements are misleading. And even if patients learn about the weakness in the scientific evidence before actually

undergoing APR, COLFS' advertisements have already harmed them. *Cf. Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("The Federal Trade Act is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."); *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 918 (2016) (UCL/FAL "are designed" "to protect consumers … by … prohibiting businesses from using false and deceptive advertising to lure consumers to shop").

COLFS' failure to disclose the purported scientific debate also renders *Bernardo* inapposite. Op. Br. 41. There, the California Court of Appeal held that Planned Parenthood's webpages explaining its position on the theory of a link between abortion and breast cancer were "statements of *opinion*." 115 Cal. App. 4th at 331, 348 (emphasis in original). Unlike here, in the headline to its webpage, Planned Parenthood was explicit that the statements were its "position" on the issue. *Id.* at 348. The webpage included studies supporting that position as well as studies supporting the existence of a link between abortion and breast cancer, and the page advised readers to "visit a qualified health care provider for personal medical evaluation, counseling, and services." *Id.* at 344-45. In contrast, COLFS makes unequivocal statements about APR's efficacy, does not inform potential patients about the significant weaknesses in the science underlying APR, and directs potential patients to contact COLFS and the APRN, not any qualified

medical provider. 5-ER-0831, 836, 864–68. As the district court correctly held,

these advertisements aim to persuade potential patients to undergo APR, not

express an opinion about a debate.[17] 1-ER-0012.

COLFS' "scientific debate" argument is meritless.

### 5. COLFS' Content and Viewpoint Discrimination Arguments Lack Merit

The district court also correctly held that COLFS was unlikely to succeed on

its argument that a hypothetical enforcement action against it would constitute

content and viewpoint discrimination in violation of the First Amendment.[18] 1-ER-

0054-55; 1-ER-0010. A law "that is 'viewpoint neutral on its face may still be

unconstitutional if not applied uniformly.'" *Waln*, 54 F.4th at 1162. "[A] plaintiff

---

[17] The other cases COLFS cites are inapposite. Op. Br. 39-41; *see Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (threatening speech); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766, 772 (2018) (compelled speech); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (defamation); *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 244 (3d Cir. 2023) (scientific studies); *Underwager v. Salter*, 22 F.3d 730, 735-36 (7th Cir. 1994) (defamation). Indeed, *Madigan v. Telemarketing Assocs., Inc.* undermines COLFS' argument. That case explained that placing the burden of proof on the government in a fraud case, as the Attorney General must bear in the Enforcement Action, ensures "sufficient breathing room for protected speech." 538 U.S. 600, 620 (2003).

[18] COLFS' content and viewpoint discrimination argument is in essence a selective enforcement claim. *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) ("We have made clear that such a claim [i.e., viewpoint discriminatory enforcement] is available, but have usually not categorized it as an 'as-applied' First Amendment challenge. Instead, we have generally classified such challenges as selective enforcement equal protection claims.").

must show that [the government's] content-discriminatory enforcement of [a statute] is the result of an intentional policy or practice." *Hoye*, 653 F.3d at 855. "[P]laintiffs are generally required to show the existence of an unconstitutional policy by extrapolating from a series of enforcement actions…in many cases a formidable task." *Id.*; *cf. Yelp, Inc. v. Paxton*, 137 F.4th 944, 954 (9th Cir. 2025) (cautioning against "read[ing] too much into…enforcement decisions…to presume bias, selective retaliation, or unconstitutional harassment"). COLFS failed to accomplish this "formidable task."

*First*, as the district court correctly held, the UCL and FAL are "general application laws" that prohibit false and/or misleading commercial speech; "they do not focus on messages in favor or against abortion." 1-ER-0055. Because the UCL and FAL "are agnostic by targeting all statements directed at consumers that are misleading…[they] are content-neutral and do not trigger strict scrutiny." *Id.*

*Second*, the district court properly rejected COLFS' claim of selective enforcement of the UCL and FAL. The Attorney General has filed a single enforcement action alleging that the APR Statements are false and/or misleading, 6-ER-1023-1025, which is insufficient to show the requisite "policy or practice." *Hoye*, 653 F.3d at 855.

*Third*, the district court appropriately rejected COLFS' argument that the Attorney General's nonenforcement of the UCL and FAL against Planned

58

Parenthood evidenced viewpoint discrimination. *See* 1-ER-0063–64. In a rehash of its free exercise argument, COLFS asserts that the Attorney General "restrict[s] *pro*-APR speech" but "exempt[s] *anti*-APR speech." Op. Br. 33. But Planned Parenthood's statements about APR are not comparable to COLFS' because Planned Parenthood's statements accurately reflect the status of the scientific evidence surrounding APR.[19] *See United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("To establish a discriminatory effect…, the claimant must show that similarly situated individuals. . .were not prosecuted."); *see supra* pp. 7-18.[20]

The Attorney General does not "label[] COLFS's speech as 'false,' 'fraudulent,' or 'deceptive' based on its topic and content of its message,'" Op. Br. 32; rather the APR Statements are misleading because they lack scientific support. *See supra* pp. 7-18, 46-51. COLFS points to the Attorney General's press releases and press conferences, in which he supports access to full reproductive care (as enshrined in the California Constitution).[21] Op. Br. 32. But "[t]he Free Speech

---

[19] COLFS also argues with respect to its free exercise claim that Planned Parenthood's statements about medication abortion are comparable. Op. Br. 50-52. For the same reasons that this argument is meritless in the free exercise context, it fails in the free speech context as well. *See supra* pp. 30-34.

[20] That three federal district courts have held that similar statements, supported by virtually identical evidence, were false and/or misleading further belies COLFS' selective enforcement claims. *See supra* pp. 17-18.

[21] To try to show the existence of a debate, COLFS points to the declarations of the People's expert as well as its own experts. Op. Br. 32 (citing 6-ER-0939–

(continued…)

Clause restricts government regulation of private speech; it does not regulate

government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467

(2009) ("A government entity has the right to 'speak for itself'…'is entitled to say

what it wishes,'…and to select the views that it wants to express."); *cf. Yelp*, 137

F.4th at 956 (courts should not "treat[] the commonplace stridency of prosecutorial

press releases as synonymous with *Younger* bad faith"). The question is the

application of the Attorney General's power in enforcement actions, not the

Attorney General's statements. *See* 6-ER-0939-941; 6-ER-0960-963; *see also*

*Hoye*, 653 F.3d at 855.

　　None of COLFS' cited cases speak to viewpoint discriminatory selective

enforcement. Op. Br. 31-33; *see Free Speech Coal., Inc. v. Paxton*, 606 U.S. ---,

145 S. Ct. 2291 (2025) (statute requiring age verification before visiting

pornography websites); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024)

(explicit threat of enforcement actions against regulated entities if they refused to

disassociate from NRA); *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 159

(2015) (ordinance placing greater restrictions on signs "directing the public to a

meeting of a nonprofit group"); *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011)

(private tort action over protests at military funeral); *R.A.V. v. City of St. Paul*, 505

---

941; 6-ER-0960–63; 3-ER-0339–69; 2-ER-0069–74). The declarations in actuality
show that there is a lack of scientific evidence supporting the APR Statements.
Even COLFS' expert characterized APR as a "possibility." 5-ER-0886.

U.S. 377, 387 (1992) (ordinance barring display of symbol that "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender"); *Adams v. County of Sacramento*, 143 F.4th 1027, 1035 (9th Cir. 2025) (government employee's termination for racist text messages); *United States v. Alvarez*, 567 U.S. 709, 716-17 (2012) (law criminalizing false claims of receipt of military honors).

This Court should affirm the district court's holding that COLFS was unlikely to succeed on the merits of its free speech claim.

## B. The District Court Correctly Held that COLFS Is Not Suffering Irreparable Harm

Because COLFS failed to show a likelihood of success on any claim, this Court need not address the remaining preliminary injunction factors. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011). COLFS, however, also has not satisfied the remaining preliminary injunction requirements. *See id.* at 776 ("proving the likelihood of [a First Amendment] claim is not enough to satisfy *Winter*").

The district court correctly held that COLFS failed to establish irreparable harm because (1) COLFS failed to establish a likelihood of success on its constitutional claims and did not "aver any other injury that could constitute irreparable harm;" and (2) COLFS waited more than a year after the Enforcement Action was filed before seeking a preliminary injunction. 1-ER-0030. COLFS

states in a single sentence that deprivation of its constitutional rights constitutes irreparable injury, Op. Br. 61, but COLFS has not demonstrated a likelihood of success on its constitutional claims, *see supra* pp. 37-61. And COLFS still offers no justification for its delay, undercutting its argument for the need for interim relief. *See Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)("'A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights,'" but "'[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.'").

### C. The District Court Correctly Held that the Balance of the Equities and the Public Interest Favor the Attorney General

The district court correctly held that "if the preliminary injunction were granted, [the Attorney General] would be unable to protect the public against false and/or misleading statements that advertise a medical procedure that has not been approved by the FDA." 1-ER-0031. COLFS argues in response only that "[w]henever a party has established it is likely to succeed on the merits of a constitutional claim, the remaining preliminary injunction factors almost always favor enjoining the offending law." Op. Br. 61. But COLFS failed to show a likelihood of success on the merits. *See supra* pp. 37-61.

The balance of equities and the public interest thus tip sharply in favor of the Attorney General. "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers). COLFS, if successful, would prohibit the Attorney General from using California's consumer protection laws against false and/or misleading statements in advertisements for a medical procedure. *Cf. Pearson v. Shalala*, 164 F.3d 650, 656 (9th Cir. 1999) ("[T]he government's interest in preventing consumer fraud/confusion may well take on added importance in the context of a product…that can affect the public's health."). Accordingly, the district court correctly held that this factor supports denial of COLFS' preliminary injunction request.

## CONCLUSION

This Court should affirm the district court's order dismissing COLFS' free exercise, substantive due process, and "right to receive information" claims and its order denying COLFS' preliminary injunction motion.

Dated: August 13, 2025          Respectfully submitted,

*s/ Erica Connolly*

ROB BONTA
  *Attorney General of California*
NELI N. PALMA
  *Senior Assistant Attorney General*
KATHLEEN BOERGERS
KARLI EISENBERG
  *Supervising Deputy Attorneys General*
ERICA CONNOLLY
LAUREN ZWEIER
HAYLEY PENAN
  *Deputy Attorneys General*

## STATEMENT OF RELATED CASES

The following related case is pending: *National Institute of Family and Life Advocates, Inc., et al., v. Bonta*, No. 25-2287.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated           .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                        **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                 *Rev. 12/01/22*